# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

SOUTHEASTERN SYNOD OF THE
EVANGELICAL LUTHERAN CHURCH
IN AMERICA; GARRETT CAUSEY,
*individually and on behalf of a class of
similarly situated persons*; and JOHN DOE,
*individually and on behalf of a class of
similarly situated persons*,

           Plaintiffs,

    v.

STEVEN R. FINNEY; BARRY P.
STAUBUS; DAN E. ARMSTRONG;
JIMMY DUNN; RYAN DESMOND;
CHARME P. ALLEN; DAVE CLARK;
JARED EFFLER; RUSSELL JOHNSON;
STEPHEN HATCHETT; COTY WAMP;
COURTNEY LYNCH; BRYANT C.
DUNAWAY; CRAIG NORTHCOTT;
JASON LAWSON; JENNINGS H. JONES;
ROBERT J. CARTER; RAY WHITLEY;
ROBERT J. NASH; GLENN FUNK;
STACEY EDMONSON; BRENT
COOPER; RAY CROUCH; NEIL
THOMPSON; MARK DAVIDSON; JODY
PICKENS; COLIN JOHNSON;
FREDERICK AGEE; DANNY
GOODMAN JR.; STEVE MULROY;
CHRIS STANFORD; and HANS
SCHWENDIMANN, *in their official
capacities as the district attorneys general
of Tennessee*,

           Defendants.

**Case No.: _____**

**CLASS ACTION COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

1

# INTRODUCTION

1.     On May 27, 2025, Tennessee Governor Bill Lee signed Senate Bill 392 into law. *See* 2025 Tenn. Pub. Acts, ch. 424. Section 5 of that legislation creates a new state immigration crime for "human smuggling," which will be codified at Tennessee Code § 39-17-118 (hereinafter, "Section 5"). Set to go into effect on July 1, 2025, Section 5 is unconstitutional in multiple respects. It violates the Supremacy Clause because it is preempted by federal law, and it violates the Fourteenth Amendment because it is impermissibly vague. The law also infringes churches' First Amendment rights to free exercise of religion and religious association.

2.     Section 5 threatens to put thousands of Tennesseans at risk of felony prosecution simply because they provide shelter to a vaguely defined category of immigrants. The law makes it a felony for any "person," acting "for the purpose of commercial advantage or private financial gain," to "[i]ntentionally conceal[], harbor[], or shield[] from detection" "an individual that the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement."[1]

3.     Significantly, Section 5 defines the term "harbor" to include merely "provid[ing] shelter to" an individual. "Shelter" is undefined. As a result, the law criminalizes the provision of shelter even without any intent to hide or conceal an individual from law enforcement or immigration authorities. Section 5 thus purports to criminalize a broad range of innocuous everyday activities that involve providing shelter to immigrants. The law appears to make it a

---

[1] Although there is no longer any such bureau, *see* 72 Fed. Reg. 20,131 (Apr. 20, 2007), the law's drafters presumably meant to refer to U.S. Immigration and Customs Enforcement ("ICE").

2

crime for a landlord to rent an apartment to immigrants who entered or remained in the United States unlawfully, according to ICE; for parents to provide housing to an undocumented child who helps pay the bills; for a charity to provide shelter to undocumented immigrants, if the charity receives donations or grants to support that work; and for a church to host such immigrants within its building for worship, a potluck, an English-as-a-second language class, or a know-your-rights training, if the church receives donations to support that work.

4.     Other aspects of Section 5's unclear phrasing expand its scope even further. The law is written in a way that could sweep in all manner of immigrants—even those who currently have lawful status in the United States. It applies to people who "illegally entered or remained in the United States," as determined by ICE. The use of past tense seems to extend the law to cover immigrants who previously entered or at some point remained in the country illegally, but who now have lawful status. And it is unclear what it means for ICE to "determine[]" that an individual entered or remained in the country illegally. As a general matter, ICE is a law enforcement agency that is not responsible for conclusively determining whether most immigrants unlawfully entered or are unlawfully present.

5.     Section 5 is preempted by federal law. The federal government has exclusive authority to regulate immigration. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). Through the Immigration and Nationality Act ("INA"), Congress has exercised that power to enact an exhaustive framework governing every aspect of the immigration system. 8 U.S.C. § 1101 *et seq*. That framework includes provisions regulating the concealing, harboring, and transporting of noncitizens. 8 U.S.C. § 1324(a)(1)(A)(i)-(v). The federal framework is comprehensive and

3

carefully balanced. It does not permit supplementation through state immigration laws, including those governing the transport and harboring of noncitizens.

