# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

SOUTHEASTERN SYNOD OF THE
EVANGELICAL LUTHERAN CHURCH
IN AMERICA *et al.*,

           Plaintiffs,

    v.

STEVEN R. FINNEY *et al.*,

           Defendants.

**Case No.: 3:25-cv-684**

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.    Enactment of Section 5. ................................................................................. 2

    II.   Plaintiffs. ........................................................................................................ 5

LEGAL STANDARD .................................................................................................. 6

ARGUMENT ............................................................................................................... 7

    I.    Plaintiffs Are Likely to Succeed on the Merits. ........................................... 7

       A.    Plaintiffs Have Standing to Challenge Section 5. ..................................... 7

       B.    Section 5 Is Preempted by Federal Law. .................................................... 9

       C.    Section 5 Is Unconstitutionally Vague. ..................................................... 18

    II.   The Remaining Preliminary Injunction Factors
         Strongly Favor Plaintiffs. ............................................................................ 24

    III.  The Court Should Award Relief to Plaintiffs
         and the Putative Class ................................................................................... 25

CONCLUSION ............................................................................................................ 25

## INTRODUCTION

It is "well settled" that the federal government has exclusive authority to "determine immigration policy" for the "entire Nation." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Through the Immigration and Nationality Act ("INA"), Congress exercised that power to enact a comprehensive framework governing every aspect of immigration in the United States. 8 U.S.C. § 1101 *et seq*. Accordingly, federal courts have consistently held that there is no room for states to legislate in this area. *See, e.g.*, *Arizona*, 567 U.S. at 410; *Ga. Latino All. for Hum. Rts. v. Governor of Georgia* (*GLAHR*), 691 F.3d 1250, 1263 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023-24 (9th Cir. 2013).

Undeterred, Tennessee enacted a new felony for transporting or harboring certain noncitizens. *See* 2025 Tenn. Pub. Acts, ch. 424, pp. 2-4, § 5 ("Section 5"). Like many other state immigration crimes that have been struck down in recent years, Section 5 is blatantly unconstitutional. It is field preempted because it intrudes on an area of exclusive federal authority, and it is conflict preempted because it stands as an obstacle to federal law regulating the transport and harboring of immigrants, *see* 8 U.S.C. § 1324. It is also unconstitutionally vague because its opaque terms fail to give fair notice of which noncitizens it covers, what a defendant must know about a noncitizen's status, and what forms of assistance qualify as harboring.

If not enjoined, the law will inflict immediate irreparable harm on thousands of well-meaning Tennesseans. The law defines "harbor" to include merely providing shelter, without intent to conceal. That means Section 5 could subject churches, landlords, and family members to felony prosecution for putting a roof over an immigrant's head. Plaintiffs seek a preliminary injunction to prevent that imminent harm.

1

# BACKGROUND

## I.    Enactment of Section 5.

On January 22, 2025, Tennessee Governor Bill Lee presented his administration's "agenda on illegal immigration" for a special session of the Tennessee General Assembly.[1] The governor indicated that he was "heeding the call" from President Trump for states to "play a major role in … enforc[ing] the immigration laws" by proposing a "comprehensive framework to strengthen immigration enforcement across Tennessee."[2] One component of this scheme was a bill purporting to "crack[] down on human smuggling and illegal immigration."[3] The bill's House sponsor, Representative Chris Todd, contended that there had been a recent influx of undocumented immigrants, including unaccompanied minors, into the state, adding, "We as legislators didn't make that decision. We did not determine this could happen. This was done by the previous administration federally with no notice to us, no permission granted, and … no accountability."[4] Claiming that "President Joe Biden failed the American people for four years when he opened our border and allowed millions of illegal immigrants to move throughout our nation," Todd stated that the bill would "improve public safety in Tennessee by … holding people accountable for harboring illegal immigrants."[5]

---

[1] Press Release, Office of the Governor, Gov. Lee, Legislative Leadership Present Agenda on Illegal Immigration Ahead of Special Session (Jan. 22, 2025), https://www.tn.gov/governor/news/2025/1/22/gov--lee--legislative-leadership-present-agenda-on-illegal-immigration-ahead-of-special-session.html.
[2] *Id.*
[3] Press Release, Rep. Chris Todd's Office, Proposed TN Bill Seeks to Criminalize Harboring Illegal Immigrants, Human Smuggling (Mar. 21, 2025), https://www.wbbjtv.com/2025/03/21/proposed-tn-bill-seeks-to-criminalize-harboring-illegal-immigrants-human-smuggling [hereinafter Todd Press Release].
[4] *H. Floor Debate on H.B. 322*, 2025 Leg., 114th Sess. (Tenn. 2025) [hereinafter *H. Floor Debate*], at 28:42-56 (statement of Rep. Chris Todd).
[5] Todd Press Release; *see also* Anita Wadhwani, *Tennessee Bill to Criminalize "Harboring or Hiding" Immigrants Without Legal Status Advances*, Tenn. Lookout (Mar. 20, 2025),

