EXHIBIT 1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | MIDDLE DISTRICT OF TENNESSEE |
| 2 | NASHVILLE DIVISION |

```
 3
   SOUTHEASTERN SYNOD OF THE      )
 4 EVANGELICAL LUTHERAN CHURCH     )
   IN AMERICA, et al.             )
 5                                )
   vs                             )        Case No. 3:25-cv-00684
 6                                )
   STEVEN R. FINNEY, et al.       )
 7
 8 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 9

10                      BEFORE THE HONORABLE

11         WILLIAM L. CAMPBELL, JR., CHIEF DISTRICT JUDGE

12                    TRANSCRIPT OF PROCEEDINGS

13                       September 10, 2025

14

15 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17

18

19

20

21

22

23 Patricia A. Jennings, RMR, CRR
   Official Court Reporter
24 719 Church Street, Suite 2300
   Nashville, TN 37203
25 patty_jennings@tnmd.uscourts.gov
```

1  APPEARANCES:

2  For the Plaintiffs:        William Powell
                              Elizabeth Cruikshank
3                             Institute for Constitutional
                              Advocacy and Protection
4                             Georgetown University Law Center
                              600 New Jersey Ave., NW
5                             Washington, DC  20001

6                             Michelle Lapointe
                              American Immigration Council
7                             PMB2026
                              2001 L Street NW, Suite 500
8                             Washington, DC  20036

9                             Michael Holley
                              The Law Office of Michael C. Holley
10                            922 Main Street, Suite C-161
                              Nashville, TN  37206
11
                              Spring A. Miller
12                            Tennessee Immigrant and Refugee
                              Rights Coalition
13                            3310 Ezell Road
                              Nashville, TN  37211
14
15 For the Defendants:        Miranda H. Jones
                              Aaron Bernard
16                            Andrew Dylan Denning
                              Tennessee Attorney General's Office
17                            PO Box 20207
                              Nashville, TN  37202-0207
18

19

20

21

22

23

24

25

1      The above-styled cause came to be heard on

2  September 10, 2025, at 9:30 a.m., before the Honorable

3  William L. Campbell, Jr., Chief District Judge, when the

4  following proceedings were had, to-wit:

5

6      THE COURT:  Okay.  Good morning.  We are here on

7  Case 3:25-cv-684 on a hearing on a motion for preliminary

8  injunction in Southeastern Synod of the Evangelical Lutheran

9  Church in America, et al. versus Finney, et al.

10     If counsel would introduce yourselves for the

11  record, please.

12     MR. POWELL:  Good morning, Your Honor.  William

13  Powell for the plaintiffs.

14     MS. CRUIKSHANK:  Good morning, Your Honor.

15  Elizabeth Cruikshank for the plaintiffs.

16     THE COURT:  All right.

17     MS. LAPOINTE:  Good morning, Your Honor.  Michelle

18  Lapointe for the plaintiffs.

19     MR. HOLLEY:  And, Your Honor, Michael Holley for

20  the plaintiffs.

21     THE COURT:  Good to see you, Mr. Holley.  It's

22  been a minute.

23     MR. POWELL:  Your Honor, I just also note the

24  presence in the courtroom of some of the plaintiffs.  We have

25  Garrett Causey here in the courtroom with us and then some

```
 1  members of the Southeastern Synod that I just wanted to
 2  acknowledge at the beginning.  Thank you.
 3          THE COURT:  Okay.  Welcome to everybody.  All
 4  right.  For defense counsel.
 5          MS. JONES:  Good morning, Your Honor.  Miranda
 6  Jones of the Tennessee Attorney General's Office on behalf of
 7  the defendants.
 8          THE COURT:  Okay.
 9          MS. JONES:  And I'm joined here today by my two
10  colleagues, Aaron Bernard and Andrew Denning.
11          THE COURT:  All right.  Welcome to everyone.
12          Who's going to present argument for each side?
13  Who's planning on that?
14          MR. POWELL:  Your Honor, with the Court's
15  permission, we'll split the argument for plaintiffs.  I'll go
16  first and address standing and state sovereign immunity, and
17  then I will then turn it over to my colleague, Elizabeth
18  Cruikshank, who will address the merits and the scope of
19  relief.
20          MS. JONES:  I will be arguing on behalf of the
21  defendants, Your Honor.
22          THE COURT:  You got them outnumbered one to two,
23  huh?
24          MR. JONES:  Yes, sir.
25          THE COURT:  All right.  Before we begin, I had a
```

question.  So the parties were able to gather and meet
face-to-face, with some attorneys participating by video
conference, a couple of weeks ago pursuant to a court order,
and I gather there's no common ground that could be found on
some sort of structure of a limited injunction.

Is that a fair assumption?

MR. POWELL:  That's correct, Your Honor.

THE COURT:  You agree?

MS. JONES:  Yes, Your Honor.

THE COURT:  Because it seems to me from the
filings that there is some common ground here.  You-all are
agreeing on a few things.  You're coming at it a little bit
differently, but you're at least I think saying some of the
same things practically.  I guess my question is, would --
from the plaintiffs' perspective, would you rather have a
narrow injunction you can control or no injunction at all?

MR. POWELL:  I think given that choice,
Your Honor, we would prefer a narrow injunction.

THE COURT:  I'm going to ask you the same
question.  Would you rather have a narrow injunction that you
control or an injunction that reaches all of Section 5?

MS. JONES:  Your Honor, the defendants, of course,
would agree with that.  I will say that I'm not authorized to
agree to anything, unless I have the opportunity to consult
with my superiors on this matter.  So at this point, yes, I

 1  think we could explore a conversation about whether a narrow

 2  injunction is possible, but I couldn't commit to anything.

 3          THE COURT:  Because if I understand the parties'

 4  position, particularly the State's position, is that -- or

 5  the defendant's position, that at least with respect to the

 6  church groups, which are non-profits, there doesn't seem to

 7  be like much disagreement that they're not -- wouldn't

 8  necessarily be in the crosshairs of this particular statute.

 9          Is that a fair reading of it?

10          MS. JONES:  Yes, Your Honor.  And I apologize.

11  The question you asked earlier, did you say if we would

12  prefer a narrow injunction we can control or no injunction at

13  all, we would prefer no injunction.

14          THE COURT:  Well, I know that.  I flipped the

15  question on you.  I asked would you prefer a narrow

16  injunction or one that reaches the entirety -- the entire

17  relief that they seek.

18          MS. JONES:  Yes.  Okay.  Thank you, Your Honor.  I

19  wanted to make sure I tracked that.  And I apologize.  What

20  was the follow-up question?

21          THE COURT:  I don't remember what it was.  I do

22  have another question, though, for you.

23          MS. JONES:  Excellent.

24          THE COURT:  You said you need to run anything you

25  could agree to by a higher-up, a superior.

```
 1              MS. JONES:  Certainly, Your Honor.
 2              THE COURT:  How hard is it to reach that person?
 3              MS. JONES:  It shouldn't be that difficult.
 4              THE COURT:  Are they reachable -- he or she
 5    reachable this morning?
 6              MS. JONES:  By phone, yes, sir.
 7              THE COURT:  By phone?  Okay.
 8              MS. JONES:  Should be possible.
 9              THE COURT:  Because here's what I'm wondering.
10    You've got -- I'm trying to get you-all to see not
11    sacrificing the good for the perfect at this early stage in
12    the lawsuit, because we got a lot of work to do on this
13    lawsuit.  We got certification issues.  We got ultimately
14    deciding it on the merits.  And my question is, would it be
15    worth spending a few minutes figuring out if there's some
16    middle ground.  I know you've tried already, but maybe with
17    all being here today, maybe new energy could be applied to
18    that endeavor so that you could have some placeholder in mind
19    that gives the plaintiffs some peace of mind that they're not
20    about to be arrested and charged with something and the
21    defendants some peace of mind that this isn't going to be a
22    very broad injunction that hangs over this case, because we
23    still got to decide it on the merits.  We're not there yet.
24              MS. JONES:  Your Honor, we're always open to
25    conversation.
```

1          THE COURT:  Okay.  What do you think about that?

2          MR. POWELL:  Your Honor, definitely, I think we

3     would be open to the possibility.

4          THE COURT:  Okay.  Because isn't there common

5     ground here at least with respect to your view of the

6     likelihood that this statute would be applied to the churches

7     and the non-profits?  You-all agree on that, don't you?

8     You're scared of it, and I understand your argument.  You're

9     saying it's not going to happen.

10          MS. JONES:  Yes, Your Honor.  And that -- partly I

11     don't know that an injunction would be palatable if it simply

12     says that the law will not apply to them, and therefore we're

13     enjoined from not applying the law that we don't believe

14     should be applied in the first place.  I don't know how well

15     that would go over, but we're happy to explore it.

16          THE COURT:  Well, I go back to my first question.

17     Not sacrificing the good for the perfect is what I'm trying

18     to say.

19          MS. JONES:  Certainly, Your Honor.  And that's why

20     I'm more than happy to have a conversation, and I will

21     certainly bring any offers back to my higher-ups.

22          THE COURT:  Well, I know we have a lot of people

23     who are here to watch a hearing, and I appreciate everybody

24     showing up.  And we can have a hearing.  We've blocked off

25     the morning for you.  But I think it might be a good use of a

few minutes for counsel to sit down again and figure out
whether there's some common ground, a narrower injunction
than what's sought, but more than nothing for the defendants,
and see if you can reach middle ground.

And to your concern about -- which I read into
what you just said, and I may get it wrong. If I did, please
correct me -- of, well, we're going to agree to an injunction
that ties the hands of people on a law that they think is
constitutional and can be implemented and should be
implemented, I think there's a way you can deal with that. I
think there could be some relief you could come back to the
Court on if there's a narrow injunction, hey, we think this
particular activity is problematic while the case is pending,
and we'd like some relief from that, and then they can be
heard, and we could deal with it sort of issue by issue.

Because to my knowledge, and you can correct me if
I'm wrong, have any of the plaintiffs been charged with
anything in the two-and-a-half months since this law went
into effect?

MR. POWELL: No, Your Honor, although for standing
purposes, that should apply at the time the lawsuit was
filed, but no.

THE COURT: I hear you. That backs it up a week.
And to your knowledge, have any of the plaintiffs even been
questioned or approached or investigated in any way for a

1  violation of this law?

2          MR. POWELL:  No, Your Honor.

3          THE COURT:  Okay.  And you're not aware of any of

4  that happening; right?

5          MS. JONES:  Absolutely not, Your Honor.

6          THE COURT:  Okay.  Because you don't think it does

7  apply to them?

8          MS. JONES:  Correct, Your Honor.

9          THE COURT:  And you think it's constitutional

10 and -- I read all your briefs.

11         MS. JONES:  Thank you, Your Honor.

12         THE COURT:  Here's what I want you-all to do

13 then -- it may not be -- I'm hopeful it's a good use of time.

14 I've had this happen in other fairly broad-reaching

15 injunction hearings, and it actually paid off if you'll just

16 take the time to, again, not sacrifice the good for the

17 perfect.

18         Kelly, can we make available to them our jury

19 room?

20         COURTROOM DEPUTY:  Sure.

21         THE COURT:  I want the lawyers to go sit down in

22 the jury room.  There's a big table in there, lots of room to

23 spread out.  Take a few minutes.  We'll put you on a

24 30-minute clock, and I'll check in with you after 30 minutes.

25 Hopefully, you can reach something before then.  And then

1  come back.  If you can't, that's fine.  We'll have a hearing.
2  I'm not going to hold it against you, just sometimes it's
3  just easier and better to control your own fate than rely on
4  the blunt instrument that is a court.  Sometimes a scalpel or
5  even a carving knife is a better way to go about something
6  than just yes or no and that's the end of it, and we go on
7  with the rest of the case.
8          I'm giving you-all that opportunity because I do
9  think, and my brain trust agrees with me, I think, that
10 there's some common ground here that I think could be reached
11 and maybe you could control at least the status of things now
12 while the case plays out.  Because as I said at the
13 beginning, we got a lot more work to do on this case.  Happy
14 to do it, but thought I might give you-all that one last
15 opportunity.  And then if it doesn't work, you can pin your
16 ears back and make your arguments, and we'll see where we go.
17 Okay?
18          MS. JONES:  Thank you, Your Honor.
19          MR. POWELL:  Thank you, Your Honor.
20          THE COURT:  All right.  Kelly will get you-all
21 back in the jury room, and then we'll check in with you in
22 about a half hour.
23          (Recess taken from 9:45 a.m. to 10:25 a.m.)
24          THE COURT:  No luck, huh?
25          MS. JONES:  No, Your Honor.

1    THE COURT:  Anything you want to share with me
2  about why you weren't able to reach some sort of a resolution
3  as to a limited injunction?
4    MR. POWELL:  Your Honor, our proposal was an
5  injunction that would hold the State to its own
6  interpretation of the law as to our proposed class against
7  the 21 defendants, meaning as to the three elements that they
8  would not enforce the law against someone unless they had a
9  business purpose, an intent to conceal, and that the
10  knowledge of an ICE determination was part of the scienter
11  requirement.  And I take it my colleague spoke with her --
12  well, you can report for your side then, I guess.
13    MS. JONES:  Thanks, Bill.  I spoke with my
14  superiors, and the determination was that that injunction
15  would amount to obeying the law, and that an obey-the-law
16  injunction wouldn't be appropriate here because it would
17  simply require the defendants to do what they already
18  intended to do.
19    THE COURT:  That's true, but you would also -- and
20  it's difficult to understand the harm in that, other than the
21  fact that it's an injunction and not just what the State or
22  the defendants view it as.
23    MS. JONES:  As I understand it, Your Honor, the
24  harm would be viewed as requiring a state official to do
25  something they already understand the law to be, deviates

1  from the presumption that the state official would obey the
2  law in the first place.  And I believe there may be added
3  layers to that that I could research with a little bit more
4  time.  I think it's a matter my superiors were a little more
5  familiar with than I am.
6           THE COURT:  Okay.  Well, I guess it's easy to say
7  that six blocks away, but you're here and we'll deal with it,
8  I suppose.  Doesn't make a lot of sense to me, but okay.
9           All right.  Well, then let's proceed.  I've taken
10  up a good chunk of your time with this endeavor to try to get
11  you-all to reach a resolution, and it's always worth the
12  effort, I think.
13           So I've got some questions.  I know you-all came
14  prepared to make your arguments, and I imagine that they're
15  probably pretty consistent with what you've already put in
16  your briefs, at least I hope so.
17           MR. POWELL:  Yes, Your Honor.
18           THE COURT:  So I've got some questions, and then
19  I'll give each of you an opportunity to make any additional
20  arguments you may want to make with respect to what I have
21  not covered with my questions so that you can make your
22  record.
23           But I understand we're not going to have witnesses
24  today.  We're just going to argue from the proof that's
25  already in the record; correct?