6.     Section 5 is also unconstitutionally vague. Tennesseans will be unable to know which immigrants fall within the law's terms. A landlord, homeless shelter, or church has no way to figure out whether ICE has determined that an individual, at any time in the past, entered or remained in the country unlawfully. Nor is it clear what conduct constitutes providing shelter. That concept could cover everything from overnight accommodations, to a day shelter providing a warm, dry place during a bad storm, to an educational program that lasts a few hours and occurs inside.

7.     As applied to Plaintiff Southeastern Synod of the Evangelical Lutheran Church in America, Section 5 also violates the First Amendment. The Synod and its churches, pastors, staff, and congregations provide a number of ministries, including shelter, to people regardless of their immigration status, and they do so as an expression of their faith. By burdening these religious practices without substantial justification, and by excepting certain secular activities but not comparable religious activities, Section 5 impermissibly infringes on the Synod's First Amendment rights to religious exercise and association.

8.     The Synod, as well as a landlord and a father proceeding individually and on behalf of a class of all those similarly situated, bring this lawsuit to challenge the constitutionality of Section 5 and to stop the law from inflicting imminent irreparable harm on them and on communities throughout Tennessee. Plaintiffs seek declaratory and injunctive relief to bar enforcement of this unconstitutional law.

4

## JURISDICTION AND VENUE

9. The Court has jurisdiction under the United States Constitution and 28 U.S.C. §§ 1331 and 1343.

10. Venue is proper in this District under 28 U.S.C. § 1391(b). Several Defendants reside in this District, and all Defendants reside in Tennessee. In addition, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

11. Plaintiff **Southeastern Synod of the Evangelical Lutheran Church in America** is a Christian body composed of 160 congregations across Alabama, Georgia, Mississippi, and Tennessee. Its vision, based on Ephesians 4:12, is "to equip, empower, and engage God's people to love and serve the world." For decades, the Evangelical Lutheran Church in America ("ELCA") has advocated for the rights of immigrants. The denomination's social message on immigration is grounded in the call to welcome the stranger in Matthew 25:35. The social message recognizes and rejoices in the contributions of newcomers in the church and the country and calls for the denomination to advocate for immigration, refugee, and asylum laws that are fair and generous.

12. In 2015, the ELCA adopted the AMMPARO Strategy to Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities. AMMPARO is a holistic, whole church commitment by the ELCA, as a church in the world, to accompany migrant families today and in the future. As part of that strategy, the ELCA has committed to uphold and guarantee basic human rights and safety of migrant children and their families; address the root causes of migration around the world and the treatment of migrants in transit; work toward just and humane policies affecting migrants in and outside the United States; and engage as a church body with all

5

of its companions, affiliates, and partners to respond to the migration situation and its causes and to advocate for migrant children and their families. As siblings in Christ, the ELCA is called to bear witness to the conditions affecting so many communities and to work to find solutions that will acknowledge the humanity in all of God's children.

13. The ELCA is also a sanctuary denomination. This means that the ELCA has declared that walking alongside immigrants and refugees is a matter of faith. In baptism, Lutherans are brought into a covenantal relationship with Jesus Christ that commits them to strive for justice and peace in all the earth. Following the example of Martin Luther, the ELCA believes that advocacy is a crucial expression of baptismal identity. As a church, the ELCA has advocated for stopping the detention of children and families, spoken out against family separation, sought a pathway to citizenship for community members who have lived in the United States for many years, and taken steps to address the root causes of migration in a way that honors the humanity in people who must flee their home countries.

14. On January 28, 2025, ELCA Presiding Bishop Rev. Elizabeth A. Eaton issued a statement addressing recent actions by the federal government relating to immigration. Bishop Eaton explained that she had heard about families frightened of being torn apart and from congregations fearful that their churches can no longer offer safety or support to their immigrant neighbors. The statement recognized that nations have the responsibility to protect their borders and safeguard their communities. At the same time, Bishop Eaton reaffirmed the ELCA's commitment that just policies must include recognition of the humanity of immigrants without status, respect for the dignity of those at the border, and refuge for displaced people. to the ELCA,

6

the Scriptures are clear: Christians are called to see anew the image of God in their immigrant neighbors.