2

The debates over the "human smuggling" bill highlighted its breadth and its ambiguity. Lawmakers and opponents of the bill raised concerns that it could criminalize family living arrangements in mixed-immigration-status households,[6] as well as nonprofits and faith-based organizations providing services without regard to immigration status.[7] In response, proponents of the bill gave conflicting or nonresponsive answers about whether particular conduct would be covered. For instance, Senate sponsor Brent Taylor said the legislation was targeted at people who were "looking to shield [noncitizens] from … immigration authorities or law enforcement" and agreed the focus was on "those people who do it for profit," not "church charities, united fund charities, healthcare clinics that take care of people."[8] But he later stated that the bill *would* apply to charitable organizations if they were "harboring or hiding or shielding" noncitizens.[9] House sponsor Chris Todd frequently directed questioners to the bill's text rather than delineating its scope. But he did explain that a person who was "harboring, *meaning housing*, or hiding or assisting another in harboring or hiding those individuals that are here illegally" would be committing a crime and that churches were protected from enforcement only so long as they were

https://tennesseelookout.com/2025/03/20/tennessee-bill-to-criminalize-harboring-or-hiding-immigrants-without-legal-status-advances (quoting Todd as saying the bill was needed because of "malfeasant … border policies and rampant illegal immigration" "over the past four years").

[6] *See, e.g.*, *H. Floor Debate* 31:04-34:29 (statement of Rep. Antonio Parkinson) (asking whether bill would cover mixed-status couple living in home owned by U.S. citizen spouse).

[7] *See, e.g.*, *Sen. Floor Debate on S.B. 392*, 2025 Leg., 114th Sess. (Tenn. 2025) [hereinafter *Sen. Floor Debate*], at 2:35:02-36:11 (statement of Sen. Raumesh Akbari) (expressing concern that bill could target "a church that is housing an asylum seeker"); *H. Floor Debate* 39:39-43:56 (statement of Rep. Bo Mitchell) (asking whether Catholic priest bringing noncitizen into church "to provide a safe place for them" would be charged with harboring); *id.* at 48:44-52:40 (statement of Rep. John Ray Clemmons) (stating that the bill would apply to a church if it "takes in anyone, gives them assistance, gives them food, gives them shelter").

[8] *Hearing on S.B. 392 Before the Sen. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 3:42:55-43:37 (Tenn. 2025) (statement of Sen. Brent Taylor); *id*. at 3:40:56-41:07 (statement of Sen. Todd Gardenhire); *id*. at 3:41:08-42:04 (statement of Sen. Brent Taylor).

[9] *Id.* at 3:44:00-34 (statement of Sen. Brent Taylor).

3

"providing services that [were] outside the definitions in this bill."[10] Several lawmakers separately questioned the bill's mechanism for ascertaining whether the noncitizen being transported or harbored lacked lawful immigration status and specifically that such determinations were to be made by U.S. Immigration and Customs Enforcement ("ICE").[11]

Despite these concerns, the general assembly passed Section 5 in April 2025, and the governor signed it into law on May 9, 2025, with an effective date of July 1, 2025. As enacted, Section 5 provides that a person commits the crime of "human smuggling" when that person "[k]nowingly transports an individual with intent to conceal the individual from a law enforcement officer or a federal immigration officer" or "[i]ntentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection," an individual that the person knows "has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security."[12] 2025 Tenn. Pub. Acts, ch. 424, pp. 2-3, § 5(a)(1)-(2).[13] Section 5 defines "harbor" to mean "to provide shelter to or conceal the whereabouts of an individual whom the person knows has illegally entered or remained in the United States, as determined by" ICE. *Id.* § 5(d). The crime of human smuggling does not extend to a Tennessee-

---

[10] *Hearing on H.B. 322 Before the H. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 1:03:31-58 (statement of Rep. Chris Todd); *H. Floor Debate* 34:41-58 (statement of Rep. Chris Todd).

[11] *Sen. Floor Debate* 2:35:29-36:12 (statement of Sen. Raumesh Akbari); *id.* at 2:39:01-44:43 (statement of Sen. Jeff Yarbro).

[12] This appears to be a reference to ICE, which superseded the Bureau of Immigration and Customs Enforcement in 2007. *See* 72 Fed. Reg. 20,131 (Apr. 23, 2007).

[13] Under Tennessee law, a person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code. Ann. § 39-11-302(a) (2024). A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* at § 39-11-302(b).

4

barred attorney "provid[ing] bona fide legal advice to an individual" or to a person providing "healthcare services or assistance to a person presenting at" a licensed healthcare facility or practice site. *Id.* § 5(e)(1)-(2). Section 5 creates an aggravated version of the crime if the "victim" was less than 13 years old "at any time during the person's course of conduct." *Id.* § 5(c).

## II.     Plaintiffs.

Plaintiffs brought this case to challenge the constitutionality of Section 5. Associational Plaintiff Southeastern Synod of the Evangelical Lutheran Church in America ("ELCA") brings this action on behalf of its churches, pastors, staff, and congregants. Individual Plaintiffs Garrett Causey and John Doe sue on behalf of themselves and a class of all others similarly situated.

The Southeastern Synod comprises 160 congregations across Alabama, Georgia, Mississippi, and Tennessee. Strickland Decl. ¶ 4. Its vision is "to equip, empower, and engage God's people to love and serve the world." *Id.* The ELCA has long advocated for the rights of immigrants. Its social message on immigration advocates for "immigration, refugee, and asylum laws that are fair and generous." *Id.* ¶ 5. In 2015, the ELCA adopted the AMMPARO Strategy to Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities, which calls on the church to advocate for migrant children and their families. *Id.* ¶ 6. And the ELCA considers itself a sanctuary denomination, which means that the ELCA "is publicly declaring that walking alongside immigrants and refugees is a matter of faith." *Id.* § 7.