1          MR. POWELL:  That's correct, Your Honor.

2          THE COURT:  All right.  And it's the same for you?

3          MS. JONES:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  Well, let me --

5     I've got a few questions for the plaintiffs, and then I'll

6     turn my attention to you.

7          MR. POWELL:  Your Honor, would you like me to come

8     up?

9          THE COURT:  Yeah, sure, come on up.

10         MR. POWELL:  And just to again reiterate, we have

11    the division and --

12         THE COURT:  I realize, though -- if a question is

13    aimed at the other person, just sound off.

14         MR. POWELL:  We'll try to make it as easy on you

15    as possible.

16         THE COURT:  I'm not the one that's got to move,

17    you-all do, so...

18         Okay.  The original request -- and I recognize

19    that it was a little bit fluid in the first few weeks after

20    this lawsuit was filed -- asks for an injunction for a

21    broader group of defendants than you're asking for an

22    injunction for now; correct?

23         MR. POWELL:  Correct, Your Honor.

24         THE COURT:  So the language that was proposed was

25    that original view, and now it's not the same.  Precisely

1  what wording are the plaintiffs saying should be in an

2  injunction should I grant it, very precisely?

3            MR. POWELL:  For the full injunction or just the

4  part covering the defendants, Your Honor?

5            THE COURT:  Just the ones on the defendants.

6            MR. POWELL:  So I think the language for that

7  would be enjoin the 21 defendants against whom the plaintiffs

8  have established standing for purposes of their preliminary

9  injunction from enforcing Section 5 of Senate Bill 392.

10           THE COURT:  Because the proposed order would bar

11 defendants -- now we're dealing with a smaller group -- from

12 enforcing Section 5 against all members of what I'll call the

13 Lutheran Church.  I realize there are different varieties of

14 Lutherans, but just for efficiency purposes, I'll refer to

15 the Lutheran Church and everyone within the putative class.

16           So you're saying these, what, 21, 22 District

17 Attorney Generals would be the ones that would be enjoined as

18 to just the Lutheran Church and the putative class.  There's

19 a couple of other named plaintiffs.  What do we do with them?

20 Are they assumed into the putative class piece?

21           MR. POWELL:  Yes, Your Honor.

22           THE COURT:  Okay.  That wasn't clear from your

23 order.  That was a question I had.

24           MR. POWELL:  Understood, Your Honor.  I appreciate

25 that clarification given that we were responding to the

1  arguments the other side presented and made some concessions,
2  but not a full concession, obviously, as to the scope.
3          THE COURT:  Sure.  So there's issues raised in the
4  filings about, you know, that -- field preemption and all
5  those arguments, but isn't -- I think your argument is that
6  federal law occupies the entirety of the field with respect
7  to regulation and enforcement of immigration policy and law,
8  and the states have no place on that field, if you will.  But
9  Section 5 seems to be aimed at not the immigrants -- you can
10 just stand up there if you want.  Just make sure I can hear
11 you; more importantly, that Patty can hear you.
12         MS. CRUIKSHANK:  Thank you, Your Honor.
13         THE COURT:  So Section 5 is aimed at
14 nonimmigrants.  Could include immigrants, I suppose, but as I
15 understand your argument, the concern is that it applies to
16 those who are providing some sort of assistance, help,
17 shelter to immigrants.  And I recognize there's a federal
18 provision addressing harboring.  But does this law occupy a
19 slightly different place than perhaps the entirety of the
20 structure of federal immigration law?
21         MS. CRUIKSHANK:  So just a point of clarification,
22 Your Honor.  We're not talking about the entirety of federal
23 immigration law as occupying the field.  We have more
24 narrowly talked about the aspect of federal immigration law
25 that governs the entry of noncitizens into the United States

and their movement within the country once they're here.  And
that's in the provisions that we've cited, including --
8 USC 1323 is the first in the string that we're referring
to, and it goes through 1328 and 1329 as well, which has
enforcement provisions.

      And so these laws collectively make up an
interconnected web of regulation of the conditions under
which noncitizens can enter and remain in the United States,
and the laws target both the noncitizens themselves, that's,
for example, in 8 USC 1325 and 1326, which govern civil and
criminal penalties for entry and reentry, as well as laws
targeting people who are responsible for bringing noncitizens
into the United States.  So we have provisions that -- that
bar bringing someone into the United States with improper
documentation or without the proper documentation; then we
have 1324 itself, which, just like Section 5, is targeting
the people who are responsible for transporting and
harboring, rather than the noncitizens; and then later
provisions that talk about bringing in a noncitizen for an
immoral purpose.

      All of those collectively talk to the way a person
can be brought into and moved throughout the United States, a
noncitizen can be brought into and moved throughout the
United States, and Congress has made those pieces fit
together.  As the Ninth Circuit said in the *Sanchez Vargas*

1    case that we cite, over the past century, Congress has

2    repeatedly sort of iterated on this scheme broadening its

3    scope and addressing any gaps in the coverage. And so

4    collectively these laws, of which 1324 is an essential

5    component, cover that field of transport and harboring.

6              THE COURT: Well, I mean, you have to connect a

7    lot there, right, in order to cover all the different

8    situations you just describe. I mean, there's plenty of

9    situations where federal law addresses a particular issue and

10   so does state law. I mean, we can all come up with -- you

11   know, controlled substance offenses, for example, are a

12   pretty easy one to identify. It's a pretty common charge we

13   deal with around here, but the state courts are doing the

14   same thing.

15             And your view is that because of the patchwork

16   that you've kind of described over time as Congress has done

17   the work, that the net effect of that is, even as to the

18   harboring piece, even as to that, that is pulled into this

19   field preemption issue; is that right?

20             MS. CRUIKSHANK: Yes. And I think it's inherent

21   in the structure of the federal regime that's paralleled in

22   the state regime. So 1324, the (a)(1)(A) offenses are all

23   about both bringing a noncitizen into the United States,

24   transporting them while they're here, and harboring them from

25   detection. These are all immigration-related offenses. They

all talk -- they're all specific to transport and harboring
of noncitizens. And the state law, in significant part,
parallels the federal provision and is specific to
transporting and harboring noncitizens, although it lacks --
it has some differentiations.

THE COURT: Right.

MS. CRUIKSHANK: So all of this is collectively
about getting at the same problem that Congress was trying to
solve in sort of different ways. And these laws can be
violated sort of in tandem. You know, if someone were in,
let's say, a smuggling situation, you could have them being
brought unlawfully into the United States for an immoral
purpose and then being transported with intent to conceal
from immigration authorities and harbored with intent to
conceal from immigration authorities. So these laws are
interrelated and sort of mutually necessary to making the
whole system -- the whole federal system work.

And then finally, we're not dealing with a state
law of general applicability. We're talking about a state
law that only applies in the context -- where a noncitizen is
involved. And that is very squarely within Congress's
federal authority to regulate immigration as many Supreme
Court cases have set forth.

THE COURT: Understood. And I'm not sure who this
question lands on. Zooming out a little bit -- and this is

1  something that the defendants have pointed out in their

2  filings, and I have concerns about as well -- is I'm

3  concerned that you-all are reading Section 5 broader than how

4  it's actually written.  I know there's a lot of discussion,

5  really in both sides' briefs, about what statement some

6  random legislator over at the General Assembly said.  I,

7  frankly, don't have a whole lot of interest in that because I

8  have to look at the statutory language.  What one person

9  might have meant by voting for it might be different than

10  what another person might have thought was important in

11  voting for it, so...

12       But getting back to the statutory language, I

13  mean, the what I'll call the financial gain component of this

14  statute is what the -- I mean, you address it in your papers,

15  but not particularly at length.  And I think, of course,

16  being the good lawyers that they are, defendants' lawyers

17  picked up on that and talked about it a lot more.  But

18  isn't -- for example, a Lutheran church congregation decides

19  that it's part of their ministry to provide meals to whomever

20  shows up on a particular day, and they want to -- and that's

21  important to what they're doing.

22       How is that for financial gain?

23       MR. POWELL:  So, Your Honor, I guess I would say

24  maybe two things about that.  The first is that the statutory

25  interpretation here could implicate various issues

1  potentially with respect to vagueness, but I think this
2  element, the financial gain element, is not one that we've
3  argued as vague as to the merits.  So really this comes in
4  only with respect to standing.  And for purposes of standing,
5  what matters is what is arguably proscribed by the statute.
6          As the Sixth Circuit said in the *Christian*
7  *Healthcare* case, the law -- to defeat standing, the law must
8  be so clear as to be obviously inapplicable to the
9  plaintiffs' conduct.  And so we just need a plausible
10  arguable interpretation of the statute.  And I think when
11  thinking specifically about Your Honor's question, the
12  language in the statute "for the purpose of commercial
13  advantage or private financial gain," that language also
14  appears in the federal statute.
15          In the federal statute, it is a sentencing
16  enhancement, whereas, here it is an element of the crime, but
17  federal courts have interpreted that language.  There is an
18  Eleventh Circuit case that my friend on the other side has
19  relied on, but there's also a Fifth Circuit case.  I don't
20  think we cited it in our briefs, but that case is
21  *United States versus Garcia*, and it is reported at
22  883 F.3d 570.  And that case says that the element of for the
23  purpose of commercial advantage or private financial gain is
24  satisfied so long as defendant just seeks to profit or
25  otherwise secure some economic benefit.  So you're just

 1   looking for some economic benefit.  There were also --

 2          THE COURT:  What's the Lutheran Church's some

 3   economic benefit in providing meals to people who need them?

 4          MR. POWELL:  So rather than answer in the

 5   abstract, in terms of the facts that we've actually put forth

 6   here, Your Honor, there are two of the churches that have --

 7   and for purposes of associational standing, we just need one

 8   member of the Synod to have standing and to potentially be

 9   covered by the statute.  I think the first is the first

10   pastor who's mentioned.  That's at paragraphs -- I believe

11   it's 12 to 14 of the declaration from the Synod.

12          And one of the things that she mentions there is

13   that they rent out portions of their space for events to

14   groups, including to groups of immigrants, that they are

15   aware that, you know, some of them likely are undocumented.

16   And in exchange for the use of the space for whether it's a

17   wedding, a party, some kind of celebration, they receive in

18   return a donation.  And that donation for the purpose of

19   their running the church, paying the pastor, keeping the

20   lights on, that is a financial benefit certainly to the

21   church.  And I think even likewise where that same church has

22   sheltered some asylum seekers, both in their own building and

23   in a house that is adjacent to the building, and have

24   received donations for purposes of that program, I think it

25   isn't just to give that money -- it's not just passing

 1  through and going to the noncitizens.  It is also covering
 2  the church's overhead.  And I think there's nothing in the
 3  federal case law interpreting this language to suggest that a
 4  nonprofit is categorically excluded from having this type of
 5  interest.
 6          And I would mention one more of the federal cases,
 7  Your Honor.  It is called -- sorry, let me find it in my
 8  notes -- *United States versus Kim*.  It's from the Second
 9  Circuit, in 2006.  And in that case, the person -- that was a
10  transportation case.  He provided transportation to a
11  noncitizen, quote, because the noncitizen promised to show
12  him where he could buy lobsters at a reasonable price in
13  Nova Scotia.  And the Second Circuit held that even that,
14  knowing where they could get a discount in Nova Scotia, was
15  enough to satisfy this statutory language.
16          And so I don't think we have any reason to think
17  that the state version of the law would be any narrower than
18  the state -- or the federal law, which has been interpreted
19  quite broadly.  There's no definition here, unlike with
20  respect to harboring, in the state statute.
21          THE COURT:  Is the Second Circuit case you just
22  cited dealing with a nonprofit or a church?
23          MR. POWELL:  It is not a nonprofit or a church,
24  no, Your Honor.  And I am not aware of any federal
25  prosecutions against a church or a nonprofit where they

1 sought the sentencing enhancement, but I would also point
2 out, Your Honor, that the federal law does require intent to
3 conceal, and we think that the state statute does not, that
4 it reaches merely providing shelter.  And so I think that is
5 a reason that churches aren't generally in the crosshairs for
6 the federal statute, as opposed to this financial gain
7 component.
8          THE COURT:  You read my mind on my next question.
9 Your brief makes a point that, candidly, I didn't follow, but
10 I'll give you a chance to -- nobody's ever accused me of
11 being the smartest guy in any room, so I just might have
12 missed the point.
13          MR. POWELL:  I'm sure that's not right,
14 Your Honor.
15          THE COURT:  But -- ask them.  But you make the
16 point that only federal prosecutors can prosecute federal
17 crimes and particularly federal immigration laws.  What was
18 the purpose of raising that point?  I mean, that's obvious --
19 right? -- I mean, I think to anybody who touches on the law.
20 Why was that point important to make?  Because I was confused
21 and thought I'd give you a chance to explain it.
22          MS. CRUIKSHANK:  Sure, Your Honor.  That goes to
23 the conflict preemption argument.
24          THE COURT:  Okay.
25          MS. CRUIKSHANK:  And the specific point there is

 1   that Congress considered and determined a very narrow and
 2   particular role for states to carry out in the enforcement of
 3   the federal transport and harboring regimes.  Specifically,
 4   state and local law enforcement officers are authorized to
 5   carry out arrests for such violations, but then in a separate
 6   provision, it says that only federal prosecutors can bring
 7   those cases in federal court.
 8           So we're just pointing to that particular
 9   statutory language to show Congress thought about the
10   appropriate role for the state in this area and declined to
11   extend it further than carrying out arrests for the federal
12   crime.
13           THE COURT:  Okay.  I understand.  I follow the
14   context of it, but I wanted to give you a chance to clarify
15   that in case I missed it.
16           So a person is, in theory, charged under
17   Section 5 -- and I recognize that the issues here are whether
18   the -- challenging the constitutionality of it.  Right now
19   we're dealing with whether an injunction is appropriate, not
20   necessarily the ultimate merits of the case.  But would a
21   person charged under this statute that sort of falls under
22   what you-all have described as -- well, as the putative
23   class -- again, something we're not reaching today -- also
24   have these same constitutional challenges to any prosecution?
25           MR. POWELL:  Yes, they would, Your Honor, but the

Supreme Court was quite clear in *Susan B. Anthony List v
Driehaus*, and the Sixth Circuit in a number of follow-on
cases has also made clear, that a plaintiff simply does not
have to wait to be prosecuted and to make the constitutional
arguments in the context of a prosecution, that there is
standing, and there is a basis for injunctive relief.