15.     The Southeastern Synod lives out these commitments not only in word, but also in deed. Its churches within Tennessee provide numerous ministries that serve the immigrant community, including undocumented immigrants. The Synod has churches that provide housing within their buildings to asylum seekers, churches that host day shelters that provide food and services to people regardless of immigration status, churches that resettle refugees and asylum seekers, churches that provide English-as-a-second-language classes, churches that run soup kitchens and food pantries, churches that provide rental assistance and help connect immigrants in need to low-cost housing, and churches that host events like weddings and funerals for immigrant communities regardless of immigration status.

16.     Recently, the Synod has also taken an active role in helping its congregations, including pastors, staff, and church members, understand how to prepare for the possibility of immigration raids, including by hosting know-your-rights trainings. The Synod has provided training materials for use by congregations in Tennessee. Those materials encourage congregations that may be impacted by raids to prepare for a potential encounter with immigration enforcement in several ways, including by asserting Fourth Amendment rights to protect private spaces within church buildings from unwarranted intrusion. Congregations are directed to develop a written response policy and preparedness plan in advance, to designate an authorized person to review warrants, to understand the difference between public and private areas and to have appropriate signage, to train staff and volunteers on how to respond to ICE requests, to document all interactions with immigration enforcement, and to connect with immigration response networks

7

in their areas. These trainings do not constitute formal legal advice, and they do not encourage anyone to break the law. But they do provide church leaders with information on how to assert their rights and protect congregants in the event of a raid.

17.     Several Tennessee churches within the Synod provide ministries to immigrants that could be covered by the new "human smuggling" law, potentially subjecting pastors, staff, and congregants to criminal prosecution.

18.     For instance, one church in Middle Tennessee has been engaged in immigrant-focused ministries for more than a decade. The pastor of this church says that providing shelter to those in need is central to their call to God and what it means to live out their faith. They would be hard pressed to stop these ministries, even if it meant going to jail.

19.     Specifically, the church provides sanctuary to immigrants in need, regardless of their immigration status. For more than a year, two Venezuelan asylum seekers lived in the church building. The church was not hiding these immigrants, but it was providing them shelter. The church received donations earmarked to support this ministry. Similarly, the church owns a small house next door to the church building, and the church has used this house intermittently to provide shelter to refugees, mostly recently to an Afghan family. In making these spaces available, the church does not check anyone's papers. And the church intends to continue providing shelter to immigrants in this way going forward. This church also helps with housing in other ways. It has held donation drives to help furnish apartments for immigrants and has also provided rental assistance.

20.     This church also hosts private events for members of the community, including weddings and birthday parties. Given the demographics of the area, many of the people who use

8

the church's space are immigrants. The immigrants who host these sorts of events at the church generally provide a donation in return for use of the space.

21.     Another organization within the Synod, which is based in Tennessee, predominantly serves immigrants from Africa. This organization has offered a variety of refugee resettlement services, including providing basic household items to families resettling in the community, hosting English-as-a-second-language classes, helping parents register their children for school, and connecting immigrants with healthcare and other public benefits. In the course of providing this assistance, the pastor who runs the organization has learned that some of those served do not have legal status. But the organization continues to host those individuals for Bible studies, meals, and other community events.

22.     This organization has also provided know-your-rights trainings, in connection with a local nonprofit, to teach members of its community how to prepare for and respond to potential immigration raids. During these trainings, members discuss their plans for what to do in case of an immigration raid either at members' homes or at the organization.

23.     Another congregation in Middle Tennessee engages in community outreach as part of its mission to love God, love others, and serve both. The congregation supports a food pantry next door to the church building that serves the community regardless of immigration status. The church receives donations of both food and money to support this ministry. In addition, the same church serves as a designated safe place for school children in the case of an emergency. In a tornado or other natural disaster, the church would provide shelter to those school children regardless of their immigration status—even if the pastor knew that a child was undocumented.

9

24.     Finally, another church in Middle Tennessee has a Monday open-door policy, which entails welcoming everyone in the community into the church building on Monday mornings and providing them basic services. During this time, the church serves breakfast and coffee. In partnership with a local nonprofit, the church helps connect those who drop in to basic resources, including housing. The church receives donations, including in the form of gift cards, to support this ministry.