The Synod "lives out these commitments not only in word, but also in deed." *Id.* ¶ 9. The Synod's churches within Tennessee provide numerous ministries that serve the immigrant community, including undocumented immigrants. *Id.* For instance, one church in Middle Tennessee provides sanctuary to immigrants in need, including by housing immigrants in the church building, and has received donations to support this ministry. *Id.* ¶ 13. The pastor says they

"would be hard pressed to stop these ministries, even if it meant going to jail." *Id.* ¶ 12. The Synod fears that its members who minister to immigrants could be prosecuted under Section 5.

Plaintiff Garrett Causey is a resident of Murfreesboro, Tennessee, who owns and rents out a house in the Antioch neighborhood of Nashville. Causey Decl. ¶¶ 1-2. His current tenant has been leasing the house for four years and has two years left on the lease. *Id.* ¶ 4. The tenant is an immigrant from Guatemala whom Causey knew did not have legal status in the United States at the time he moved into the house. *Id.* Causey believes that the tenant has since acquired legal status. *Id.* ¶ 5. There are other people who also live in the house and contribute to the rent who may not have legal status. *Id.* ¶¶ 6-7. It is important to Causey to rent the house to tenants regardless of immigration status. *Id.* ¶ 8. He fears prosecution under Section 5. *Id.* ¶ 9.

Plaintiff John Doe is a Tennessee resident and an immigrant from Mexico. Doe Decl. ¶¶ 1-2. He recently became a lawful permanent resident. *Id.* ¶ 2. His oldest daughter and her husband live with Doe. *Id.* ¶ 3. Doe's son-in-law entered the country unlawfully and is seeking asylum. *Id.* Because Doe's daughter is an adult, she and her husband insist on paying rent. *Id.* ¶ 4. Doe believes that families belong together. *Id.* ¶ 5. He fears prosecution under Section 5. *Id.* ¶ 6.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

6

**I.      Plaintiffs Are Likely to Succeed on the Merits.**

**A.  Plaintiffs Have Standing to Challenge Section 5.**

All three plaintiffs have standing to press their claims. To have Article III standing, a plaintiff must "have suffered an injury in fact, that was caused by the conduct complained of, and which a favorable decision is likely to redress." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (internal quotation marks omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). "[O]nly one plaintiff needs to have standing in order for the suit to move forward." *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015); *accord Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In a pre-enforcement challenge like this one, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotation marks omitted); *see also Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024). When dealing with a recently enacted law, the Sixth Circuit has found that "the statutory language" itself can "evince[] a credible threat of prosecution." *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987). A plaintiff therefore has standing to challenge a "newly enacted law" where the state "has not suggested" it "will not be enforced," and there is "no reason to assume otherwise." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).

7

Once a plaintiff demonstrates an injury in fact based on a credible threat of prosecution, the causation and redressability requirements are easily met. As the Sixth Circuit has explained regarding a "potential" prosecution, a Tennessee district attorney general "would cause that injury by filing the charges, and the district court could redress it by enjoining [him] from doing so." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

Plaintiffs here are engaged in conduct that arguably violates Section 5, and they face a credible threat of prosecution under the law. Plaintiff Garrett Causey rents a house to an immigrant he knows was previously undocumented. In other words, Causey provides shelter for purposes of private financial gain to an individual he knows unlawfully remained in the United States for some period. That subjects him to a credible threat of prosecution under the statute. He is also aware that some of his other tenants may be undocumented. Likewise, Plaintiff John Doe provides housing to his son-in-law and receives rent in exchange, and he knows that his son-in-law entered the country unlawfully. That too arguably meets the elements of the statute.

Plaintiff Southeastern Synod asserts associational standing on behalf of its members. To demonstrate associational standing, a plaintiff must show that (1) one of its members would have standing to sue in her own right, (2) the litigation is germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). That standard is easily met here. The Synod's pastors who provide sanctuary to undocumented immigrants and receive donations to support that work are at least arguably covered by the statute. This litigation is germane to the Synod's purpose, given its longstanding focus on ministering to immigrants. And this purely legal challenge to Section 5, which seeks only injunctive relief, does not require participation of individual members. Plaintiffs have standing.

8

## B. Section 5 Is Preempted by Federal Law.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. In light of this rule, it is a "fundamental principle of the Constitution … that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

There are "three classes of preemption," *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012), each of which entails a different analysis. First, Congress "may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. Second, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* Third, "state laws are preempted when they conflict with federal law." *Id.* Ultimately, for any form of preemption analysis, "'the purpose of Congress is the ultimate touchstone.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996))

Section 5 is both field and conflict preempted. The federal government derives its authority to regulate the status of immigrants within its borders from numerous sources. *See Toll v. Moreno*, 458 U.S. 1, 10 (1982). These include its powers "[t]o establish [a] uniform Rule of Naturalization" and "[t]o regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cls. 3-4, as well as "its broad authority over foreign affairs," *Toll*, 458 U.S. at 10; *see also Arizona*, 567 U.S. at 395 (describing the federal government's "inherent power as sovereign to control and conduct relations with foreign nations"). These immigration powers are "inherent in [the] sovereignty" of the federal government. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).

9

"[T]he interest of the people of the whole nation[] imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003) (internal quotation marks omitted). Ample precedent confirms "the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll*, 458 U.S. at 10 (collecting cases). Regulation of immigration—"which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"—is therefore reserved for the federal government and impermissible for the states. *De Canas v. Bica*, 424 U.S. 351, 355 (1976).