       THE COURT:  I recognize that.  And, I mean, it was
a bit of a softball question to you.  But my point is that
it's not that -- is that that's still a remedy available to
someone who might be prosecuted.  It's not -- they don't have
to pick their poison, if you will.  You follow what I'm
saying?  It's still there.  They can still do it.

       MR. POWELL:  That is true, Your Honor, but I think
in the interim what we are seeing -- and we have the
declaration from Ms. Boatner in the record as well -- is
landlords don't want to get prosecuted and just have to raise
their defenses and take their chance in state court.  So
instead they are evicting their undocumented tenants, and we
are seeing quite a bit of fear and harm in the community.
And so that's the irreparable harm that we are seeking the
injunction to avoid.

       THE COURT:  Well, you got to my next point, which
is the irreparable harm prong.  And there was basically one
paragraph devoted to that in your principal brief, which is a
bit concerning because it's a pretty important -- they're all

1  important factors to consider, but most of the time

2  injunction hearings kind of land on likelihood of success on

3  the merits or immediate threat of irreparable harm.

4         Why was that given such little attention?  Or is

5  the answer because you've done the best you could, and

6  there's been no prosecutions in two-and-a-half months, and

7  you're just going to have to stand on the body of case law

8  talking about constitutional violations constitute

9  irreparable harm?  So I'll give you a chance to address that.

10        MS. CRUIKSHANK:  Sure.  So just in candor, we were

11  constrained by page limitations, and there were a lot of

12  arguments to make.  So we did the best we could to hit every

13  point at least to some extent.  That's just why some of the

14  arguments got less of a full treatment than others.

15        THE COURT:  Understood.

16        MS. CRUIKSHANK:  And I don't think that the

17  opposition to the PI brief went sort of too deeply into

18  irreparable harm, except to say that because the plaintiffs

19  are not the kinds of people who would be targeted by the law,

20  they're not actually facing this prosecution.  So because we

21  disagree on that interpretation of the law question, there

22  wasn't that much for us to respond to.

23        As to sort of the core of the question, there is

24  ample case law suggesting that the threat of prosecution for

25  an unconstitutional law is, itself, irreparable harm.  Our

1   clients, the plaintiffs here, live every day with the
2   possibility that they could be prosecuted simply for
3   ordinary -- carrying out tasks in their ordinary life,
4   whether it's renting to a potentially undocumented person or
5   living in a mixed-family household or carrying out the
6   ministries of the Synod.  And so that, in itself, the
7   possibility of prosecution, the possibility of arrest and
8   facing a potential mandatory minimum prison sentence is,
9   itself, an irreparable harm.
10          As courts have concluded and as my colleague
11  pointed out, this goes a bit more to the public interest
12  piece, but we have been seeing evictions even before the law
13  went into effect, and those have continued.  We don't have in
14  our -- in our preliminary injunction materials anything about
15  the sort of ongoing state of play in Tennessee since the law
16  has gone into effect since most of our briefing was completed
17  in the early days, but even before the law went into effect,
18  we were seeing people being evicted or unlawfully asked for
19  their papers and things like that, all of which signaling
20  both an irreparable harm to the landlords and then also harm
21  to the community.
22          And on the other side of the equation, the State
23  has no interest in enforcing an unconstitutional law and in
24  sort of challenging federal prerogative, and I think the
25  State in this case particularly has no interest in enforcing

the law as against the associational plaintiff and the
members of the putative class and named plaintiffs because
it's already made it its litigating position that it won't be
enforcing the law in that way.

THE COURT:  Well, that gets me to my next
question, too.  You-all are good at anticipating where I'm
going.  You mentioned the ICE determination, which I've got
several questions for the other side about that language
because you fairly brought up some concerns about that.  But
they've taken the position that the law requires actual
knowledge of a determination by ICE.  And I realize the
parties' positions on that language.  But wouldn't that
decrease the threat of irreparable harm?

MS. CRUIKSHANK:  I don't think so.  As Your Honor
has recognized, we think that that's the poorer reading of
the statute, to incorporate the "as determined by ICE" into
the scienter requirement.  But even without it, even without
determining where the "as determined by ICE" language
functions in the law, and assuming it's part of the scienter
requirement as defendants would suggest, ordinary people have
no way of knowing what it means for ICE to have made a
particular determination absent some granular knowledge of
the inner workings of a federal agency.  Pegging scienter on
whether ICE has made a particular determination doesn't help
ordinary people conform their behavior.

1        ICE engages in a range of enforcement activities

2   from stopping people on the street on the basis of reasonable

3   suspicion, to carrying out civil and criminal arrests, to

4   issuing notices to appear.  There are a range of things that

5   ICE, as a law enforcement agency, is tasked with doing.  None

6   of those is sort of formally referred to as a determination.

7   And so ordinary people would simply be incapable of knowing

8   what it means for ICE to have made a determination in a

9   particular case.  So I don't think that that mitigates the

10  harm even if defendants were right on their strange reading

11  of the scienter requirement.

12       THE COURT:  Well, let me just jump over to the

13  other side while that topic is up.  You can stay in place.  I

14  want to give you a chance to respond to that because I am --

15  she raises a fair point.  How does one know -- assuming your

16  reading of it is accurate and understandable and along those

17  lines, how does a regular citizen have actual knowledge, as

18  you've taken the position that's how the statute must be read

19  and that's how a Tennessee court would read it -- how do they

20  have actual knowledge of an ICE determination?  Because she

21  raises different scenarios, reasonable suspicion stop,

22  different things along this spectrum all the way up to a

23  warrant.  How does the average Tennessean know what an ICE

24  determination is?

25       MS. JONES:  Certainly, Your Honor.  There is three

1   parts to the answer I'd like to give the Court.

2             THE COURT:  Okay.

3             MS. JONES:  The first part is that this idea of

4   requiring knowledge of a governmental determination is not a

5   new one.  There's a very commonly used federal felony for

6   smuggling or harboring someone from detection who is trying

7   to evade an arrest warrant.  And we would argue that the same

8   logic applies here.  You have to know in order to violate --

9   that statute is 18 USC 1071.  We cite it in our brief.  In

10  order to violate that statute, you have to know that there

11  was an arrest warrant for that person and, nonetheless, hide

12  them.  It's a similar concept here.  You would have to know

13  that there was an ICE determination that the person was here

14  unlawfully.  And stopping someone based on a reasonable

15  suspicion by definition is an investigation.  It's not a

16  determination that you're here unlawfully.  You are

17  investigating whether the person is here unlawfully.

18            We have provided clear examples of when a person

19  could know if there has been an ICE determination.  One

20  example would be if they've seen an arrest warrant issued by

21  ICE that states that the person is in the United States, has

22  entered or remained unlawfully.  The second one would be a

23  notice of appearance, I believe is the terminology we

24  reference in our briefing, that talks about how if this

25  letter has been issued, if you're aware of the letter, or if

1  you've seen the letter, then you know a formal ICE
2  determination has been made.  Posting on ICE's website that a
3  person is here unlawfully would clearly give a person
4  information that ICE is here unlawfully.  So an ordinary
5  person would have reasonable notice in those three scenarios.
6          Now, as for the many other scenarios that really
7  just -- my third point to the response that really just
8  elevates how premature this lawsuit is, there may be
9  instances where state courts will say that doesn't constitute
10 knowledge of an ICE determination or that was not a final
11 stage of an ICE determination assessment of whether a person
12 here is lawful or not.  That was just an investigatory review
13 so that doesn't amount to concealment.  But that's a question
14 that state courts should be given the opportunity to answer
15 based off of very fact specific circumstances, as opposed to
16 this purely hypothetical position we're here today.
17         THE COURT:  But, I mean, to play out her example,
18 a guy who has some apartments to rent in Murfreesboro is
19 walking down Broadway one day and sees a guy who's applied
20 for one named Fred, and Fred is all of a sudden put up
21 against the wall and frisked by a federal agent.  Wouldn't
22 that cause that person to go, "Hmm, better deny Fred's
23 application because I don't want to run afoul of this thing
24 in case he's in trouble with ICE"?  Would that not have a
25 chilling effect, just that -- because actual knowledge is not

1  written in the statute; right?

2          MS. JONES:  Your Honor, we read the statute to

3  require actual knowledge of the ICE determination.

4          THE COURT:  Right, but they raise the issue of

5  should have known and -- you-all go back and forth a little

6  bit on --

7          MS. JONES:  Circumstantial evidence --

8          THE COURT:  Yes.

9          MS. JONES:  -- to contribute to knowledge?

10          THE COURT:  Yes.

11          MS. JONES:  I understand the scienter requirement

12  to be you know.  We prepared a PowerPoint that just breaks

13  down and highlights the specific language.  If I could have

14  one moment to bring up the statute myself.  And I'm happy to

15  share the PowerPoint with Your Honor if it would be helpful,

16  but I'm just bringing it up so I can look at the language of

17  the statute.

18          So the ICE determination portion of the statute

19  says word-for-word the person -- that the person knows --

20  referring to the individual who's been harbored from

21  detection.  The person knows the individual has illegally

22  entered or remained in the United States as determined by

23  ICE.  And that is -- that is direct knowledge.

24          THE COURT:  Actual knowledge, not constructive.

25          MS. JONES:  Yeah.  Not that they should have

known.  And, in fact, a "should have known" provision was
considered and rejected by the General Assembly.  It's not
they should have known, it's that they actually know ICE has
determined this.

THE COURT:  Well, I don't have an example in front
of me, but I'm fairly confident that there are some other
criminal statutes that have the word "knowledge" that have
been interpreted to be broader than actual knowledge maybe,
but I understand your point.

Okay.  Thank you.

MS. JONES:  Yes, Your Honor.

THE COURT:  And I'll give you the opportunity to
show me your PowerPoint here in a minute.

MS. JONES:  Thank you.

THE COURT:  If you want to.  Back to irreparable
harm --

MS. CRUIKSHANK:  Might I respond --

THE COURT:  Oh, sure.  Go ahead.

MS. CRUIKSHANK:  -- to a few of those points?

THE COURT:  Yeah.

MS. CRUIKSHANK:  I have a variety of notes I'd
like to get through.  The first is just the comparison to a
statute in which -- a criminal provision in the federal law
in which someone is helping someone avoid execution of an
arrest warrant.  I think that's an opposite for two reasons,

both because that statute involves an intent to conceal.  So
there's a much clearer nexus between the existence of the
arrest warrant and what the person is doing.  And here, as
we've argued, there's no requirement of an intent to conceal
for every iteration of the Section 5 offense.  So there's no
way of being certain that -- that the person actually did
have that knowledge.

And the other reason that it's an opposite is
because an arrest warrant is a clearly identifiable and
specific document.  There is no such thing in federal law as
an ICE determination.  And so there's no way for an ordinary
person, who's not familiar with the operations of ICE, to
know as far as ICE is concerned what counts as a
determination, unlike an arrest warrant.

I'll also note that there's -- my friend on the
other side talked about, you know, a reasonable suspicion
stop is an investigation, but ICE is a law enforcement
agency, and nearly nothing that it does constitutes a final
determination.  When it issues a notice to appear, that's
essentially a charging document, an indicting document, but
that doesn't mean that someone is definitively not lawfully
present in the United States.  And the defendant's
interpretation of the law doesn't give -- doesn't have any
answer to what would happen if a notice to appear were issued
at time point A, but then an immigration judge, the Board of

1  Immigration Appeals, or a federal court subsequently
2  determined that the person either did have lawful presence or
3  otherwise was protected from immigration enforcement under a
4  variety of federal provisions, the notice to appear would
5  still exist.  The landlord, or whomever, would still
6  potentially have knowledge that that notice to appear had
7  arrived.  It would just have been potentially superseded, but
8  it would still exist and constitute an ICE determination.
9         THE COURT:  Well, wait, you just said something
10 different, I thought.  You said it's the equivalent of a
11 summons or perhaps an indictment.
12        MS. CRUIKSHANK:  Right.
13        THE COURT:  But it's not a final determination.
14        MS. CRUIKSHANK:  It's both not a final
15 determination of whether someone is, in fact, lawfully
16 present in the United States, and also the notice to appear
17 would continue to exist -- would sort of continue to be a
18 document that exists in the world, regardless of whether a
19 subsequent adjudication had been made that the person could
20 remain in the United States.
21        THE COURT:  But that's not a final determination.
22 You just said ICE doesn't really make final determinations.
23        MS. CRUIKSHANK:  That's correct.
24        THE COURT:  So how is it that there's really much
25 of a threat at all if ICE doesn't -- and I'll give you a

1  chance to respond on the ICE determination language because

2  that's an important part of why we're here.  So if ICE

3  doesn't make final determinations as to somebody, whether

4  they illegally entered or remained, how is it that anybody

5  would run afoul of this law?