25.     Plaintiff **Garrett Causey** is a resident of Murfreesboro, Tennessee. Through an LLC, he owns a home in the Antioch neighborhood of Nashville, Tennessee, that he uses as a rental property. His current tenant is an immigrant from Guatemala who has been renting the home for the past four years, with two years remaining on the lease. When he moved in, the tenant disclosed that he did not have a Social Security number, which Causey interpreted to mean that the tenant did not have lawful status in the United States. Since then, Causey understands that the tenant has obtained some form of lawful status.

26.     Although the tenant is the only person on the lease, Causey knows based on his annual inspections of the property that other individuals also live in the house and help pay the rent. Those other individuals are Spanish speakers, and, based on the demographics of the neighborhood, it is possible that some of them may be undocumented.

27.     Causey intends to continue using the house in Nashville as a rental property in the future. It is important to him to rent out the property to tenants regardless of immigration status. But he fears prosecution under the new "human smuggling" law for providing shelter, in exchange for rent money, to a tenant he knows was previously undocumented, as well as other occupants whom he suspects may be undocumented.

10

28.     Plaintiff **John Doe** is a resident of Tennessee and an immigrant from Mexico. He has been living in the United States for many years, having come to this country for the first time almost 40 years ago. After many years of struggle and difficulty seeking lawful status in the United States, he finally became a lawful permanent resident a few months ago. Together with his wife, he owns a home in Tennessee.

29.     Doe's oldest daughter and her husband live with Doe in his home. Doe's son-in-law is an asylum seeker who unlawfully entered the United States. Because Doe's daughter is an adult, she and her husband insist on paying rent. Doe believes that families belong together and that is what matters most.

30.     Doe fears that he could be prosecuted under the "human smuggling" law for providing shelter to his daughter and son-in-law because they are paying rent and because Doe knows his son-in-law's immigration status. He worries about the safety and security of his family.

31.     Defendants are Tennessee's elected district attorneys general. Specifically, they are Steven R. Finney (first judicial district), Barry P. Staubus (second judicial district), Dan E. Armstrong (third judicial district), Jimmy Dunn (fourth judicial district), Ryan Desmond (fifth judicial district), Charme P. Allen (sixth judicial district), Dave Clark (seventh judicial district); Jared Effler (eighth judicial district), Russell Johnson (ninth judicial district), Stephen Hatchett (10th judicial district), Coty Wamp (11th judicial district), Courtney Lynch (12th judicial district), Bryant C. Dunaway (13th judicial district), Craig Northcott (14th judicial district), Jason Lawson (15th judicial district), Jennings H. Jones (16th judicial district), Robert J. Carter (17th judicial district), Ray Whitley (18th judicial district), Robert J. Nash (19th judicial district), Glenn Funk (20th judicial district), Stacey Edmonson (21st judicial district), Brent Cooper (22nd judicial

11

district), Ray Crouch (23rd judicial district), Neil Thompson (24th judicial district), Mark Davidson (25th judicial district), Jody Pickens (26th judicial district), Colin Johnson (27th judicial district), Frederick Agee (28th judicial district), Danny Goodman Jr. (29th judicial district), Steve Mulroy (30th judicial district), Chris Stanford (31st judicial district), and Hans Schwendimann (32nd judicial district).

## FACTS

### Federal Immigration Law

32.     The federal government has exclusive power over immigration. *See, e.g.*, *Arizona*, 567 U.S. at 394-95.

33.     Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the INA. *See* 8 U.S.C. § 1101 *et seq.*

34.     Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. The INA was originally enacted in 1952, and Congress has frequently amended the relevant provisions, including by passing particularly significant legislation in 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other acts modifying the immigration regime in countless ways.

35.     The federal scheme specifically addresses which conduct is punishable as unlawful transport and harboring of noncitizens. As to immigrants who unlawfully enter or remain in the United States, the statute penalizes only transport or harboring that facilitates those immigrants' unlawful conduct. *See* 8 U.S.C. § 1324(a)(1)(A)(ii) (prohibiting "transport[]" only if it is "in furtherance of such violation of law"); *id.* § 1324(a)(1)(A)(iii) (requiring that the person

12

"conceal[], harbor[], or shield[] from detection"). The Sixth Circuit has interpreted "harbor" in the federal statute to mean "conduct that tends to substantially facilitate noncitizens remaining in the country illegally and prevent authorities from detecting the noncitizens' presence." *United States v. Zheng*, 87 F.4th 336, 343 (6th Cir. 2023); *see also Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 277 (4th Cir. 2024) ("[T]he statute only applies to those who intend in some way to aid an undocumented immigrant in hiding from the authorities" and thus does not cover "merely entering a lease agreement with an undocumented immigrant.")