**Field preemption.** In assessing field preemption, "[t]he intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399 (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This requires determining whether congressional regulation in an area is so comprehensive that Congress has "left no room for States to regulate," *id.* at 400, or whether there is a "supremacy of the national power" in the relevant field, *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). Congressional intent to displace state law from a field can be determined from "the text of the relevant federal statutes" and the overall statutory scheme. *GLAHR*, 691 F.3d at 1263; *see also Medtronic*, 518 U.S. at 486 (discerning congressional intent from the text, "statutory framework," "structure and purpose of the statute as a whole," and "surrounding regulatory regime" (internal quotation marks omitted)). States are categorically barred from regulating conduct in a field Congress has decided must be "'regulated by its exclusive governance.'" *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (quoting *Arizona*, 567 U.S. at 399).

10

Congress has exercised its broad authority, in a manner that is both "pervasive" and "dominant," *Arizona*¸ 567 U.S. at 399, to regulate the transport and harboring of noncitizens without lawful status. The INA makes it a federal crime for any person to knowingly transport or move an unlawfully present noncitizen within the United States in furtherance of the noncitizen's violation of federal immigration laws; to conceal, harbor, or shield from detection or attempt to conceal, harbor, or shield from detection such a noncitizen; or to encourage or induce a noncitizen to illegally "come to, enter, or reside in the United States." 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv). It is also a federal crime to conspire to commit or to aid or abet the commission of any of the preceding acts. *Id.* § 1324(a)(1)(A)(v). The statute sets forth detailed evidentiary rules for proving transport and harboring crimes in federal court. *See id.* § 1324(b)(3). State and local law enforcement officers are authorized to arrest individuals for violations of these federal laws, but only federal prosecutors may prosecute alleged violations of these provisions, and all such prosecutions must be brought in federal court. *Id.* §§ 1324(c), 1329. That is, in addition to establishing a comprehensive federal scheme governing the transport and harboring of noncitizens, § 1324 provides a specific, narrow role for states in the enforcement of that scheme: making arrests, but not making charging decisions or prosecuting. This federal scheme has evolved over more than 100 years, with Congress "steadily broaden[ing] the scope … with respect to proscribed conduct" to "address[] … apparent gap[s] in federal immigration law." *United States v. Sanchez-Vargas*, 878 F.2d 1163, 1168 (9th Cir. 1989); *see id.* at 1169 (describing "[t]he evolution of § 1324(a)(1)" to provide "a single comprehensive 'definition' of the federal crime of alien smuggling").

Section 5, which generally parallels the federal provision, *but see infra*, at 14-19, is an impermissible attempt by Tennessee to regulate in a field over which the federal government has established "exclusive governance." *Arizona*, 567 U.S. at 399. As multiple courts of appeals have

concluded, "[t]he federal government has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens." *United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013); *see also, e.g.*, *GLAHR*, 691 F.3d at 1263 (describing the "comprehensive [federal] framework to penalize the transportation, concealment, and inducement of unlawfully present aliens"); *Alabama*, 691 F.3d at 1285-86; *Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3d Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013). Just like the other states that have sought to enact transport and harboring crimes despite this federal backdrop, Tennessee is "prohibited from enacting concurrent state legislation in this field of federal concern." *Alabama*, 691 F.3d at 1287.

The federal dominance in the field of "entry, movement, and residence" of noncitizens within the United States is confirmed by the "larger context of federal statutes criminalizing acts undertaken by aliens and those who assist them in coming to, or remaining within, the United States." *GLAHR*, 691 F.3d at 1264. For instance, 8 U.S.C. § 1325 creates civil and criminal penalties for noncitizens who enter or attempt to enter the United States unlawfully, and § 1326 creates criminal penalties for any noncitizen who unlawfully reenters the United States after having been "denied admission, excluded, deported, or removed." Meanwhile, § 1323 makes it unlawful for any person to bring into the United States any noncitizen who does not have a valid passport and any necessary visa; § 1327 criminalizes knowingly aiding or assisting any noncitizen in unlawfully entering the United States; and § 1328 prohibits importing noncitizens for any "immoral purpose." "[T]he breadth of these laws illustrates an overwhelmingly dominant federal interest in the field." *GLAHR*, 691 F.3d at 1264; *see also South Carolina*, 720 F.3d at 531 (finding analogous state anti-harboring scheme "field preempted because the vast array of federal laws and regulations on this subject … is 'so pervasive … that Congress left no room for the States to

supplement it'" (quoting *Arizona*, 567 U.S. at 399) (second alteration in original)).

To the extent Section 5 tracks the federal prohibition, that does not save it from being field preempted. Rather, "[w]here Congress occupies an entire field …, even complementary state regulation is impermissible," because "[f]ield preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. The Supreme Court's decision in *Arizona* is instructive. In that case, Arizona "add[ed] a state-law penalty for conduct proscribed by federal law"—there, the failure to complete and carry registration documents. *Id.* at 400. After canvassing the "comprehensive" federal regime and determining that it had been "designed as a 'harmonious whole,'" the Supreme Court explained that this system left no room for states to regulate. *Id.* at 401 (quoting *Hines*, 312 U.S. at 72). Although the state system was identical in many respects to the federal analogue, the Court rejected Arizona's argument that its law could survive because the state had "the same aim as federal law and adopt[ed] its substantive standards." *Id.* at 402. The Supreme Court emphasized that "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Id.*

The same analysis applies to Section 5. Here too, Congress has established a "full set of standards" to govern the transport and harboring of noncitizens, "including the punishment for noncompliance." *Id.* at 401. In light of this "complete scheme of [federal] regulation," Tennessee may not "conflict or interfere with, curtail or complement, the federal law" in any way "or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66-67; *see also Pennsylvania v. Nelson*, 350 U.S. 497 504 (1956) (where Congress "has intended to occupy the field," an analogous state "statute is superseded regardless of whether it purports to supplement the federal law"); *Charleston & W.C. Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915) ("When Congress has taken the particular subject-matter in hand, coincidence is as ineffective as opposition ….").