6          MS. CRUIKSHANK:  I mean, that's one of the reasons

7  that we think the law is vague, is because its language is

8  essentially a content list.  There's really no way of knowing

9  what the legislature was seeking to accomplish in that "as

10  determined by ICE" language.  So we've pointed out there's

11  the structural issue.  We don't know whether "as determined

12  by ICE" is part of the scienter requirement or simply sort of

13  a factual predicate.  There's the temporal issue, which is we

14  don't know whether the ICE determination must have been made

15  before the alleged harboring or transporting occurred or

16  whether it could happen, you know, over the course of trial

17  ICE comes in and presents evidence as to a particular

18  determination.  And we also don't know, again, what it means

19  for ICE to actually make such a determination because, as I

20  mentioned, ICE is not in the business of making final

21  determinations about whether someone is entitled to be in the

22  country, but rather issues sort of charging documents at the

23  sort of most rigorous end of the official spectrum, but also

24  engages in a bunch of other enforcement activities that an

25  ordinary person could plausibly consider or not ICE

1  determinations.

2        So I think that's -- those are all for --

3        THE COURT:  Let me continue -- sorry for

4  interrupting.  Let me continue with my very imprecise and

5  crude scenario I gave you about Fred on Broadway.  So Fred

6  wants to rent this apartment in Murfreesboro, and landlord --

7  I'm not sure if I gave the landlord a name, but landlord

8  calls you, says, "Hey, this is what happened.  I don't know

9  what -- it was just ICE, and I don't know what happened."

10        Wouldn't the advice be "ICE can't make final

11  determinations.  You got nothing to worry about"?

12        MS. CRUIKSHANK:  That is one version, one

13  plausible interpretation, which runs directly contrary to

14  what defendants are proffering, which is that not only does

15  ICE make determinations, but that's an essential component of

16  the scienter requirement.  I think that defendants' version

17  of the law essentially renders the subset of people who could

18  be prosecuted for it dramatically smaller, but -- sort of two

19  responses.

20        To the standing piece, we don't actually need to

21  definitively prove how to interpret the law.  We just need to

22  show that it's an arguable interpretation.  And as to the

23  unconstitutional vagueness piece, I don't know that ICE

24  determinations is something that we can necessarily pinpoint

25  what the legislature is getting at.  So we have said ICE

1   doesn't make final determinations, but it's arguable that ICE

2   makes informal determinations, you know, in the -- in the

3   course of investigating and issuing notices to appear and

4   things like that.  And so we just don't know what of the

5   activities that ICE carries out counts as a determination,

6   and there's really no saving construction of the statute that

7   would remedy all of the ambiguities that we've pointed out.

8           THE COURT:  So perhaps the word "adjudication"

9   might have been a better choice than "determination," even

10  though ICE doesn't adjudicate anything either.  I'm just

11  saying take out ICE.  Someone has been adjudicated to be in

12  the country --

13          MS. CRUIKSHANK:  That would at least --

14          THE COURT:  -- illegally or whatever.

15          MS. CRUIKSHANK:  That would at least have

16  reference to federal class -- federal immigration

17  classification, which gets back to the conflict preemption

18  argument as well, which is that the law has created an

19  immigration classification not present in federal law.  And

20  this was actually raised -- I know we don't need to get into

21  the legislative history for purposes of finally interpreting

22  what the law means, but these issues were all raised in the

23  floor debates, and what the sponsor ultimately said is he was

24  trying to target a different group of noncitizens, meaning

25  those that hadn't necessarily already had a final

1  adjudication, because the idea was to at least theoretically
2  keep people out of trafficking situations by catching them
3  ahead of time.  We don't think that the language as enacted
4  accomplishes that, but that's the reason at least that one of
5  the sponsors said it wasn't adjudication or wasn't a specific
6  reference to a federal classification.
7          THE COURT:  What determinations does ICE make?
8          MS. JONES:  Your Honor, in issuing an arrest
9  warrant, ICE is authorized to determine that an individual
10 has unlawful status and therefore should be arrested.  In
11 issuing a notice of appearance, ICE makes the initial
12 determination that a person has unlawful status and therefore
13 that status should be adjudicated.  ICE makes -- yes, ICE
14 does not decide the status of someone permanently.  They
15 don't make the final determination, but this statute doesn't
16 refer to final or initial determinations.  And we would argue
17 the initial determination is adequate.
18          In order to issue an arrest warrant -- and we talk
19 about this in the introductory background section of our
20 brief on pages 3 and 4.  We go through ICE's power to issue
21 an arrest warrant in order to enforce federal immigration law
22 and issue an arrest -- a notice of appearance that my
23 colleague on the other side helpfully went into.  In order to
24 address whether someone is here unlawfully, there has to be a
25 decision made, much like, again, and I return to the arrest

1   warrant for evading a criminal arrest warrant under 1071.

2          I appreciated my colleague's point that that has a

3   flavor of concealment.  Exactly.  The statute makes sense

4   when you combine the intent to conceal with the knowledge

5   that someone has determined that person should be arrested.

6   The same logic applies here.  If professional smugglers --

7   because those are the target of the statute.  We agree the

8   statute doesn't apply across the board.  It is intended to

9   target a serious professional smuggling type violation.  The

10  scope of people covered under the statute would naturally be

11  narrow because we don't anticipate there are millions of

12  people out there conducting professional smuggling.

13         So the reading supports the intent of the statute.

14  Under that reading, the intent to conceal someone because --

15  while knowing that ICE has said that person isn't in the

16  United States illegally is enough.  If ICE has said -- not if

17  ICE is investigating, not if ICE is asking "Can I see your

18  identification card?  Can you let me know -- where's your

19  country of origin?  How long have you been here?  Do you have

20  a visa?  Those are all investigatory questions.

21         But if ICE tells that person, either through a

22  notice of appearance, through an arrest warrant, "You are not

23  here lawfully by our review of the law, by our review of the

24  circumstances," then ICE has made that determination.

25  Whether that determination is ultimately proven to be

incorrect is irrelevant for the culpability of the person
hiding someone knowing that ICE says that they're not here
lawfully.  Just like if someone is facing arrest, and it
turns out they didn't actually commit a crime, it's still
improper to hide that person knowing there's a warrant out
for their arrest.  The same culpability, the state of mind
exists.

However, if the person says, "Yeah, ICE said that
I was here unlawfully, but I ultimately obtained legal
status," then ICE has no longer determined -- we're not
longer in the state of events where the determination made by
ICE is the controlling determination.  ICE determines you're
here unlawfully.  Presumably, ICE would adhere to any future
ruling of a court and respect that decision.  Any future
administrative judge, any future appeal from that would have
the controlling effect.  But the target here is not on
whether the illegal immigrant is ultimately determined to be
here lawfully or not.  The target of this statute is the
culpable state of mind of someone who says, "Oh, ICE is --
ICE doesn't think this person should be here.  We know that
because there have been press releases.  They're talking
about these 50 children who have been brought into the
country unlawfully, and they're trying to find them.  We know
that because there is a notice of appearance that was sent to
this person.  I heard them talking about it, and I know that

1  ICE -- they said that ICE told them they're not allowed to be
2  here."
3          Those are all instances of ICE determinations that
4  can be applied in different contexts.  And to win a facial
5  vagueness challenge, we don't have to prove that every
6  possible application of the statute is crystal clear.  We
7  only have to demonstrate that it can be reasonably applied in
8  one context.  And that alone is enough for the statute to
9  survive.  Now, we argue that there are many applications
10 where it could be reasonably understood, but the one cleanest
11 example is the arrest warrant.  That is ICE's initial
12 determination.  And if you find out someone has a warrant
13 against their arrest -- a warrant against them to arrest
14 them, and you still hide them, you have culpable mental
15 state.
16          THE COURT:  What if it's not a warrant?  What if
17 it's just some sort of notice?
18          MS. JONES:  A notice again -- and that's where we
19 get into some -- to some extent the factual analysis of the
20 case, but, yes, a notice could qualify depending on what the
21 notice says and what you understand the notice to say.
22 Because this turns -- this doesn't turn ultimately on whether
23 or not the person you're smuggling is in the country
24 unlawfully.  Ultimately, this turns on whether you believe
25 that ICE has determined they're in the country unlawfully,

1    and you are, nonetheless, hiding them from detection.

2            THE COURT:  But, I mean, it's layered because -- I

3    mean, in some ways you're asking landlord, in my scenario,

4    to -- let me change the scenario a little bit.  Fred is not

5    up against a wall on Broadway.  Fred has just got a notice in

6    the mail from ICE that says "We think you're here illegally,

7    and this is what you have to do next."  And he says to

8    landlord, "Hey" -- they're just talking, and he says, "I got

9    this in the mail.  It's kind of weird, but, you know, I've

10   got an asylum petition pending," or "I've got some other

11   thing I'm working on, and ICE just got it wrong.  They got me

12   mixed up with somebody else."  Right?  And the landlord says,

13   "Okay.  I'll just go ahead and rent this apartment to you."

14           Aren't they subject to prosecution at that point?

15           MS. JONES:  Not at all.

16           THE COURT:  I mean, presumption of innocence for

17   Fred be damned.  It's they can just do whatever they want?

18           MS. JONES:  Not at all, Your Honor.  Now, if the

19   landlord had said, "Do you want me to hide you?  Do you want

20   to come and stay in my basement so no one can find where you

21   are, and you don't have to go to this event," then, yes,

22   maybe they would be subject to prosecution.  That's where the

23   concealment intent is so crucial, and that's why the felony

24   is named "human smuggling."  It's not named "human renting."

25   It's a felony to hide someone knowing that ICE has determined

1  they're here unlawfully.  But if the person isn't trying to
2  hide, and they're cooperating with the administrative
3  process, then there should be no concern at all for any
4  landlord to rent them a room.
5          MR. POWELL:  Your Honor, could I address the
6  intent to conceal aspect of the --
7          THE COURT:  Please.
8          MR. POWELL:  Because that seems to be relevant to
9  the answer here.  A clear textual reading of the statute --
10 and, again, for standing purpose at least, it just has to be
11 an arguable read.  But intentionally conceals, harbors, and
12 shields from detection, that language -- the operative
13 language is the same as in the federal statute, and the
14 Sixth Circuit has read that federal language to require an
15 intent to conceal.  So it would have been easy enough
16 texturally to stop there, and there would have been an intent
17 to conceal, but the legislature did not do that.
18         The legislature added a definition of the word
19 "harbor."  And that definition says "to provide shelter to or
20 conceal the whereabouts of," and the word "or" is
21 disjunctive, and it means that harbor can be satisfied by
22 either of those two options.  You can do it by concealing the
23 whereabouts of, but you can do it just by providing shelter.
24         I take it then that the kind of response the other
25 side comes back with is that we could go back up to the

operative phrase.  The "from detection" at the end, "shields from detection," goes back and modifies the whole list, but under clear statutory interpretation canons, the rule of the last antecedent trumps the series qualifier rule, and that "from detection" modifies only the last antecedent in the list, which is "shields."  It does not modify "conceal" and "harbor."

And, in fact, there are many hundreds of opinions interpreting the federal language, and there is no case that I could find, and I looked quite hard, that has ever read the statute to mean that "from detection" modifies "harbors" in the federal statute.  And the only case even discussing that question that I could find was *United States versus Acosta De Evans* from the Ninth Circuit, which we cited, which said that if "from detection" were to modify the whole list, you end up with the, quote, redundant phrase "conceal from detection" and the awkward construction "harbor from detection."  So "from detection" modifies only "shields," and then that leaves "harbor," standing alone, to have the definition, which is "to provide shelter to."

So there -- this law is broader than the federal law, and certainly there's an arguable basis for reading it. And you asked earlier if I was advising a client, I would advise a client "I think the best reading of this statute is that 'to provide shelter to' is enough and so that means that

1  you probably do need to evict that person if you want to

2  avoid prosecution."

3           THE COURT:  You want to respond?

4           MS. JONES:  Absolutely.  May I share the

5  PowerPoint with Your Honor?

6           THE COURT:  Go ahead.

7           MS. JONES:  On this point I think it would be

8  quite helpful to see.

9           THE COURT:  You took the time to prepare it, so

10 let's go ahead and see it.

11          MS. JONES:  Well, I tried to keep it very high

12 level.  It's just a few slides, but -- and I'll skip a couple

13 of them, so we can talk specifically about the one at issue

14 here.

15          So talking about the intent to harbor, yes, my

16 colleague is correct, that "harbor" is defined as to provide

17 shelter to or conceal the whereabouts of an individual, but

18 their argument that the "from detection" provision doesn't

19 apply to "harbor" is incorrect.  And there are a couple

20 reasons why.

21          First of all, Tennessee state courts have also

22 considered the series of last antecedent rule versus the

23 series modifier canon.  And I have a case that we can -- we

24 printed out, and I'm happy to share today, where the

25 Tennessee Court of Appeals considers that exact nuance of

 1  tension between these two canons and does -- does a following
 2  part of a statute modify an entire series or only the last
 3  part of it.
 4          The Court of Appeals in *Bearing versus*
 5  *Gerregano* -- and please let me know if you want me to hand
 6  that case out -- says that when evaluating which of these two
 7  rules to pick from, there are a couple different things you
 8  can look at.  One, is the series itself in parallel
 9  construction?  So if the series is made up of a verb and then
10  a noun and then a verbal phrase, then there's more of a
11  compelling argument that the next part of it, the "from
12  detection," would only modify the last part because there is
13  not a parallel construction.  And two, do later parts of the
14  statute, not the -- the last antecedent in issue.  So that
15  would be, for example, the requirement -- the "ICE
16  determination language" or "the individual the person knows
17  has illegally entered US" portion.  Does that modify the
18  entire series, or does it modify only part of a series?
19          And if both of those factors -- if there's both
20  parallel construction and later parts of the statute modify
21  every part of the series, then the likelihood is that the
22  clause, the little "from detection" prepositional clause at
23  the very end of the series modifies the entire series.
24          And that's what we have here.  We have
25  "intentionally conceals, harbors, or shields from detection."