36.     The federal statute contains detailed evidentiary rules for proving transport and harboring crimes in federal court. *See* 8 U.S.C. § 1324(b)(3). It also explicitly limits the states' role in the enforcement of federal transport and harboring laws to a specified circumstance: making arrests for violations of its criminal provisions. *See* 8 U.S.C. § 1324(c).

37.     In light of this comprehensive scheme, federal courts of appeals have consistently held that Congress has occupied the field of immigration regulation, leaving no room for the states to regulate. *See Arizona*, 567 U.S. 387; *Ga. Latino All. for Hum. Rts. v. Governor of Georgia* ("*GLAHR*"), 691 F.3d 1250, 1263-65 (11th Cir. 2012); *United States v. Alabama*, 691 F.3d 1269, 1285-87 (11th Cir. 2012); *United States v. South Carolina*, 720 F.3d 518, 530-32 (4th Cir. 2013); *Lozano v. City of Hazleton*, 724 F.3d 297, 314-17 (3d Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023-26 (9th Cir. 2013).

**Section 5**

38.     Section 5 is Tennessee's own version of the transport-and-harboring federal crime. Because it intrudes on an area of exclusive federal authority, it is field preempted. *Arizona*, 567 U.S. at 399. In addition, Section 5 is conflict preempted because it stands as an obstacle to the

13

accomplishment of the purposes and objectives of the federal regime. *See GLAHR*, 691 F.3d at 1265-67. Section 5 is also unconstitutionally vague because "it fails to give ordinary people fair notice of the conduct it punishes" and is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). As to the Southeastern Synod, Section 5 infringes on its First Amendment rights of freedom of religious exercise and of association.

39.     On January 22, 2025, Tennessee Governor Bill Lee presented his administration's "agenda on illegal immigration" for a special session of the Tennessee General Assembly.[2] The governor indicated that Tennessee was "heeding the call" from President Trump to "play a major role in … enforc[ing] the immigration laws."[3] Accordingly, the governor proposed a "comprehensive framework to strengthen immigration enforcement across Tennessee."[4]

40.     Section 5 was a key component of this proposed state crackdown on immigration. The sponsor of the bill in the Tennessee House, Rep. Chris Todd (R-Madison County), stated his view that "President Joe Biden failed the American people for four years when he opened our border and allowed millions of illegal immigrants to move throughout our nation."[5] Given that alleged failure by the prior administration, Rep. Todd believed the state needed to step in. "Not only has his dereliction of duty placed an immense financial and public safety burden on states,

---

[2] *See* Press Release, Office of the Governor, Gov. Lee, Legislative Leadership Present Agenda on Illegal Immigration Ahead of Special Session (Jan. 22, 2025), https://www.tn.gov/governor/news/2025/1/22/gov--lee--legislative-leadership-present-agenda-on-illegal-immigration-ahead-of-special-session.html.

[3] *Id.*

[4] *Id.*

[5] *See* Press Release, Rep. Chris Todd's Office, Proposed TN Bill Seeks to Criminalize Harboring Illegal Immigrants, Human Smuggling (Mar. 21, 2025), https://www.wbbjtv.com/2025/03/21/proposed-tn-bill-seeks-to-criminalize-harboring-illegal-immigrants-human-smuggling.

14

but it also helped fuel a heartbreaking human smuggling and trafficking crisis affecting men, women and children. This legislation will improve public safety in Tennessee by protecting victims, prosecuting the evil people driving the multi-billion-dollar industry and holding people accountable for harboring illegal immigrants." *Id.*

41. Section 5 creates a new state felony of "human smuggling" that regulates the same field as the federal statute—transport and harboring of immigrants. In certain respects, the language of Section 5 mirrors that of its federal counterpart. Section 5 applies to any person who, "for the purpose of commercial advantage or private financial gain" either (1) "[k]nowingly transports an individual with intent to conceal the individual from a law enforcement officer or a federal immigration officer, while knowing the individual has illegally entered or remained in the United States, as determined by" ICE, or (2) "[i]ntentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection, an individual that the person knows has illegally entered or remained in the United States, as determined by" ICE. 2025 Tenn. Pub. Acts, ch. 424, p. 2, § 5(a)(1)-(2).