13

**Conflict preemption.** Section 5 also stands as an obstacle to the accomplishment of the purposes and objectives of the federal regime and is conflict preempted. *See GLAHR*, 691 F.3d at 1265-67; *Alabama*, 691 F.3d at 1287-88; *South Carolina*, 720 F.3d at 531-32; *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528-36 (5th Cir. 2013). A state law conflicts with federal law when either "'compliance with both federal and state regulations is a physical impossibility'" or "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (first quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963); then quoting *Hines*, 312 U.S. at 67). The conflict-preemption analysis is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Section 5 is broader than § 1324 in the conduct that it prohibits, undermining the congressional choice not to criminalize certain acts. In enacting § 1324, Congress "struck a careful balance," *Arizona*, 567 U.S. at 400. It extended the criminal prohibition only to a person who, while "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection" that individual. 8 U.S.C. § 1324(a)(1)(A)(iii). As the Sixth Circuit has held, under the federal scheme, harboring entails "conduct that tends to substantially facilitate noncitizens remaining in the country illegally and prevent authorities from detecting the noncitizens' presence," but it does not include merely providing housing or other shelter to noncitizens without lawful immigration status. *United States v. Zheng*, 87 F.4th 336, 343 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2604 (2024). The language of Section 5 appears to track the federal provision in that it also applies to any person who "conceals, harbors, or shields from detection" a noncitizen without lawful status. 2025 Tenn. Pub. Acts, ch. 424, p. 2, § 5(a)(2). But Section 5 contains a separate definition provision that

14

explicitly defines harboring as "*provid[ing] shelter to or* conceal[ing] the whereabouts of an individual whom the person knows has illegally entered or remained in the United States." *Id.* at § 5(d) (emphasis added). The criminalization of providing shelter to an undocumented immigrant, without any requirement that the harboring facilitate unlawful presence by preventing detection by authorities, sweeps more broadly than the federal provision, overriding the congressional decision not to prohibit such conduct.

Relatedly, Section 5 may be broader than § 1324 because it might criminalize transporting or harboring noncitizens who would not be covered by the federal analogue. To establish a violation of § 1324, a federal prosecutor must prove that the noncitizen being transported or harbored "was present in the United States in violation of law." *United States v. Franco-Lopez*, 687 F.3d 1222, 1228 (10th Cir. 2012); *see also United States v. Aguilar*, 883 F.2d 662, 677 (9th Cir. 1989) (construing § 1324 to preclude liability for harboring a noncitizen who "had been previously processed and released by" federal authorities (internal quotation marks omitted)). By contrast, Section 5 by its plain text appears to apply to transporting or harboring people who unlawfully entered or remained in the United States but who subsequently obtained legal status. In the INA, Congress provided a host of ways for noncitizens who entered without authorization— or at some point were unlawfully present in—the United States to obtain status. Section 5 appears to criminalize providing shelter to these same people, disrupting the federal regime that enables such individuals to remain lawfully in the country.

Section 5 also conflicts with Congress's careful calibration of transport and harboring crimes by impermissibly expanding the role of state officials in enforcing them. In the INA, Congress permitted state and local law enforcement officers to make arrests for violations of § 1324 but vested the prosecutorial power exclusively in federal authorities. *See* 8 U.S.C.

15

§§ 1324(c), 1329. This signals that Congress "specifically considered the appropriate level of involvement for the states," *Valle del Sol*, 732 F.3d at 1025, and the "inference from these enactments is that the role of the states is limited to arrest for violations of federal law," *GLAHR*, 691 F.3d at 1264. In Section 5, Tennessee disregarded this congressional determination and assumed a prosecutorial power over transport and harboring crimes that Congress rejected. By purporting to "give itself" such prosecutorial authority, Tennessee impedes federal "'control over enforcement'" and thus disrupts "a comprehensive and unified system" created by Congress. *Arizona*, 567 U.S. at 401-02 (quoting *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

Section 5 further conflicts with the federal system because it creates a new immigration classification Congress never contemplated. Section 5 applies to the transport and harboring of noncitizens who "illegally entered or remained in the United States, as determined by" ICE. As discussed further *infra*, at 19-22, this is not a federal immigration status. Federal immigration status is determined by federal law, not by ICE alone, and is assigned based on a number of factors, including but not limited to when and where a person entered (generally monitored by U.S. Customs and Border Protection ("CBP")); whether they entered with a visa (issued by the U.S. Department of State) or other entry document; eligibility for immigration benefits and humanitarian protection (adjudicated by U.S. Citizenship and Immigration Services); and the decisions of federal immigration judges (employed by the U.S. Department of Justice) and federal courts. If Section 5 were enforced, state police, prosecutors, judges, and juries would have to figure out what it means for a person to have "illegally entered or remained in the United States, as determined by" ICE, without reference to governing sources of law or input from Congress or relevant administrative agencies about how to assess the person's status. But "[t]he federal

government alone … has the power to classify non-citizens," *Farmers Branch*, 726 F.3d at 536, because immigration classifications are bound up in foreign relations and border control—matters over which the federal government has sole authority, *see Plyler v. Doe*, 457 U.S. 209, 219 n.19 (1982); *Arizona*, 567 U.S. at 401-02. Tennessee's attempt to attach criminal consequences based on an immigration "classification that does not exist in federal law," *Farmers Branch*, 726 F.3d at 534, undermines the carefully calibrated, comprehensive federal immigration scheme.