1  Those three verbs are all in present tense.  They're all in
2  the exact parallel construction.  And then later on, in the
3  following sentence, we have an even clearer example of it.
4  We have "to conceal, harbor, or shield from detection."
5  That's infinitive form.  And notably, the General Assembly
6  didn't repeat the word "to."  They didn't say "to conceal, to
7  harbor, or to shield from detection."  They assumed that the
8  word "to" would apply to all three.  So it was fair to assume
9  as well that the word "from detection" would apply to all
10 three backwards.  And I'm -- the Westlaw cite for that state
11 court of appeals case is 2022 Westlaw 4008.
12          But to address the second part, the Ninth
13 Circuit's evaluation in *Acosta*, the federal law that they're
14 referring to, 1324, differs from the state law in a crucial
15 way.  The federal law does not talk -- does not have the
16 parallel construction that we have in state law.  It just
17 talks about conceal, harbor, shield from detection, and it
18 moves on.  In state law, we have under (a)(1) it's a
19 violation to knowingly transport an individual with the
20 intent to conceal the individual from a law enforcement
21 officer.
22          So you have a specific intent to conceal from a
23 specific group of people, and then below it's a crime to
24 conceal from detection generally.  So the phrase -- *Acosta*
25 said the series modifier doesn't apply because the phrase

"conceal from detection" is duplicative.  "Conceal" means the same thing as "from detection," so using that phrase would render the word superfluous.  But here that phrase is not duplicative.  You have in (a)(1) a violation of "to conceal from a law enforcement officer"; whereas, in (a)(2), there's a more broad violation of "to conceal from detection" generally.

So say, for example, you've smuggled a child into the United States, and you're aware that their family is here searching for them, and you hide that child from the family, that wouldn't necessarily be a violation of (a)(1), but it would be a violation of (a)(2).  You are concealing them from detection, as opposed to from a specific person.  Because "from detection" can reasonably be read to apply to conceal, it also should be reasonably read to apply to harbor, harbor from detection.

And that makes perfect sense because, as we discussed earlier, the name of the statute is -- or the name of this felony is the felony of human smuggling.  The General Assembly wasn't hiding an intent to prevent people from renting homes when it said "You may not provide shelter to someone."  It says, "You may not provide shelter from detection to someone who you know is not here unlawfully."

THE COURT:  Okay.  Anything else on that point?

MR. POWELL:  Just very quickly, Your Honor.  The

reading just given reads shelter -- the "to shelter" part of
the definition completely out of the statute because there
would have been no reason, whatsoever, to put that "or" in
the definition if the "from detection" was still going to
kick back in and modify and put a concealment requirement
onto all of the verbs no matter what.  So it creates a
conflict between the definition and the operative verbs.

        The only other point I would make is that our
point is not that one of those canons always wins out over
the other.  We agree that you have to look at the sentence
and decide what is the plausible inference, and here where no
court to interpret the exact same list of verbs in the
federal court has ever read "from detection" to go back to
all three verbs and where "conceal from detection" is a
redundant phrase, it makes sense that it modifies only the
word "shields."

        THE COURT:  Okay.

        MR. POWELL:  And for purposes of standing, we only
need an arguable interpretation.

        THE COURT:  Understood.  Is the plaintiffs'
position -- I realize we don't have any actual prosecutions
or to my knowledge any concrete threats of prosecution, but
is the plaintiffs' position that they, and perhaps others of
this putative class, are censoring themselves already?  Is
there any evidence or proof of that?

1          MR. POWELL:  So the case law on standing in this
2     area and the credible threat of prosecution arises often in
3     the First Amendment context, but that same mode of analysis I
4     think does apply to a challenge even if it's a preemption
5     challenge or a vagueness challenge.  And I would say two
6     things about that, Your Honor.
7          The first is that in *Kentucky versus Yellen,* the
8     Sixth Circuit was clear that when assessing that credible
9     threat of prosecution, you do it at the time the complaint
10    was filed.  And here we filed the complaint before the law
11    went into effect.  And so to assess for purposes of standing
12    whether we have credible threat, you do it at the time the
13    complaint was filed.
14          The second thing I would say, even with what has
15    happened over the last two-and-a-half months, taking it into
16    account, is that we have seen chill of people in general in
17    the community and landlords who have done evictions, and we
18    have the declaration in the record about that, and that is a
19    relevant additional factor that can be considered as part of
20    that *McKay* balancing test.  In the *Kareem* case, which was the
21    ballot selfie case, the Court held that, in addition to the
22    four initial *Kareem* factors, a relevant additional factor was
23    that the Ohio ballot selfie law was deterring others from
24    taking ballot selfies, and that was a sufficient -- among the
25    factors to consider when assessing whether there is a

1   credible threat of prosecution.

2           And then the final point I would make is that if

3   there is subjective chill, meaning a self-censorship, the

4   Sixth Circuit has recognized that to be actually a factor

5   that can cut against standing because it means that you're

6   not currently engaged in the activity for which you could be

7   prosecuted, and that can attenuate the causal connection, but

8   where you are continuing the conduct, then the prospect that

9   you could be prosecuted for conduct that is ongoing is, in

10  fact, higher.  And I think that is what we have here, at

11  least as to our individual plaintiffs, that they continue --

12  for the most part certainly the individual plaintiffs, Causey

13  and Doe, continue to provide shelter.

14          I do think with respect to the Synod, the first

15  church that we mentioned, had previously been sheltering

16  individuals in their building, and they are not, to my

17  understanding, doing that at present in part because of their

18  concern about the law.  So there is some subjective chill

19  even among our plaintiffs.

20          THE COURT:  That kind of goes back to, I think,

21  what the defendants are saying, is if there is subjective

22  belief that they're subject to prosecution, they're just

23  wrong, they don't understand the law.

24          Is that what you're saying?

25          MS. JONES:  Your Honor, yes, they are wrong.  I

1   don't know if it's a lack of understanding of the law so much
2   as it is a needless fear of the law, because I think the law
3   is -- a natural reading of the law could be understood by an
4   ordinary person.
5           Addressing the subjective and objective chill
6   point, if I may, that entire doctrine is limited to the First
7   Amendment.  Most -- that's -- we would even argue it's
8   limited to facial overbreadth challenges under the First
9   Amendment because the concept of subjective versus objective
10  chill comes into play when you're looking at whether First
11  Amendment rights are being deterred from being exercised.
12  There is a very unique exception to standing where the
13  Supreme Court says people can come into court, and they can
14  prosecute in a facial overbreadth challenge if they believe
15  that the law is -- has a chilling effect, and even if they
16  are not personally chilled, it chills other people because
17  the law is so overbroad.
18          That is a huge exception to the standard standing
19  requirements, if you'll pardon the alliteration, in the
20  normal case, especially in this case, where, one, they don't
21  bring an overbreadth challenge, but, two, the claims we're on
22  before the Court aren't even their First Amendment claims.
23  It's just their preemption and their vagueness claims.  We
24  don't touch the concept of chilling because the concern is
25  not whether the law is deterring people from exercising their

constitutional rights. That concern only arises in the
concept of -- in the context of a First Amendment facial
overbreadth challenge. The free speech case they,
themselves, cite, the Free Speech [sic] versus -- oh, I'm
going to butcher this. *Schlissel*?

                MR. BERNARD: *Schlissel*.

                MS. JONES: *Schlissel*. That case talks about how
there's a key distinction between a facial overbreadth
challenge and an as-applied overbreadth challenge and how in
an as-applied overbreadth challenge, you can't find standing
based solely on existence of a potential objective chill.
You have to demonstrate subjective chill, plus all the *McKay*
factors. And even on a facial overbreadth challenge, you
still have to show some form of governmental action above and
beyond the simple existence of a law.

                The issues at -- the regulations at issue in
*Schlissel* were enacted and had been enforced 16 times before
they came to court. That is certainly not the position we're
here in today. Our position is that the better approach to
determining standing is following the two-part components
that are first set out in *Crawford versus Department of
Treasury* and then apply the *McKay* factors to the second half.

                So on the first half, under *Crawford*, the
plaintiffs have to demonstrate an intention to act in a way
that is affected by constitutional interest, but violates the

law, which for all the reasons we've discussed today, our
position is they haven't done that, and they also have to
show a certain threat of prosecution. *Crawford* said, "A mere
possibility of prosecution is not enough. You have to show a
certain threat." And they cannot show a certain threat of
prosecution because of the very preliminary stage at which
they decided to bring this lawsuit.

THE COURT: And the fact that you won't do an
agreed injunction that says you won't prosecute these people.

MS. JONES: Your Honor, that does not go to our
position that they won't be prosecuted. That goes to the --

THE COURT: I understand.

MS. JONES: -- merits of the case.

THE COURT: Sure could have settled things down a
little bit for a little while.

MS. JONES: An injunction indicates a likelihood
of success on the merits. If an injunction were issued in
this case, it would tell people plaintiffs are likely to
succeed on the merits, which we firmly believe they're not
because we want the public to be reassured, plaintiffs can
breathe easy, they're not violating the law, but if an
injunction is issued, then people will think, "Oh, there's --
there's something there. They're likely to succeed. A
violation is potentially occurring. We should all be
scared"; whereas, a clear ruling from the Court that says

"Injunction denied, everyone can go home and keep doing what
they've always been doing" would be a much greater
reassurance to the public and the plaintiffs.

THE COURT:  I've got more questions.  I know
you-all have more things to say.  But skipping to the end,
I'm ultimately going to take this under advisement after this
hearing today.  And while the thought is on my brain, what
would be the defendants' view of a requirement -- until I
rule on the merits of the pending motion, a requirement that
any prosecution or investigation of any of these
plaintiffs -- there must be at least some sort of notice
provided to the Court of the intent to do that?  Because
you've said "We're not going to do that."

MS. JONES:  Yes, Your Honor.

THE COURT:  So what would be the downside of going
ahead and having that -- it's not an injunction.  It's just a
requirement if, hey, the circumstances change, I need to know
about it.  And the same will be true for the plaintiffs.

MS. JONES:  Absolutely, Your Honor.  No intention
to enjoin the behavior of the defendants, but if the Court is
requesting prompt notice of any shift in potential
enforcement or potential prosecution by the defendants, I
have no objection to us being required to provide that notice
to the Court, and I think the absence of that notice would be
a resounding point in support of our position.

1          THE COURT:  What do you think of that idea?

2          MR. POWELL:  Certainly while Your Honor is taking

3    the case under advisement to determine whether to issue the

4    preliminary injunction, we would welcome that defendants

5    provide such notice.

6          THE COURT:  I mean, for peace of mind purposes, at

7    least --

8          MR. POWELL:  Of course.

9          THE COURT:  -- until I get around to ruling on

10   this, it may give -- everybody can take a deep breath and

11   say, I'm -- the particular church is doing X, Y or Z, and

12   they've said that doesn't violate the law, we can keep doing

13   that.  And if that changes, then I'll be told about it.  We

14   may have to get back together.

15         Yes, ma'am?  You want to add something to that?

16         MS. JONES:  Yes, Your Honor.  Just wanted to make

17   sure I'm following the logic of what's being proposed.  This

18   is specifically referring to the named defendant --

19         THE COURT:  Yeah, named defendant -- named

20   plaintiffs, sorry, yes.

21         MS. JONES:  Not -- not to -- and I apologize --

22   not to the class-wide potential enforcement, but strictly to

23   members -- if we learn of a member of Synod or we learn of --

24   to be clear, to enforce this properly, we would need to know

25   the identity of the John Doe, which still has not been

1  provided to us, so that we can ensure that all the defendants

2  are aware of who this person is, and they can properly notify

3  us if there is an intent to prosecute.

4      THE COURT:  Can that be provided in some sort

5  of -- I mean, I'm borrowing from ideas of attorneys' eyes

6  only type designations in protective orders, which you don't

7  have, but is that something that could be done just so that

8  they can comply with the Court order?

9      MR. POWELL:  I think on --

10     MS. CRUIKSHANK:  I think we have to check with our

11  client, but I think subject -- possibly subject to an

12  attorneys' eyes only protective order.

13     THE COURT:  I think you can explain to him or her

14  what that means.

15     MS. CRUIKSHANK:  Yes.

16     MS. JONES:  If I may, Your Honor, and I don't mean

17  to be difficult here, I'm not sure an attorneys' eyes only

18  would work because the defendants wouldn't be able to notify

19  us if they don't also know the identity of the person.

20     THE COURT:  Well, you-all are smart folks.  You

21  can sort that detail out.

22     MS. JONES:  Thank you, Your Honor.  We have agreed

23  to protective orders of a similar type in many other cases,

24  and I want to reassure you-all that we can certainly put in

25  parameters to make sure that your client's identity is

1    protected.

2            THE COURT:  Okay.  So back to a couple questions I

3    have.  The plaintiffs filed a supplemental authority -- it

4    was Docket Entry 46 -- concerning the *Yoder versus Bowen*

5    case, and the Sixth Circuit applied the *McKay* factors.  And

6    you're arguing, I think, that the *Yoder* analysis is proper.

7            Which one do you think is right, or are they both

8    right for different reasons?

9            MR. POWELL:  So, in *Yoder*, the Court applied the

10   *McKay* factors and did so consistent with I think a number of

11   subsequent precedents to *McKay* that make clear it's not a

12   laundry list.  The Sixth Circuit said that in the *Fischer*

13   case, that you don't have to meet all of the *McKay* factors,

14   and that it's okay to have additional factors.  That's from

15   the *Kareem* case.  And so I think in terms of what our

16   position is, our primary argument was the more objective

17   chill argument that where -- and I think you can take this

18   from the *Universal Life Church Monastery Storehouse v Nabors*

19   case, from the Sixth Circuit, in 2022.  That case was not a

20   free speech overbreadth case.  And there the Court held that

21   because a felony law clearly applied to the activities that

22   the plaintiff wanted to engage in, that that alone was enough

23   to show a credible threat of prosecution because you're in

24   the crosshairs of a law that could subject you to felony

25   penalties.  That is a real serious injury that you are

1  facing.