42. Unlike the federal statute, which includes no definition of the word "harbor," Section 5 defines "harbor" to include either "*provid[ing] shelter to or* conceal[ing] the whereabouts of an individual." *Id.* § 5(d) (emphasis added) That definition means that merely providing shelter, even without concealing the whereabouts of an individual, is sufficient to violate the statute. That makes the state statute substantially broader than federal law: Unlike the federal scheme, *see Zheng*, 87 F.4th at 343, Section 5 does not require that harboring prevent authorities from detecting an immigration violation to be a crime.

15

43.     Other unique features of Section 5 both conflict with the federal scheme and render it vague. Section 5 purports to apply to a category of immigrants not recognized in federal statutes: those who "illegally entered or remained in the United States, as determined by" ICE. That provision departs from federal immigration law in several ways. The federal statute has been interpreted to require ongoing violations of immigration law. *See United States v. Franco-Lopez*, 687 F.3d 1222, 1227-28 (10th Cir. 2012); *United States v. Aguilar*, 883 F.2d 662, 676-77 (9th Cir. 1989). Section 5, by contrast refers to anyone who "has illegally entered or remained" in the United States in the past, even if they now have legal status. Accordingly, the state law may apply to someone providing shelter to an individual who previously entered the country illegally but now has lawful status, a common occurrence under the many provisions allowing for immigration benefits and relief from removal in federal immigration law.

44.     In addition, it is unclear what it means for a criminal defendant to know an individual's immigration status "as determined by" ICE. Does the defendant need to know specifically that ICE made a determination about the person's immigration status, or is it sufficient for the defendant to know the person's immigration status and for that status to have been determined by ICE? What if United States Customs and Border Protection determines that someone entered illegally? Or if ICE determines that someone remained illegally but a court later disagrees in the context of a removal proceeding? Section 5 provides no answers.

45.     Section 5's exceptions confirm its broad scope. The law contains only two narrow exceptions: for a licensed attorney who "provide[s] bona fide legal advice to an individual" and for a person who "provide[s]" certain "healthcare services or assistance to an individual." The

existence of those exceptions suggests that the statute's definition of "harbor" would otherwise be broad enough to cover such activities.

46. Although the state law provides those two exceptions for secular activities, it provides no exception for comparable religious activities.

47. Section 5 includes an aggravated version of "human smuggling" that is also different from federal law. The aggravated version is a Class A felony and applies if the "victim of the offense was less than thirteen (13) years of age at any time during the person's course of conduct."

48. During legislative debates, opponents of the bill identified these problems. One state Senator raised the concern that the law could apply to "a church that is housing an asylum seeker." *Sen. Floor Debate on S.B. 392*, 2025 Leg., 114th Sess. (Tenn. 2025) [hereinafter *Senate Floor Debate*], at 2:35:02-36:11 (statement of Sen. Raumesh Akbari). Likewise, a state Representative argued the bill would apply to a church if it "takes in anyone, gives them assistance, gives them food, gives them shelter." *House Floor Debate on H.B. 322*, 2025 Leg., 114th Sess. (Tenn. 2025) [hereinafter *House Floor Debate*], at 48:44-52:40 (statement of Rep. John Ray Clemmons).

49. In response, the sponsors of the bill offered no clear guidance. For instance, Senate sponsor Brent Taylor stated that the legislation was targeted at people who were "looking to shield [noncitizens] from immigration authorities or law enforcement authorities" and agreed that the focus was on "those people who do it for profit," not "the church charities, charities, healthcare clinics that take care of people." *Hearing on S.B. 392 Before the Sen. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 3:40:56-41:07 (statement of Sen. Todd Gardenhire); *id.* at 3:41:08-

17

42:04 (statement of Sen. Brent Taylor). But he later stated that the bill *would* apply to charitable organizations if they were "harboring or hiding or shielding" noncitizens. *Id.* at 3:44:00-34.

50.     Likewise, House sponsor Chris Todd explained that a person who was "harboring, *meaning housing*, or hiding or assisting another in harboring or hiding those individuals that are here illegally" would be committing a crime and that churches were protected from enforcement only so long as they were "providing services that [were] outside the definitions in this bill." *Hearing on H.B. 322 Before the H. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 1:03:31-58 (statement of Rep. Chris Todd); *House Floor Debate* at 34:41-58 (statement of Rep. Chris Todd).