Exacerbating this issue, Section 5 provides none of the requisite evidentiary guidance for assessing a person's immigration status that is present in the federal system. In § 1324(d), Congress imposed "statutorily limited categories of *prima facie* evidence" that are to be used to resolve the "significant complexities" involved in determining a person's immigration status. *Id.* at 531 (internal quotation marks omitted). Section 5, by contrast, lacks those essential procedural safeguards, creating another obstacle to accomplishment of Congress's objectives in enacting § 1324 as part of the INA's overall scheme for regulating immigration.

Moreover, Section 5 conflicts with federal law because it imposes burdens and penalties not authorized by and contrary to federal law. Under the federal system, the § 1324 offenses of transporting and harboring carry a statutory maximum sentence of 5 years' imprisonment, unless the offense was done for commercial advantage or private financial gain, in which case the statutory maximum is increased to 10 years' imprisonment. None of the applicable § 1324 offenses includes a mandatory minimum sentence. By contrast, the aggravated version of Tennessee's "human smuggling" offense, which applies when the noncitizen being transported or harbored was less than 13 years old at the time of the offense, is a Class A felony that carries a mandatory minimum sentence of 15 years' imprisonment and a statutory maximum sentence of 60 years' imprisonment. Even the non-aggravated versions of the Section 5 offenses, which are Class E

17

felonies, carry a mandatory minimum sentence of one year. This "further intrusion upon the federal scheme" via an "inconsistency … with respect to penalties" creates an additional "conflict with the plan Congress put in place." *Arizona*, 567 U.S. at 402-03.

Finally, even the aspects of Section 5 that directly parallel the federal analogue are conflict preempted. As the Supreme Court explained, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Arizona*, 567 U.S. at 402. That is because, if Section 5 "were valid, every State could give itself independent authority to prosecute" § 1324 violations, "diminishing the Federal Government's control over enforcement and detracting from the integrated scheme of regulation created by Congress." *Id.* (internal quotation marks and alterations omitted); *see also GLAHR*, 691 F.3d at 1266 ("Each time a state enacts its own parallel to the INA, the federal government loses control over enforcement of the INA, thereby further detracting from the integrated scheme of regulation created by Congress." (internal quotation marks and alterations omitted)). Section 5 would allow Tennessee to prosecute individuals for transporting and harboring noncitizens "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. *Arizona* made plain that states are not permitted to act unilaterally to regulate immigration to "achieve [their] own immigration policy." *Id.* at 408. Section 5 "create[s] an obstacle to the smooth functioning of federal immigration law, improperly place[s] in the hands of state officials the nation's immigration policy, and strip[s] federal officials of the authority and discretion necessary in managing foreign affairs." *South Carolina*, 720 F.3d at 531-32. This conflict with federal enforcement priorities plagues Section 5 in its entirety and renders the law preempted.

### C.  Section 5 Is Unconstitutionally Vague.

Section 5 is unconstitutionally vague because it is almost impossible for ordinary people to conform their behavior to its requirements or know if their behavior is unlawful. A law is unconstitutionally vague if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *accord Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999). Vagueness is especially problematic with respect to criminal laws because "the consequences of imprecision" are "severe." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982); *see Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) ("When criminal penalties are at stake … a relatively strict [vagueness] test is warranted."). As a result, "facial analysis" is appropriate in vagueness challenges to laws "impos[ing] criminal sanctions." *Belle Maer Harbor*, 170 F.3d at 557.

Section 5 is impermissibly vague in multiple respects. First, the law predicates liability on "knowing" that the individual being transported or harbored "has illegally entered or remained in the United States, as determined by" ICE. *See* 2025 Tenn. Pub. Acts, ch. 424, p. 3, § 5(a)(1), (a)(2), (d). This requirement is inscrutable and irrational. Noncitizens who have unlawfully entered or remained in the United States do not necessarily encounter ICE, and those who provide them shelter would have little way of knowing about such encounters, much less the result of those encounters. Federal law defines improper entry, *see* 8 U.S.C. § 1325, and unlawful presence, *see id.* § 1182(a)(9)(B)(ii). The former is a crime, while the latter is a civil infraction that can lead to removal. Immigration-related crimes like unlawful entry are prosecuted by the Department of Justice, and most such cases are referred not by ICE but by CBP. *See Immigration Prosecutions Jump in March 2025,* Transactional Records Access Clearinghouse (June 3, 2025), https://tracreports.org/reports/761. ICE likewise is not always involved in civil infractions that can

19

result in removal. Although ICE has authority to make arrests for those infractions and issue notices to appear for removal proceedings, it shares that authority with CBP and other agencies. *See* 8 U.S.C. § 1226 (authority to arrest and detain); 8 C.F.R. § 239.1(a) (authority to issue notices to appear). Section 5 thus presumes a role for ICE that often does not exist, making the law "fundamentally irrational." *Springfield Armory*, 29 F.3d at 252.