2        Setting that aside, if the Court were to disagree

3  that just that is enough, then we agree, yes, that you

4  consult the *McKay* factors, as the Court did in *Yoder*, as the

5  Court did in *Kareem*, as the Court did in that *Christian*

6  *Healthcare Centers* case that I mentioned earlier.

7        THE COURT:  Okay.  All right.  You've been

8  standing up a long time.  You can return to your seat because

9  I think I got some questions for -- yes, ma'am?  Did you want

10  to say anything else?

11        MS. CRUIKSHANK:  Just with respect to -- since we

12  talked a bit about scope of relief and with respect to the

13  notice provision, I'm not sure we could ask for the notice

14  provision to apply as to members of the putative class

15  because we don't have --

16        THE COURT:  We don't know who they are.

17        MS. CRUIKSHANK:  We don't know who they are.

18        THE COURT:  Right.  Right now I'm just focused on

19  the named plaintiffs because that's who we have and who

20  you-all can communicate with and so forth.

21        MS. CRUIKSHANK:  I understand.  I would just like

22  to take a second to talk about putative class-wide relief in

23  the potential issuance of an eventual preliminary injunction.

24  It's well-established that courts have authority in equity to

25  grant class-wide relief to a putative class even before the

1  filing of a class certification motion.  We've pointed in our

2  papers to the Supreme Court's recent decision in *AARP versus*

3  *Trump*, which held that fairly squarely relying on the Newberg

4  class action treatise, but there are also many other cases in

5  which courts have granted putative class-wide relief on a

6  preliminary basis before the filing of a class certification

7  motion.

8        There's a case from another court in this

9  district, *Rodriguez versus Providence Community Corrections*,

10  which is available at 155 F.Supp.3d 758.  And that was a

11  putative class action on behalf of a group of misdemeanor

12  probationers who were challenging the constitutionality of

13  the supervisory -- the for-profit supervisory system of their

14  probation.  And they sought injunctive relief on a class-wide

15  basis without a motion for class certification, and the Court

16  said that it could craft injunctive relief that will

17  alleviate this injury pending a final ruling on the merits

18  without necessitating individualized remedies and reject the

19  argument that plaintiffs were required to file a Rule 23

20  motion in order to secure that type of relief.

21        THE COURT:  Was that Judge Sharp's case or my

22  case?  Because we had two of them.

23        MS. CRUIKSHANK:  That was Judge Sharp's case.

24        THE COURT:  That's what I thought.

25        MS. CRUIKSHANK:  Although I think the *McNeil* case,

1  which was also in this circuit, involved putative class-wide

2  relief as well.

3          THE COURT:  Right.

4          MS. CRUIKSHANK:  There's also -- I mean, I have a

5  number of others, but one that I think is particularly

6  helpful is *Fish versus Kobach*, which is out of the District

7  of Kansas.  That was also a preemption challenge, which is

8  why I think it's sort of helpful.  It was a challenge to the

9  requirement that individuals registering to vote while

10 applying for a driver's license provide documentary proof of

11 citizenship, and the Court concluded that the preemption

12 challenge was susceptible to class-wide relief on a putative

13 basis without ruling on class certification.

14          So I just wanted to clarify that in addition to

15 the *AARP verus Trump* case, there are many instances of courts

16 throughout the country considering this to be well within

17 their equitable authority.

18          THE COURT:  Okay.  Thank you.

19          MS. CRUIKSHANK:  Thank you, Your Honor.

20          THE COURT:  All right.  Let me ask you a few

21 questions.  Is blocking doors concealment or pulling the

22 shades down?  Is that concealment?

23          MS. JONES:  I believe it would depend on the facts

24 of a particular case, Your Honor.  In some instances, it

25 could be, and in some it couldn't.

 1          THE COURT:  What about allowing someone to live on
 2     a property without their name on a lease so that it's not --
 3     someone can't see who's living there?  Is that concealment?
 4          MS. JONES:  If the intention is to hide their
 5     presence, if they are intentionally structuring the way the
 6     person lives to hide them from detection, it would be
 7     concealment.  So if leaving the name off the lease is done
 8     with the intention to hide their presence and the belief that
 9     somehow leaving the name off the lease would prevent people
10     from finding the person, that could potentially be
11     concealment.  Again, this would all be very fact dependent.
12          THE COURT:  We've talked earlier about what is an
13     ICE determination.  What if ICE makes a determination, as you
14     understand that phrase to mean, and they're just wrong?
15     That's great for the person who might have been accused of
16     being here illegally, but the person who the state claims
17     harbored them is still subject to prosecution; right?
18          MS. JONES:  Yes, Your Honor.  If they had the
19     knowledge that ICE made the determination, and they tried to
20     hide someone anyway, they would be culpable just like a
21     person who had the knowledge of an arrest warrant and tried
22     to hide someone from enforcement of that arrest warrant under
23     18 USC 1071.
24          THE COURT:  Have you ever tried a criminal case in
25     front of a jury?

1        MS. JONES:  No, Your Honor.

2        THE COURT:  Okay.  Which is fine.  I didn't want

3   to insult your experience or intelligence by asking this

4   question.  So at the very beginning of a jury trial in a

5   criminal case, one of the things I tell the jury is that an

6   indictment is just an accusation and nothing more.  It's just

7   to place a defendant on notice of what, in this court, the

8   United States contends they did in violation of federal

9   criminal law, and that they should not take that accusation

10  as establishing anything.

11       But isn't a notice or even a warrant by ICE the

12  same thing?  It's just a notice that they believe something

13  needs to be addressed or adjudicated.

14       MS. JONES:  Yes, Your Honor.

15       THE COURT:  Okay.  So then we've got another group

16  of people over here who are expected to understand that

17  distinction and make decisions to, in their eyes, avoid

18  potential criminal liability based on an accusation.  If your

19  reading of "ICE determination," that phrase, is correct,

20  then -- you see the problem with that?

21       MS. JONES:  I'm not sure I'm following Your Honor.

22       THE COURT:  It's probably not a very good

23  question.  My concern is that, as I said a moment ago, you

24  could have somebody who's later determined to be here

25  lawfully for a variety of reasons, but the prosecution

1 proceeds.  They weren't harboring an illegal alien.  They
2 weren't harboring somebody that this statute appears to be
3 aimed to address.  Ultimately, that was determined to be the
4 case, yet they could still face criminal liability.

5       MS. JONES:  They could, Your Honor, if they were
6 intending to hide someone from detection.  That's where the
7 concealment factor is so crucial to explain why --

8       THE COURT:  But you're missing the -- aren't you
9 missing the point of somebody who's here illegally?

10      MS. JONES:  Yes, Your Honor.

11      THE COURT:  Okay.  So if they're harboring or
12 hiding somebody who's here illegally, as ICE has determined
13 it, but then ICE says, "Okay, we were wrong," that
14 prosecution is still over here making its way through the
15 court, while that person who they were harboring is here on a
16 Green Card, or whatever the circumstances are.  They
17 weren't -- it didn't end up being what the aim of the statute
18 was.

19      Do you follow what I'm saying?

20      MS. JONES:  I do, Your Honor.  I had a similar
21 concern when I first got this case, which was why I keep
22 returning to 18 USC 1071, why I find that statute so helpful,
23 because plaintiffs -- or defendants who are charged with
24 violation of 18 1071 have raised the same argument, where
25 they said, "Yes, I harbored someone who had a warrant out for

1    their arrest."  That person was ultimately adjudicated to be

2    innocent.  I do not remember the case off of the top of my

3    head.  I can find it in minutes if I search that statute.

4    And the Court said the issue under this felony is not whether

5    the person you are hiding committed a crime or not.  That's

6    not the issue.  The issue is that you had the culpable mental

7    state of knowing that the government was looking for this

8    person, they had issued an arrest warrant for this person,

9    there was a concern about this person being at large and

10   violating the law, and you, nonetheless, decided that you had

11   more power than the government, and you could take this

12   person and you could hide them anyway.  You had a culpable

13   mental state in that moment to hide someone that you had

14   reason to believe the government did not want hidden.

15          That culpable mental state is still problematic,

16   and that is why the felony is named "human smuggling."  It

17   turns on the idea of harboring from detection.  Either

18   concealing from law enforcement under (a)(1) or concealing

19   from detection under (a)(2), people cannot hide someone who

20   they know the government has -- at some stage in a

21   proceeding, should not be here, whether it be an arrest

22   warrant or a notice of appearance because --

23          THE COURT:  But that's not what the statute says.

24   The statute says "ICE determination," not the government

25   determination.  I've got another scenario that I'm going to

lob at you here in a second that is broad -- it's outside of
the ICE context.  This has to be an ICE determination; right?
They have to have knowledge of an ICE determination.  We can
talk about actual knowledge.  We've already addressed it.

You follow what I'm saying?

MS. JONES:  Yes, Your Honor.

THE COURT:  You just changed the scenario a little
bit, so I want to call you out on that.

MS. JONES:  Certainly, Your Honor.  And when I
said "the government," I was referring to ICE as an agency,
specifically --

THE COURT:  Okay.

MS. JONES:  -- part of the government.  I
understand that the General Assembly chose to go with ICE as
the deciding point of who gets to decide who is here
unlawfully or not, and that avoids issues of people saying,
"Well, I think they might be here unlawfully," or "I don't
know," or state law enforcement saying, "Well, yes, this
person is here unlawfully."  It avoids situations of a person
saying, "I think they're here unlawfully, but I'm going to
hide them anyway."  That's not a crime.  If a person here is
a state official or a state law enforcement officer, says, "I
do think they are here illegally," hiding them is still not a
crime.

But if this person learns that a federal agency

tasked with enforcing immigration law says "We think they are
here unlawfully, we've decided we think they're here
unlawfully, we've decided it at -- to the extent that we have
decided to expend federal resources on issuing a warrant for
arrest, on issuing a notice of appearance," that is enough to
increase the culpable concern.

         And, yes, the General Assembly may have been able
to choose a different federal agency, but for purposes of
defending the constitutionality of the statute, the question
is not whether the General Assembly made the best choice,
it's whether the General Assembly made a permissible choice,
which it did.

         THE COURT:  So here's my other scenario, because
you broadened it out a little bit, and I want to run that by
you.  Oftentimes, in illegal immigration prosecutions in this
court, one of the conditions post-conviction and post -- and
part of sentencing can be that they're not allowed to return
to the United States, assuming they get deported, without
permission from Homeland Security.  And if they do, they have
to go straight to a local probation -- District Court
probation office, which never quite sure why we have that in
there.  I doubt anybody's going to do that, but...

         So a guy has a prior federal conviction for
illegal reentry, and someone goes to Memphis and picks up a
handful of people, is driving them across the state of

 1   Tennessee in a van with blacked-out windows and trying to
 2   keep people from seeing who's in the van.  And the guy on the
 3   road says, "Oh, I've got a prior federal charge.  I'm not
 4   allowed to be here."  Just says that to them.  Okay?  That's
 5   because there was a determination at some point earlier in
 6   time of a conviction.  Is that -- but that's a court
 7   adjudication; right?  Is that an ICE determination such that
 8   that driver is now subject to violating this law?
 9           MS. JONES:  If ICE was involved in that process,
10   helped with the initial arrest, potentially.  If ICE had no
11   role in that, then, no, as written, the statute doesn't turn
12   on that.
13           THE COURT:  But how does that driver, or even the
14   defendant, know who was investigating agencies five years
15   earlier on his prior case?  I mean, how does somebody even
16   know that to where they can feel certain, okay, I will or I
17   won't be prosecuted here?
18           MS. JONES:  Exactly.  If the driver doesn't know
19   that ICE had a role in it, if the person doesn't say "I got
20   arrested.  ICE told me I shouldn't be here, then I got
21   convicted," then the person has no knowledge, and they
22   haven't violated the statute.
23           THE COURT:  Might have violated some other law,
24   but not this one, because there's no ICE determination?
25           MS. JONES:  Exactly, Your Honor.

1          THE COURT:  Okay.  I want to ask you about some

2    phrasing in your response.  You may have already addressed

3    this, but you say, on page 4, that ICE conveys its

4    determination of unlawful status through warrants, and then

5    you say "among other things."

6          What are the "other things" that you're talking

7    about there?

8          MS. JONES:  The other two examples I'm aware of

9    are the letters of appearance, the notice of appearance, and

10   its own web page where it lists people who are most wanted.

11   There may be others, this is a large federal agency, but

12   those are the three that we found quite easily.

13          THE COURT:  And, again, that web page is just an

14   accusation; correct?

15          MS. JONES:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MS. JONES:  It reflects ICE's decision.

18          THE COURT:  ICE's accusation.  ICE doesn't make

19   decisions, ultimately; right?

20          MS. JONES:  Your Honor, ICE doesn't decide the

21   ultimate legal status, but ICE does determine whether -- if

22   they see -- if someone says, "We should put her name up on

23   the web page," and ICE says, "No, they have a Social Security

24   card, they were born in the US," then ICE decides they are

25   here lawfully, they don't pursue any kind of enforcement.  So

1  there is a decision being made, there is a determination
2  being made about whether to pursue enforcement or not.
3          THE COURT:  But that's not what the statute says.
4  The statute -- the determination as to -- is their status,
5  not whether to pursue a charge against them.
6          MS. JONES:  It says, if I may -- I want to make
7  sure I'm quoting the statute correctly.
8          THE COURT:  Yeah, get your PowerPoint back out.
9  Let's take a look at it.
10         MS. JONES:  Absolutely, Your Honor.  If I may have
11  one moment.  What it says is that the person knows that the
12  individual has illegally entered or remained in the
13  United States as determined by ICE.  So ICE would make that
14  determination that they have illegally entered and then
15  pursue -- and we would learn of that determination by them
16  pursuing enforcement, either in the form of an arrest
17  warrant, a notice of appearance, a listing on the website, or
18  any one of these other means.
19         The reason we bring those up is in the context of
20  talking about how would people learn of this ICE
21  determination, how would a common person on the street know
22  this.  Those are three readily visible ways that this could
23  happen.
24         THE COURT:  So to be safe, the local -- is it a
25  parish?  Is that what you call -- is it a parish?  I see --

1      MR. POWELL:  The Bishop nodded at me, Your Honor.

2      THE COURT:  Okay.

3      MR. POWELL:  So I think close enough.

4      THE COURT:  He would know.  Okay.  The local

5  parish, you're saying, before they have their meals program

6  for any and all comers, needs to get on the ICE website and

7  take a look and ask them for their ID when they show up and

8  say, "Hey, are you -- let me make sure you're not on this

9  list before I do this, or I might be violating the law"?