51.     Tennessee's state immigration crime of "human smuggling" thus intrudes into an area of exclusive federal control, differs markedly from the carefully calibrated federal law governing immigrant transport and harboring, is so vague that it fails to provide adequate notice of what it criminalizes, and, as applied to religious organizations, infringes the rights to free exercise and association.

## CLASS ACTION ALLEGATIONS

52.     Individual Plaintiffs Garrett Causey and John Doe bring their claims in this action under Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

53.     Individual Plaintiffs seek to represent the following class: all persons in Tennessee who (1) provide shelter to immigrants who entered or remained in the United States unlawfully "as determined by" ICE and (2) receive some form of financial benefit in connection with providing that shelter.

18

54. The proposed class satisfies the numerosity requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Hundreds if not thousands of Tennesseans will be subject to arrest and prosecution under Section 5 for providing shelter to noncitizens.

55. The proposed class satisfies the commonality requirements of Rule 23(a)(2). There are questions of law common to the class, including whether Section 5 is preempted by federal immigration law and whether Section 5 is unconstitutionally vague.

56. The proposed class satisfies the typicality requirements of Rule 23(a)(3) because the claims of the representative Individual Plaintiffs are typical of the claims of the class. All members of the class, including the representative Plaintiffs, face the same injuries of arrest and prosecution for human smuggling, and all members of the class raise the same argument that Section 5 is both preempted by federal law and unconstitutionally vague.

57. The proposed class satisfies the adequacy requirements of Rule 23(a)(4). The representative Plaintiffs seek the same relief as the other members of the class: an order declaring Section 5 unconstitutional and an injunction preventing Defendants from enforcing Section 5. In defending their rights, the representative Plaintiffs will defend the rights of all proposed class members fairly and adequately.

58. The proposed class is represented by experienced attorneys from the Institute for Constitutional Advocacy and Protection at Georgetown Law, the American Immigration Council, and the Tennessee Immigrant & Refugee Rights Coalition. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens, including cases asserting very similar claims to the claims asserted here.

19

59.     The proposed class also satisfies Rule 23(b)(2). Defendants will act on grounds generally applicable to the class by subjecting them to arrest and prosecution under Section 5. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### Count I
### Equitable Claim for Violation of Supremacy Clause
### All Plaintiffs

60.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

61.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

62.     The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

63.     The federal government has exclusive power over immigration law and policy. *Arizona*, 567 U.S. at 394-95. Congress has created a comprehensive system of federal laws regulating the transport and harboring of immigrants in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(i)-(v).

20

64.     Section 5 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

65.     Section 5 further violates the Supremacy Clause because it conflicts with federal laws, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

66.     Plaintiffs have no adequate remedy at law. They may sue in equity to obtain injunctive relief against Section 5.

**Count II**
**42 U.S.C. § 1983 – Due Process Clause of the Fourteenth Amendment**
**All Plaintiffs**

67.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

68.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

69.     Section 5 deprives people of due process of law, in violation of the Due Process Clause of the Fourteenth Amendment.

70.     Section 5 is impermissibly vague.

71.     "The void-for-vagueness doctrine requires that [a] statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States*

*v. Kerns*, 9 F.4th 342, 351 (6th Cir. 2021) (quoting *United States v. Farah*, 766 F.3d 599, 614 (6th Cir. 2014)) (alteration in original).

72.     Section 5 is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited and because it authorizes and encourages arbitrary and discriminatory enforcement.

73.     Section 5 exposes a person to felony charges if she "provide[s] shelter to" an individual she "knows has illegally entered or remained in the United States, as determined by" ICE. The Due Process Clause does not permit subjecting a person to criminal penalties based on those vague terms because they are indeterminate, incoherent, and amorphous.

74.     Absent an injunction, Section 5's vague terms expose Plaintiffs and thousands of other Tennesseans to a credible threat of prosecution without providing them fair notice of what conduct the statute proscribes.

75.     Plaintiffs seek relief on this claim directly under the Constitution and under 42 U.S.C. § 1983.

### Count III
### 42 U.S.C. § 1983 – First Amendment Free Exercise of Religion
### Plaintiff Southeastern Synod of the Evangelical Lutheran Church in America

76.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

77.     The First Amendment, as incorporated against the states, provides that the State "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

78.     Section 5 unlawfully burdens the free exercise of religion by the Synod, its churches, and their pastors, staff, and congregants, in violation of the First Amendment.