Even in cases where ICE is involved, there is a further problem with Section 5's "determination" requirement: ICE is a law enforcement agency that is not responsible for conclusively determining the legal status of most noncitizens.[14] When ICE investigates improper entry and refers a case to the Department of Justice for prosecution, a court—not the executive branch—makes the final adjudication. *See* U.S. Const. amend. VI. In the context of unlawful presence, a notice to appear issued by ICE is simply a "case-initiating document" analogous to a criminal indictment or a civil complaint. *See Niz-Chavez v. Garland*, 593 U.S. 155, 163-64 (2021). A notice to appear is not a determination of violation but a statement of "alleged" infractions. 8 U.S.C. § 1229(a)(1)(C). It is the job of an immigration judge, not ICE, to ultimately "decid[e]" whether a person is unlawfully present and subject to removal. *Id.* § 1229a(a)(1).[15]

The upshot is that it is all but impossible to discern what Section 5 means when it references ICE "determinations" of unlawful entry or presence, leaving a key element of the law "not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And there is "no apparent saving

_____

[14] In the limited context of expedited removal, ICE can order a noncitizen removable without further review. *See* 8 U.S.C. § 1225(b)(2); 8 C.F.R. § 235.15.

[15] These problems were raised in the Tennessee legislature, but Section 5's supporters either misapprehended them or suggested that they were by design. *See Hearing on H.B. 322 Before the H. Fin., Ways, & Means Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 59:01 (statement of Rep. Chris Todd) (explaining that the bill relies on determinations by "U.S. officials," "whatever their rules are"); *S. Floor Debate* 2:41:10-19 (statement of Sen. Brent Taylor) (explaining that the bill's reliance on determinations by ICE, rather than immigration judges or courts, was "because many of these people that are here illegally have not been adjudicated through the judicial system").

20

construction" of Section 5, *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987), because any conceivable interpretation of the "determination" requirement is plagued with vagueness issues. Perhaps the law mistakenly assumes that ICE makes final adjudications on these matters. That would leave the statute unintelligible, with "no core" and no "ascertainable standard" for what is forbidden. *See Smith v. Goguen*, 415 U.S. 566, 578 (1974); *see also Valle del Sol*, 732 F.3d at 1020-21 (striking down a transport and harboring law on vagueness grounds because of "nonsensical" statutory text). Alternatively, the law might mean that liability attaches on the basis of informal ICE "determinations" rather than formal adjudications. That interpretation would present problems of its own, as ordinary Tennesseans have no way of knowing what ICE has informally determined. *See Johnson*, 576 U.S. at 596.

To be sure, Section 5 contains a scienter requirement that links liability to "knowing" that the individual being transported or harbored "has illegally entered or remained … as determined by" ICE. *See* 2025 Tenn. Pub. Acts, ch. 424, p. 3, § 5(a). Although knowledge requirements can mitigate vagueness concerns, that is not the case when "the contours of the … scienter requirement are themselves unclear." *Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 535 (6th Cir. 1998). Here, the scienter requirement is itself as source of Section 5's vagueness. To be liable for transporting or harboring another person, must the defendant know that ICE "determined" that the person unlawfully entered or remained in the United States? Or must the defendant simply know that the person entered or remained in the United States in a manner that ICE would consider unlawful—even if ICE made no actual "determination"? Either reading would "produce an absurd result," *White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 849 (6th Cir. 2010), requiring ordinary Tennesseans to discern the inner workings of a federal agency. The scienter requirement thus does nothing "to cure the problems inherent in this provision." *Peoples Rts. Org.*,

152 F.3d at 535.

Section 5 has another vagueness problem: Its broad applicability to any noncitizen who "has illegally entered or remained" in the United States, in the past tense, suggests that a person could be convicted under the law for providing shelter to an individual who previously entered or remained in the country unlawfully but now has lawful status. *See supra*, at 15. It is unclear whether Tennessee intended to criminalize the concealment or sheltering of a person with lawful status who has no reason to avoid detection. Indeed, courts have interpreted the federal harboring law to exclude such inexplicable applications. But Section 5's plain text is unclear on this point.

Section 5 is unconstitutionally vague in a third way: It is impossible to know what conduct constitutes "harboring." The statute defines "harbor[ing]" in part as "provid[ing] shelter." *See* 2025 Tenn. Pub. Acts, ch. 424, p. 3, § 5(d). This does not describe the proscribed behavior with sufficient particularity. The term "provide shelter" is most naturally associated with providing housing to those unable to obtain or afford housing on their own. To the extent the phrase is "used in both legal and common parlance," *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 798 (6th Cir. 2005), it is generally used in this way. *See, e.g.*, 42 U.S.C. § 11343(a) (stating that certain grants may be used to "provide shelter … for homeless individuals"); *Andret v. Garland*, No. 23-3426, 2024 WL 167115, at *6 (6th Cir. Jan. 16, 2024) (noting that a "government provides shelter[]" to "survivors of gender-based violence"). But Section 5 confounds this common usage by requiring harboring to be done for commercial advantage or private financial gain, making uncertain what the statute means by "provide shelter."