10     MS. JONES:  Not at all, Your Honor.

11     THE COURT:  Okay.  Because you're back to they

12  didn't intend to harbor them or intend to conceal them?

13     MS. JONES:  For two reasons.  The statute doesn't

14  place a proactive burden on people to learn whether ICE has

15  made a determination or not because the statute isn't

16  designed to target common everyday folks.  It's designed to

17  target human smugglers, people who are already paying

18  attention to what the federal government is doing.

19     THE COURT:  Okay.  So in that scenario, there's

20  not an affirmative duty, as you understand the statute, to

21  seek out the information to verify whether or not somebody's

22  been subject to an ICE determination, whatever that means.

23     What if -- let's say a local alderman or sheriff

24  in a Tennessee county decided to be the mouthpiece for that

25  website in their community, and they start sending out

1   mailers, or they start going around and saying, "Hey, I've
2   looked at the website, and this person's here -- ICE has
3   determined" -- I think more accurately ICE believes or
4   accuses someone of being here illegally -- "so you guys ought
5   to make sure you know that."  I mean, that starts happening,
6   doesn't that change the dynamic a little bit on knowledge of
7   ICE determination?  You say there's no duty for them to go
8   find out.  What if it comes to them?
9           MS. JONES:  If they choose to expose people to
10  that knowledge and say "You shouldn't help them because ICE
11  said they're here unlawfully," one, that's not something the
12  statute requires, so I don't understand how that would affect
13  the situation, but, two, there's still no discussion of
14  concealment in that context, and that returns us to the
15  smuggling component of this law.  Just knowing what ICE has
16  determined isn't enough.  You have to be trying to hide the
17  person from detection, and you have to be trying to do so for
18  a profit.  In that scenario, we're missing the for-profit
19  motive and concealment.
20          THE COURT:  Unless they're a landlord.
21          MS. JONES:  Right.  I understood you to be talking
22  about the Synod.
23          THE COURT:  No.  No, I changed my scenario a
24  little --
25          MS. JONES:  Oh, I misunderstood that.

```
 1          THE COURT:  That's all right.  All right.  I think
 2   that covers the list of questions.  And we've jumped all over
 3   the place, I recognize that, but it's been a good and
 4   interesting discussion.  But I also want to make sure that
 5   you-all have ample opportunity to make any record you want to
 6   make, but I'm not inviting you to repeat everything you put
 7   in your briefs because that's in the record already, and I
 8   hope it's clear now that we've read those.  But I want to
 9   give you an opportunity to raise any other issues you want to
10   raise while we're all gathered together.
11          Go ahead.
12          MR. POWELL:  Thank you, Your Honor.  I will try to
13   be quite brief, but I did want to make a couple of additional
14   points about pre-enforcement standing in particular.
15          THE COURT:  You do realize that when a lawyer says
16   "I'm going to be brief" I don't believe them?
17          MR. POWELL:  Well, I mean, to convey at least my
18   sincere intention.
19          THE COURT:  I'm joking.  Make your record.
20          MR. POWELL:  So the three-part test comes from the
21   Supreme Court Susan B. Anthony List against Driehaus.  It's a
22   three-part test within a three-part test.  So to see the
23   injury, you have to show an intent to engage in a course of
24   conduct arguably affected with a constitutional interest,
25   that the conduct is arguably proscribed by the statute, and
```

1    that there is a credible threat that the statute's
2    enforcement against the plaintiff.  The credible threat
3    language comes straight from the Supreme Court and overrides
4    any prior Sixth Circuit precedent.
5            So we've already covered a lot about all three of
6    those prongs, and I'm not going to repeat anything we've
7    already discussed or that's in the briefs, but there were
8    just maybe one or two extra things about each of those prongs
9    that I wanted to mention based on the argument that we've had
10   here this morning.
11           The first is that the arguably affected prong.
12   This test has been applied often in the First Amendment
13   context, but that is not the only context in which it
14   applies.  And the Sixth Circuit has recognized that it can
15   apply to things like preemption challenges as well to
16   structural constitutional claims.  And there are two cases in
17   particular I would mention.  In *Kentucky versus Yellin*, that
18   was a claim by states that a federal law was restricting
19   their power to cut taxes, and the Court applied the same test
20   there and found that there was a sufficient constitutional
21   interest.  And then in *Block v Canepa*, which was a dormant
22   commerce clause challenge to a law that made it illegal to
23   bring wine into Ohio, the Court there as well found that
24   there was pre-enforcement standing.
25           Turning to the arguably proscribed prong -- we've

1   talked a lot about statutory interpretation this morning, so
2   I'm not going to belabor this point at all, but with respect
3   to all three of the elements we've discussed, I think there
4   is at least an arguable interpretation that it could apply to
5   our plaintiffs.  And I wanted to say a couple other things
6   about the facts, because we've talked about some
7   hypotheticals, but I want to talk about -- a little bit about
8   the facts of what our plaintiffs actually do and how in
9   criminal cases scienter requirements are proved.
10          Because even if it does require actual knowledge,
11  juries are not mind readers, and the way that knowledge is
12  proved in a criminal case is through circumstantial evidence,
13  through things that were going on in the facts.  And in our
14  declaration from the Synod, sort of the first half of that
15  declaration from the Bishop talks about them being a
16  sanctuary denomination, about how they want to provide
17  housing to noncitizens, and they provide know-your-rights
18  training so that churches understand which parts of their
19  building are subject to search and which parts aren't in the
20  absence of a warrant.
21          And I think it is easy to imagine a circumstance
22  where a noncitizen may have a notice to appear, but goes to
23  the pastor and says, "I'm showing you right here my Green
24  Card.  I'm in the country legally, and I'd like to stay here.
25  You're a sanctuary church," and they say, "Sure.  Yeah,

1    you're here legally.  We wouldn't be violating any statute.

2    You can stay in this interior room of our church that's not

3    subject to search."  Would that be enough to impute knowledge

4    and an intent to conceal?  I think that's the sort of thing

5    that we have a reasonable fear of prosecution about under

6    this statute, even with these three elements that we disagree

7    about.

8            The other thing I would say about this is that

9    the -- Tennessee has a statute about how to read other

10   statutes, and it says that when reading statutes, they shall

11   be given their natural and ordinary meaning without forced or

12   subtle construction that would limit or extend the meaning.

13   And I think some of what you've heard from my friend on the

14   other side would give this law basically no scope,

15   whatsoever, and I don't think when the governor made this a

16   top priority of the last legislative session, they intended

17   to pass a law that had no scope.

18           And so when we're talking about what is an

19   arguable interpretation, I think you have to look at a more

20   natural reading of the statutory text.  And insofar as it's

21   directed at smugglers, it would be pretty easy for smugglers

22   to just say, "I'm not reading the ICE website, and when I

23   smuggle somebody, I don't ask them about a notice to appear."

24   And then they'd all be off scott free on this kind of

25   reading.  So I don't think that's the most natural reading of

1    the statute.

2          And then turning finally to the credible threat of

3    prosecution, I did just want to emphasize that to the extent

4    the Court consults those *McKay* factors, the first two are the

5    history of enforcement and the warning letters.  And we

6    agree, you know, we filed this lawsuit before the point when

7    the law went into effect and so those things had not happened

8    yet, but the Sixth Circuit has repeatedly in like

9    circumstances and then this district in the recent *Welty*

10   decision also found pre-enforcement standing even where those

11   factors weren't met where you had a refusal to disavow

12   prosecution.  And I really do think that the decision this

13   morning not to accept our offer to just accept their own

14   interpretation of the statute cuts quite against the idea

15   that they've disavowed prosecution.

16          And in the supplemental authority we filed, that

17   also in that case they said a litigation position isn't

18   enough to be a disavowal of prosecution.  And then I really

19   would emphasize the *Universal Life Church* case because there

20   they found a credible threat of prosecution primarily based

21   on factors that are similar to what we have here.  It's a

22   felony offense, and that means that even if it's a lower

23   probability of enforcement, that the harm that would result

24   from that enforcement is quite high, and what we're

25   ultimately looking for here is a real injury.  And that when

even a lower probability chance that you're going to be
prosecuted could lead to years in prison, that is a real
injury that gives you pre-enforcement standing.

I would also point out that the mere fact that it
is a recent law shows that it is more likely to be enforced.
That's from the *Nabors* case and a couple others we cited in
our brief.

Unless the Court has any further questions, I will
turn things over then to my colleague to maybe make just a
couple of additional points about the merits.

Or are you good?

MS. CRUIKSHANK:  I think the point that I'd like
to make is that all of the defendants' arguments about sort
of the ICE determination piece are predicated on their
sui generis interpretation of the law.  Regardless of how to
interpret the "as determined by ICE" piece, none of that
affects any of our preemption arguments, which are -- which
rest on sort of the existence of the law itself and the fact
that it is impinging on a field that Congress has fully
occupied.

THE COURT:  All right.  Thank you.

Yes, ma'am.  And I've got a couple of questions
for you to get your response to counsel's final points.  Go
ahead.

MS. JONES:  Yes, Your Honor.  Did you want to

 1    start with the questions or --

 2            THE COURT:  Sure.  He gave an example there of a

 3    Green Card, and they provide sanctuary inside a church.  I

 4    want to give you an opportunity to respond to that scenario

 5    that he gave, where there's knowledge of an ICE determination,

 6    or accusation, but then there's countervailing information

 7    given to the parish that, okay, wait, I don't know what to

 8    believe, yet they could still be subject to prosecution

 9    because of knowledge of the ICE determination irrespective of

10    other information and wanted to get your thoughts on that.

11            MS. JONES:  Sure, Your Honor.  Let's start out

12    with I didn't hear a for-profit purpose alleged.  So already

13    we're outside of the realm of commercial smuggling.  Then it

14    would be a very fact-specific assessment of did ICE say this

15    before the Green Card was issued?  After the Green Card was

16    issued?  It would be an area that would require unique

17    analysis, which just shows how premature this lawsuit is, but

18    there could potentially be a circumstance in which ICE has

19    made a determination that a person is no longer here

20    lawfully, say, perhaps they have violated the terms of their

21    presence in this country, and that the person who agrees to

22    hide them may have a culpable intent and choose to hide them

23    for profit, but that doesn't seem to fit the circumstances

24    that I heard described.

25            THE COURT:  And then to his point about the not

1   agreeing to some sort of an agreed injunction that we talked

2   about at the beginning of our time together raises concerns

3   that there will be prosecutions.

4         MS. JONES:  Yes, Your Honor.  That is a wildly

5   inappropriate reading of our good-faith attempt to negotiate

6   with them and still maintain our defense in this case.  The

7   fact that defendants are taking the position that the statute

8   is lawful does not mean that defendants should therefore be

9   deemed to choose to enforce the law anyway simply because

10   they reject an agreed-upon injunction that would require them

11   to do what they are already doing, when in order for an

12   injunction to be issued, there has to be a finding of

13   likelihood of success on the merits.

14         So even an agreed-upon injunction carries and

15   conveys with it the message of likelihood of success on the

16   merits, and the defendants firmly believe there is no

17   likelihood of success on the merits on any point.  So while

18   they disagree -- and while they do not intend to convey an

19   intent to prosecute, treating their litigation process,

20   rejecting a needless injunction, obey-the-law injunction as

21   somehow indicating an intent to prosecute would be very

22   unfair to defendants, and it would also upend the burden of

23   proof.

24         Defendants shouldn't be required to proactively

25   demonstrate an intent not to prosecute.  *McKay* said that

1  refusal -- just one of several factors, refusal to disavow
2  enforcement of the law would amount to an intent to
3  prosecute.  Defendants have not refused to -- have not
4  disavowed or refused -- excuse me.  They have not refused to
5  disavow enforcement of the law in saying that there is no
6  need for an injunction that says we don't have to do what we
7  already said we're not going to do.  That's a very different
8  kind of injunction.
9          THE COURT:  I think what I had in mind at the
10 beginning of today, and it's something you-all -- I would
11 encourage you to continue to think about when we go away from
12 here today, and perhaps talk to your supervisors about, is --
13 I mean, I have done agreed injunctions where there's no
14 concessions at all ultimately about really any of the
15 factors.  There's just an agreement.  We're going to agree to
16 do or not do these things, preserving all defenses,
17 preserving all positions.  Because all these same issues I'm
18 sure are going to come right back up when we get to the
19 ultimate merits of the case, not all of them, but many of
20 them.
21          And the point I was trying to get to was, you can
22 have some control over the outcome of the pending motion
23 without giving anything away, and so can they.  That was the
24 point.  I've done that several times where there's no
25 concessions, just we're agreeing -- for a placeholder, while

1   the litigation proceeds, we're agreeing to the following

2   things, boom, boom, boom.  They probably want it in the form

3   of a court order, and I understand that, which is why I

4   proposed it.  But that's -- I didn't want you to

5   misunderstand that I was saying by doing that -- and

6   hopefully your supervisors understand I wasn't suggesting

7   that they concede any of the injunction factors, just they

8   concede that as a placeholder so that we can proceed with

9   litigation this is what we'll do or not do.  That's all I was

10  getting at.  So perhaps you can recouch that to them when we

11  leave here and see if they change their minds.