22

79.     The First Amendment's Free Exercise Clause provides that the government may not "burden[] [a] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable'" unless the government can show that the policy satisfies strict scrutiny. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879-81 (1990)).

80.     Section 5 burdens the sincere religious practices of the Synod, its churches, and their constituencies. "The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* at 524.  As the Supreme Court recently reaffirmed, performing services for others can be as core to religious exercise as "worship, proselytization, or religious education." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, No. 24-154, 605 U.S. --- , 2025 WL 1583299, at *8 (U.S. June 5, 2025).

81.     As an expression of their faith and practice of their religion, the Synod, its churches, and their constituencies provide a number of services to people regardless of their immigration status, including undocumented immigrants. These services include providing housing, day shelters, resettlement programs, rental assistance, and other forms of aid. Section 5 makes many of these services unlawful, significantly burdening the sincere free exercise of religion of the Synod and its constituencies.

82.     Section 5 is not a neutral and generally applicable law, and thus it triggers strict scrutiny, because it exempts secular activities—legal representation and healthcare services—but not religious ones from its prohibitions. "[G]overnment regulations are not neutral and generally

applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original); *Kennedy*, 597 U.S. at 526 ("A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way[.]'") (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021)). "In other words, a regulation that burdens religiously motivated conduct will 'trigger strict scrutiny' even if [it] contains just *one* comparable secular exception to its restrictions." *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 303 (6th Cir. 2023) (Murphy, J., concurring) (quoting *Tandon*, 593 U.S. at 62) (emphasis in original).

83.     Section 5 does not survive strict scrutiny. The burden is on the defendants to establish that the law is narrowly tailored to further a compelling government interest, which it cannot do.

84.     Plaintiffs seek relief on this claim directly under the Constitution and under 42 U.S.C. § 1983.

**Count IV**
**42 U.S.C. § 1983 – First Amendment Freedom of Association**
**Plaintiff Southeastern Synod of the Evangelical Lutheran Church in America Only**

85.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

86.     The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta* (*APF*), 594 U.S. 595, 606 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).

24

87.     Section 5 unlawfully interferes with Plaintiff Southeastern Synod of the Evangelical Lutheran Church in America's freedom to associate for religious purposes.

88.     "[T]he Supreme Court 'has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (quoting *Roberts*, 468 U.S. at 618). Indeed, the First Amendment provides "special solicitude" to freedom of association for religious purposes. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). "As [courts] give deference to an association's assertions regarding the nature of its expression, [courts] must also give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).

89.     Section 5 impairs the Synod's freedom of association by restricting its ability to provide services, including shelter, to people based on their immigration status.

90.     Once a plaintiff shows any interference with their First Amendment right to associate, the burden shifts to the government to demonstrate that its restrictions are narrowly tailored to an important or compelling governmental interest. *APF*, 594 U.S. at 611, 617.

91.     Section 5 is not narrowly tailored to an important or compelling government interest.

92.     Plaintiff seeks relief on this claim directly under the Constitution and under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court certify a class, enter judgment in their favor, and grant the following relief:

a.    A declaration that Section 5 of Tennessee Senate Bill 392 is unconstitutional and invalid on its face;

b.    A declaration that Section 5 is unconstitutional and invalid as applied to Plaintiffs;

c.    A preliminary and permanent injunction enjoining Defendants from enforcing Section 5 in its entirety;

d.    An award to Plaintiffs of reasonable costs and attorneys' fees; and

e.    Such other and further relief that this Court may deem just and proper.

June 20, 2025

Michelle Lapointe*
Suchita Mathur*
Chris Opila*
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street NW, Suite 500
Washington, DC 20036
Phone: (202) 507-7523
Fax: (202) 742-5619
mlapointe@immcouncil.org
smathur@immcouncil.org
copila@immcouncil.org

*/s/ Michael C. Holley*
Michael C. Holley
Spring Miller
TENNESSEE IMMIGRANT & REFUGEE RIGHTS
COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
spring@tnimmigrant.org

Rupa Bhattacharyya*
Gregory Briker*
Elizabeth Cruikshank*
William Powell*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6629
Fax: (202) 661-6730
rb1796@georgetown.edu
gb954@georgetown.edu
erc56@georgetown.edu
whp25@georgetown.edu

*Attorneys for Plaintiffs*

*Motions for admission pro hac vice
forthcoming.*