Questions about the meaning of "provide shelter" do not end there. Although "shelter" often refers to overnight accommodations, it can suggest more temporary forms of protection and hospitality. *See, e.g.*, *Shelter*, Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/shelter ("something that covers or affords protection"); *Tennessee Shelters*, Tennessee Emergency Management Agency, https://www.tn.gov/tema/tennessee-shelters.html (listing not only "overnight shelter[s]" but also "storm shelter[s], "warming center[s]," and "cooling center[s]"). The concept of shelter can thus encompass permanent and temporary housing, daytime storm shelters, educational programs, and soup kitchens. But as enacted, Section 5 provides no clarity as to which of those forms of shelter fall within its ambit.

The vagueness of Section 5 has sparked concern over whether it covers family living arrangements, *see* Doe Decl. ¶¶ 6-7, or religiously motivated charitable work, *see* Strickland Decl. ¶¶ 11-19. Both of those areas are protected by federal or state law. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-20 (1984) (Constitution protects "cohabitation with one's relatives"); *Ward v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M-2018-00633-COA-R3-CV, 2019 WL 1753053, at *7 (Tenn. Ct. App. Apr. 17, 2019) (Tennessee law protects religiously motivated charitable work). Ordinarily, "courts presume that legislatures act" lawfully, *Illinois v. Krull*, 480 U.S. 340, 351 (1987), yet Section 5 seems to intrude upon these sensitive domains. Tennesseans are thus left guessing whether their otherwise protected activities are covered by the law. Section 5's legislative history provides no clarity, as the law's supporters simply reiterated that organizations "doing the right thing" would not be subject to liability.[16] That subjective metric evokes just the sort of "arbitrary enforcement" against which the Constitution's Due Process Clause protects. *Johnson*, 576 U.S. at 595. Section 5's harboring provision is therefore impermissibly vague.

---

[16] *See, e.g.*, *Hearing on H.B. 322 Before the H. Crim. Just. Subcomm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 18:50-20:12 (statement of Rep. Chris Todd).

23

## II.     The Remaining Preliminary Injunction Factors Strongly Favor Plaintiffs.

The equities favor Plaintiffs. Absent an injunction, Plaintiffs will suffer irreparable harm. "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436. And in a preemption challenge, Plaintiffs suffer irreparable harm from "the threat of state prosecution for crimes that conflict with federal law." *GLAHR*, 691 F.3d at 1269. "[E]nforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable." *Id.*; *see also Valle del Sol*, 732 F.3d at 1029. If Section 5 goes into effect, Plaintiffs and those similarly situated risk felony prosecution and mandatory minimum prison sentences merely for providing shelter to undocumented people while receiving some financial benefit.

The balance of equities and public interest, which merge in a suit against the government, *see Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020), weigh heavily in favor of a preliminary injunction. As a general matter, "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987). In the preemption context, a state's "[f]rustration of federal statutes and prerogatives" is "not in the public interest." *Alabama*, 691 F.3d at 1301; *see also GLAHR*, 691 F.3d at 1269; *Chamber of Commerce v. Edmonson*, 594 F.3d 742, 771 (10th Cir. 2010); *Valle del Sol*, 732 F.3d at 1029. Here, the enactment of Section 5 is already causing landlords who fear prosecution to engage in illegal evictions of immigrant tenants. Boatner Decl. ¶ 12. Once it goes into effect, the law "will undoubtedly lead to many [immigrants] losing their homes, because landlords won't be willing to rent to them," which will have "catastrophic consequences" in the community. *Id.* ¶ 16.

A preliminary injunction in this case will not harm Defendants. No substantial harm arises from an injunction prohibiting enforcement of an unconstitutional law. *See Deja Vu of Nashville,*

*Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001). In particular, a state has no legitimate interest in regulating conduct arising in an exclusively federal arena. *See, e.g., Alabama*, 691 F.3d at 1301; *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990). Transport and harboring crimes that occur in Tennessee will continue to be prosecuted by the federal government—the proper authority to enforce immigration law in any event. Finally, an injunction delaying enforcement of the new law, which will not go into effect until July 1, would simply maintain the status quo while Plaintiffs' significant constitutional challenges to Section 5 are resolved. *See Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016).

### III.    The Court Should Award Relief to Plaintiffs and the Putative Class

The Court should issue a preliminary injunction barring Defendants from enforcing Section 5 against all members of the Southeastern Synod and everyone within the putative class. First, relief granted to the Synod necessarily runs to all of its members because an injunction issued to an associational plaintiff "will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Second, the Court can and should issue relief to the putative class without considering class certification. As the Supreme Court recently clarified, "courts may issue temporary relief to a putative class" and "need not decide whether a class should be certified" before granting class-wide injunctive relief to prevent irreparable harm during the pendency of litigation. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025).

### CONCLUSION

The Court should grant the motion and issue a preliminary injunction.


Respectfully submitted this 23rd of June, 2025.

25

Michelle Lapointe*
Suchita Mathur*
Chris Opila*
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street NW, Suite 500
Washington, DC 20036
Phone: (202) 507-7523
Fax: (202) 742-5619
mlapointe@immcouncil.org
smathur@immcouncil.org
copila@immcouncil.org

/s/ Michael C. Holley
Michael C. Holley
Spring Miller
TENNESSEE IMMIGRANT & REFUGEE RIGHTS
COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
spring@tnimmigrant.org

Rupa Bhattacharyya*
Gregory Briker*
Elizabeth Cruikshank*
William Powell*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6629
Fax: (202) 661-6730
rb1796@georgetown.edu
gb954@georgetown.edu
erc56@georgetown.edu
whp25@georgetown.edu

*Attorneys for Plaintiffs*

*Motion for admission pro hac vice forthcoming.*

26