12          MS. JONES:  I will certainly convey that,

13  Your Honor.

14          THE COURT:  One other question I had that just

15  came to mind, it's been a minute since I've looked at the

16  Attorney General's website, if you'll forgive me, but there

17  are times when the Attorney General, for clarity, will issue

18  memorandum opinions about various topics.  Right?

19          MS. JONES:  Yes, Your Honor.

20          THE COURT:  You-all still do that?

21          MS. JONES:  Yes, Your Honor.

22          THE COURT:  Okay.  Has there been any sort of

23  effort to do such a thing with respect to the scope of this

24  particular statute?

25          MS. JONES:  Well, not that I'm aware of for a

1 really key reason. Memorandum opinions are not something the

2 Attorney General issues of his own volition.

3          THE COURT: Right.

4          MS. JONES: He has a statutory duty to do it when

5 certain qualified individuals ask for an opinion. And I'm

6 not aware of that request even being made or ruled on.

7          THE COURT: Any interest in asking for that?

8 Again, this is -- I'm just trying to think of -- we got a lot

9 of work to do on this case. I was just trying to think of

10 some practical steps that could give your clients, as they

11 are now -- we haven't gotten to the class yet -- some sort of

12 peace of mind, but...

13          MR. POWELL: Your Honor, I think those Attorney

14 General opinions can be a relevant consideration, and in the

15 *Nabors* case, the Sixth Circuit did consider them in

16 interpreting the relevant law. I'm not sure -- sort of to

17 the point you're making about not conceding anything, I'm not

18 sure it would necessarily entirely defeat our potential

19 standing here, but it could certainly add clarity for the

20 public in general. And I will confess that I'm just not

21 totally familiar with who the qualified individuals are, or

22 if I'm one of them, but the, you know, opinion like that

23 could be helpful for clarity, I think, certainly.

24          THE COURT: I mean, again, these are just sort of

25 commonsense placeholder things to give everybody a little

1  peace of mind because a lot of times the injunctions -- and

2  this one reaches pretty far and wide, if granted -- don't

3  necessarily deal with the threat of prosecution.  There are

4  other statutes that are brought to this Court with me or some

5  of the other judges that don't involve that, but given that

6  that is a concern of the plaintiffs, and I think at least a

7  legitimate one, perhaps for their at least peace of mind so

8  that the parishes can continue to do what they're doing, and

9  people can continue to live their lives without this fear

10 while the case plays out, perhaps some -- in addition to the

11 order that I've already talked about doing, maybe that would

12 be worth considering.

13          And I'm sure she can direct you to who that

14 request would go to, if you choose.  I'm not strong-arming

15 you into doing that.  I'm just floating ideas here so that

16 everybody can have some idea of where they stand while the

17 case plays out.

18          MS. JONES:  Absolutely, Your Honor.

19          THE COURT:  All right.  Any other points you need

20 to make?

21          MS. JONES:  Yes, Your Honor.  I will attempt to

22 address a few of the points they raised, and then I would

23 like to address the scope of relief, since that was something

24 we haven't touched on, on our side of the argument.

25          Plaintiffs argue about pre-enforcement standing,

and they argue that they have shown both an intent to violate
a law and a credible threat of prosecution.  As we have
discussed today, our position is there is no intent to
violate the law because the law doesn't apply to them.  The
credible threat of prosecution factor cannot turn simply on
the existence of a law.  That cannot be enough.  Because if
that were the case, then every plaintiff would always have
standing to sue if a law had been enacted.  There has to be
something more than the existence of a law, and plaintiffs
have not shown that something more.

We've been in court for months now, and for
purposes of this preliminary injunction, setting aside the
issue of standing and thinking about this in terms of
irreparable injury, they haven't shown the something more.
They haven't shown that anyone has approached them.  They
haven't shown that anyone has accused them of violating the
law.  All they have to rely on -- all they had to rely on
before the law went into effect and all they have to rely on
today is their own fear.  And that is not a credible threat
of prosecution.  That's not even a mere possibility of
prosecution.

THE COURT:  Not to get into another branch of
government's actions, but given efforts made to enforce
immigration laws over the past number of months, I mean is it
not -- doesn't that give at least some credibility to a fear

1  for people who are dealing with undocumented people?

2         MS. JONES:  For people who intend to hide

3  undocumented people, yes, but the law is not called -- the

4  felony is not called "felony for rental to immigrants."  The

5  felony is called "human smuggling."  You commit the offense

6  of human smuggling when -- and that's what's so crucial here.

7  None of the plaintiffs have done anything remotely resembling

8  smuggling.  And by their own allegations, they don't intend

9  to.  Synod, at the very least, alleges "We don't plan to hide

10  anyone."

11         So all of the hypotheticals today, while helpful

12  for us understanding the parameters of the law, are not

13  relevant to this issue of standing.  They're not in play.

14  Plaintiffs don't intend to hide someone.  They don't intend

15  to smuggle someone.  So they haven't violated the law, and

16  they shouldn't be afraid.  If the law had said it's a felony

17  to rent out a home, we would be in a very different position,

18  but that's not what the law says.  It says it's a felony to

19  harbor from detection.  And there's -- that concept of "from

20  detection" just hasn't appeared anywhere in their briefing,

21  anywhere in their allegations.

22         They talk about the issue of -- excuse me one

23  moment.  Let me decode my own handwriting.

24         THE COURT:  You should see mine.

25         MS. JONES:  They talk about the knowledge of ICE

1  determinations, and they claim their reading of the statute

2  is the most natural reading of the statute because otherwise

3  the statute would be very narrow in application, but the

4  General Assembly is entitled to pass laws with narrow

5  applications.  It passes laws with narrow applications all

6  the time, passes laws that directly target only a handful of

7  a specific type of medical practitioners.  It can pass a

8  criminal law with a very narrow parameter.

9          The narrowness or breadth of a statute cannot be a

10 reason for finding whether the law is or is not

11 constitutional, what the most natural reading of the law is.

12 And the most natural reading of the statute we have proposed

13 tracks the federal structure for both ICE -- for both

14 harboring immigrants under 1324 and for harboring someone

15 from an arrest knowing that an arrest warrant has been

16 issued, that culpable mental state.  This law is designed to

17 target only serious offenders, which should -- plaintiffs

18 should breathe easy after today, after hearing the argument

19 we've made in court today, and even hearing our reason for

20 saying, no, an injunction is not needed because the

21 defendants don't intend to do anything to violate the law.

22         Why enjoin someone from doing something that

23 they're not going to do and that there's no evidence they're

24 going to do?  I hope plaintiffs go home tonight and lay their

25 head on their bed pillows and just sleep like babies because

they have heard the state say repeatedly today that they do
not have an intent to violate the law, and the natural
reading of the statute requires them to know that ICE has
decided someone is here unlawfully, and none of them know
that.

The final point of plaintiffs' argument, if I
may -- a lot of what we've discussed here today turns on
intent, it turns on details, it turns on nuances, but
ultimately what we're talking about today is the relief
plaintiffs are asking for, and the relief they are asking for
is quite broad.  They're not just challenging this provision
in the statute that we've all been talking about today,
shelter from detection.  They're challenging the entirety of
the ASA.  They're saying the conceal from detection, the
shield from detection, the transport.  They're saying that
entire act should be declared unconstitutional based on a
very narrow set of circumstances.  And none of the arguments
I've heard today would justify declaring -- or, excuse me,
enjoining enforcement of the entire act.

THE COURT:  Yeah, I was going to say, nobody's
asked me to definitively in a final judgment declare anything
because we're not there yet, but I understand your point.

MS. JONES:  I meant enjoin.

THE COURT:  Right.

MS. JONES:  The injunction they ask for is to

enjoin enforcement of the entire act and not just the shelter
provision in the act, not just harbor, which we define as to
provide shelter from detection.  They ask that the entire act
be enjoined from enforcement, and that's inappropriate,
especially -- if the Court were to find some form of
preemption and vagueness, which we vigorously argue there is
no preemption or vagueness, but if the Court were, then any
injunction should be crafted to only the discrete portions of
the ASA that are potentially preempted or potentially vague
and not to the entirety of the ASA.  A preliminary injunction
that they seek, as I understand it, extends to the entire
ASA, and that would be inappropriate.

         And then finally, on the class-wide relief, we do
not dispute that class-wide relief can be issued before a
court rules on a motion for certification, a motion for class
certification.  What we dispute is whether they have
presented enough information for the Court to determine a
likelihood of success on class-wide relief and therefore a
likely -- a right to class-wide relief.  The genesis point
for obtaining class relief is the filing of a motion for
class certification.

         In *AARP*, a motion for class certification had been
filed.  And now plaintiffs had come back in their reply, and
they said, "Yes, yes, but that motion was denied."  Setting
aside that the District Court denied it on other grounds than

1 were before the Supreme Court, that doesn't affect our
2 argument in any way because it was the filing of the motion
3 for class certification that contained enough information for
4 a court to assess the scope of the class and assess whether
5 they were likely to succeed on class entitlement, how big is
6 this class, who are its members, and therefore whether they
7 were entitled to injunctive relief because they have a
8 likelihood of success on class certification and therefore a
9 likelihood of success on the merits and right to relief for
10 the potential class.
11         The Supreme Court could make that assessment in
12 *AARP* because there was a motion that had been filed that it
13 could look at.  We have no motion like that in this case.  So
14 any class-wide relief would be inappropriate.  And for the
15 reasons we set out in our brief, the allegations in the
16 complaint certainly don't provide enough information to issue
17 class-wide relief when plaintiffs themselves don't even fall
18 within the class definition.
19         So at bottom, Your Honor, the parties do agree
20 that plaintiffs haven't done anything wrong by their own
21 allegations.  What the parties disagree about is what that
22 means.  Plaintiffs think it means the entire statute should
23 be overturned, the entire statute should be enjoined from
24 enforcement against an unknown number of individuals.
25 Defendants believe that presumption of constitutionality of

1  the law requires the statute to be left as is; the
2  presumption of -- against preemption, especially in the
3  context of criminal law, requires the statute to be left as
4  is.  The heavy burden of facial challenges requires the
5  statute to be left as is.  And that plaintiffs have done
6  nothing wrong, but they cannot deprive innocent children and
7  vulnerable families, who are brought into this country and
8  hidden and sent subject to unknown atrocities -- they can't
9  deprive those people of the protections of the statute based
10 on their own fears.
11         THE COURT:  Okay.  Thank you.
12         MS. JONES:  Thank you, Your Honor.
13         THE COURT:  Anything briefly you want to say in
14 response to that?
15         MR. POWELL:  Nothing further, Your Honor.
16         THE COURT:  Okay.  Well, as I said earlier, I'm
17 going to take this under advisement.  I am going to do an
18 order that if -- based on the defendants' representations,
19 both today and in the filings, that their -- the actions
20 described by the plaintiffs would not be subject to
21 prosecution under this statute, that if that changes, then
22 you're to let me know, and we'll just at least have that
23 placeholder in place.  The one issue is the one John Doe.  I
24 assume that that information, you-all can sort out a way to
25 share that, and maybe even just limit it to the District

1  Attorney General where that person lives.  Maybe that's a

2  path towards limiting who it's disclosed to.  But you-all

3  figure that out.  You're smart folks.

4          But I do want to commend the lawyers on excellent

5  briefing on both sides, excellent argument today, putting up

6  with my questions and scenarios, which sometimes don't make a

7  whole lot of sense.  I would also express my appreciation for

8  those who showed up to watch today.  We have public courts.

9  You can come in here any time you want.  Most of the time

10 there's nobody sitting back there on most of our hearings,

11 but I hope -- as Justice Scalia was known to say and

12 Justice Barrett recently reiterated, lawsuits, people attack

13 ideas and not people, and that's -- that's what we do.

14          So it's good to see that that's how the lawyers

15 have approached this, respectfully and collegially, but

16 vigorously arguing your respective positions.  And hopefully

17 the folks who've attended today can see a model for perhaps

18 how society might be able to discuss issues better, too, and

19 just agree without being disagreeable and respecting the

20 other person's point of view even if you think it's

21 absolutely wrong.  So that's my civics speech for today.

22          But I, again, appreciate all the hard work of the

23 lawyers.  We'll take it under advisement and get an order out

24 as soon as we can.

25          The other thing I would encourage you-all to do is

1   continue to talk about whether or not there's some sort of an
2   agreed injunction that could be reached.  Again, I'm not
3   asking for anybody to concede any points.  I'm not asking for
4   anybody to admit to anything.  We've got a long way to go in
5   this lawsuit.  But that may at least give everybody a little
6   bit of peace of mind while we wade through this and try to
7   get you a ruling.  So please consider that.  If you decide to
8   do that, then we can put our pencils down and then proceed
9   with the rest of the case.  If you don't to it, I'm not going
10  to hold it against you, just trying to float some ideas for
11  everybody to consider.
12              I hope everyone has a good rest of the day.
13
14              (Proceedings concluded at 12:25 p.m.)
15
16
17
18
19
20
21
22
23
24
25

<u>REPORTER'S CERTIFICATE</u>

1             

2       I, Patricia A. Jennings, Official Court Reporter

3 for the United States District Court for the Middle District

4 of Tennessee, with offices at Nashville, do hereby certify:

5       That I reported on the Stenograph machine the

6 proceedings held in open court on September 10, 2025, in the

7 matter of SOUTHEASTERN SYNOD OF THE EVANGELICAL LUTHERAN

8 CHURCH IN AMERICA, et al. vs. STEVEN R. FINNEY, et al., Case

9 No. 3:25-cv-00684; that said proceedings in connection with

10 the hearing were reduced to typewritten form by me; and that

11 the foregoing transcript (pages 1 through 95) is a true and

12 accurate record of said proceedings.

13       This the 20th day of September, 2025.

14

15

16

17

18                  /s/ Patricia A. Jennings
                 Patricia A. Jennings, RMR, CRR

19                  Official Court Reporter

20

21

22

23

24

25