# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| SOUTHEASTERN SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA *et al.*, | |
| Plaintiffs, | |
| v. | **Case No. 3:25-cv-684** |
| STEVEN R. FINNEY *et al.*, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................1

LEGAL STANDARD .........................................................................................................3

ARGUMENT .....................................................................................................................3

    I.       Tennessee Courts Would Not Adopt Defendants' Interpretation of Section 5.....................3

    II.      Defendants' Threshold Arguments Fail. ........................................................................6

        A.     Plaintiffs Have Standing to Challenge Section 5. ...............................................6

        B.     Defendants Are Not Entitled to Sovereign Immunity.......................................15

        C.     Plaintiffs' Vagueness Claim Is Ripe...................................................................15

        D.     Plaintiffs Have a Cause of Action.......................................................................16

    III.     Plaintiffs Have Stated a Claim that Section 5 Is Preempted by Federal Law......................17

        A.     Plaintiffs Have Stated a Claim that Section 5 Is Field Preempted.....................17

        B.     Plaintiffs Have Stated a Claim that Section 5 Is Conflict Preempted. ...............23

    IV.     Plaintiffs Have Stated a Claim that Section 5 Is Unconstitutionally Vague. ........................28

    V.      The Synod Has Stated First Amendment Claims.......................................................31

        A.     Section 5 Unlawfully Burdens the Synod's Free Exercise Rights. .....................31

        B.     Section 5 Impedes the Synod's Freedom to Associate for Religious Purposes................34

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Abriq v. Metro. Gov't of Nashville,*
  333 F. Supp. 3d 783 (M.D. Tenn. 2018) .................................................................31

*Agostini v. Felton,*
  521 U.S. 203 (1997) ...............................................................................................22

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ...............................................................................................17

*Allen v. United States,*
  83 F.4th 564 (6th Cir. 2023) ............................................................................... 4, 5

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
  103 F.4th 765 (11th Cir. 2024) ..............................................................................15

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) .......................................................................................... 34, 35

*Andret v. Garland,*
  No. 23-3426, 2024 WL 167115 (6th Cir. Jan. 16, 2024) .......................................28

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................ 1, 18, 19, 20, 21, 22, 23, 24, 25, 27

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .......................................................................................... 16, 17

*Barnhart v. Thomas,*
  540 U.S. 20 (2003) ...................................................................................................4

*Bates v. City of Little Rock,*
  361 U.S. 516 (1960) ...............................................................................................34

*Belle Maer Harbor v. Charter Twp. of Harrison,*
  170 F.3d 553 (6th Cir. 1999) ........................................................................... 28, 30

*Bland v. United States,*
  299 F.2d 105 (5th Cir. 1962) .................................................................................29

*Boone Cnty. Republican Party Exec. Comm. v. Wallace,*
  132 F.4th 406 (6th Cir. 2025) ................................................................................15

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ...............................................................................................35

*Bryant v. Woodall,*
  1 F.4th 280 (4th Cir. 2021) ....................................................................................11

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ...............................................................................................21

*Cahoo v. SAS Analytics Inc.,*
  912 F.3d 887 (6th Cir. 2019) .................................................................................14

*Cal. Coastal Comm'n v. Granite Rock Co.,*
  480 U.S. 572 (1987) ...............................................................................................20

*California v. Zook,*
   336 U.S. 725 (1949) ............................................................................................23

*Cameron v. Johnson,*
   390 U.S. 611 (1968) ............................................................................................28

*Carman v. Yellen,*
   112 F.4th 386 (6th Cir. 2024) ...................................................................... 15, 16

*Cartwright v. Garner,*
   751 F.3d 752 (6th Cir. 2014) ................................................................................3

*Castillo v. Bondi,*
   140 F.4th 777 (6th Cir. 2025) ...................................................................... 26, 30

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
   605 U.S. 238 (2025) ............................................................................................34

*Christian Healthcare Ctrs., Inc. v. Nessel,*
   117 F.4th 826 (6th Cir. 2024) ........................................................................ 7, 10

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) ..............................................................................................20

*Clark v. Martinez,*
   543 U.S. 371 (2005) ..............................................................................................8

*Club Madonna Inc. v. City of Miami Beach,*
   42 F.4th 1231 (11th Cir. 2022) ..........................................................................20

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................................................23

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
   --- F.4th ---, No. 23-3630, 2025 WL 3102072 (6th Cir. Nov. 6, 2025)...................7, 11, 13

*DelRio-Mocci v. Connolly Props. Inc.,*
   672 F.3d 241 (3d Cir. 2012) ..............................................................................30

*Do No Harm v. Lee,*
   No. 3:23-CV-01175, 2024 WL 3730623 (M.D. Tenn. Aug. 8, 2024) ................15

*Doe #11 v. Lee,*
   609 F. Supp. 3d 578 (M.D. Tenn. 2022) ...........................................................13

*Emp. Div., Dep't of Hum. Res. v. Smith,*
   494 U.S. 872 (1990) ............................................................................................32

*Encino Motorcars, LLC v. Navarro,*
   584 U.S. 79 (2018) ................................................................................................4

*Ex parte Young,*
   209 U.S. 123 (1908) ............................................................................................15

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ............................................................................................15

*FEC v. Cruz,*
   596 U.S. 289 (2022) ........................................................................................8, 12

*Fischer v. Thomas,*
  52 F.4th 303 (6th Cir. 2022) ................................................................................. 10

*Fla. Immigrant Coal. v. Att'y Gen.,*
  No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) ................................. 17

*Fox v. Saginaw Cnty.,*
  67 F.4th 284 (6th Cir. 2023) ................................................................................. 13

*Free Speech Coal., Inc. v. Skrmetti,*
  761 F. Supp. 3d 1132 (W.D. Tenn. 2024) ............................................................ 11

*Ga. Latino All. for Hum. Rts. v. Governor of Georgia,*
  691 F.3d 1250 (11th Cir. 2012) ........................................... 1, 18, 19, 23, 25, 27

*Glennborough Homeowners Ass'n v. U.S. Postal Serv.,*
  21 F.4th 410 (6th Cir. 2021) ................................................................................. 13

*Hewitt v. United States,*
  606 U.S. 419 (2025) ......................................................................................... 5, 25

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) .................................................................................. 17, 20, 22

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ............................................................................................... 35

*In re Est. of Tanner,*
  295 S.W.3d 610 (Tenn. 2009) ............................................................................ 4, 5

*In re McKenzie,*
  716 F.3d 404 (6th Cir. 2013) ................................................................................... 3

*Iowa Migrant Movement for Just. v. Bird,*
  --- F.4th ----, No. 24-2263, 2025 WL 2984379 (8th Cir. Oct. 23, 2025) ......... 7, 17, 21

*Johnson v. United States,*
  576 U.S. 591 (2015) ......................................................................................... 8, 28

*Kansas v. Garcia,*
  589 U.S. 191 (2020) .................................................................. 17, 20, 22, 26

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,*
  141 F.4th 796 (6th Cir. 2025) ............................................................................... 16

*Kareem v. Cuyahoga Cnty. Bd. of Elections,*
  95 F.4th 1019 (6th Cir. 2024) ...................................................................... 7, 10, 12

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ......................................................................................... 8, 32

*Kentucky v. Yellen,*
  54 F.4th 325 (6th Cir. 2022) ................................................................................... 7

*Lichtenstein v. Hargett,*
  83 F.4th 575 (6th Cir. 2023) ........................................................................... 34, 35

*Lockhart v. United States,*
  577 U.S. 347 (2016) ................................................................................................. 5

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010) ........................................................................ 12

*Lozano v. City of Hazleton,*
   724 F.3d 297 (3d Cir. 2013) .................................................................. 19, 20

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................... 13

*Marouf v. Lynch,*
   811 F.3d 174 (6th Cir. 2016) .................................................................. 26, 30

*Martinez-Quiroz v. United States,*
   210 F.2d 763 (9th Cir. 1954) ....................................................................... 29

*McKay v. Federspiel,*
   823 F.3d 862 (6th Cir. 2016) ......................................................... 10, 11, 12

*Medtronic, Inc. v. Lohr,*
   518 U.S. 470 (1996) .............................................................................. 18, 21

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
   774 F.3d 895 (6th Cir. 2014) ....................................................................... 16

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't,*
   984 F.3d 477 (6th Cir. 2020) ....................................................................... 33

*NAACP v. Button,*
   371 U.S. 415 (1963) ...................................................................................... 35

*NAACP v. Claiborne Hardware,*
   458 U.S. 886 (1982) ...................................................................................... 35

*NAACP v. State of Ala. ex rel. Patterson,*
   357 U.S. 449 (1958) ...................................................................................... 34

*Niz-Chavez v. Garland,*
   593 U.S. 155 (2021) ...................................................................................... 31

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020) ...................................................................................... 35

*Padilla v. Kentucky,*
   559 U.S. 356 (2010) ...................................................................................... 29

*Padres Unidos de Tulsa v. Drummond,*
   785 F. Supp. 3d 993 (W.D. Okla. 2025) ..................................................... 17

*Pennsylvania v. Nelson,*
   350 U.S. 497 (1956) ...................................................................................... 20

*Peoples Rts. Org., Inc. v. City of Columbus,*
   152 F.3d 522 (6th Cir. 1998) .................................................................. 15, 30

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati,*
   822 F.2d 1390 (6th Cir. 1987) ..................................................................... 11

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.,*
   769 F.3d 447 (6th Cir. 2014) ....................................................................... 13

*Pleasant View Baptist Church v. Beshear,*
  78 F.4th 286 (6th Cir. 2023) ................................................................32

*Plyler v. Doe,*
  457 U.S. 209 (1982) ...........................................................................26

*Ramsey v. Town of Oliver Springs,*
  998 S.W.2d 207 (Tenn. 1999) ..............................................................12

*Reno v. ACLU,*
  521 U.S. 844 (1997) ...........................................................................35

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ...........................................................................18

*Roberts v. Neace,*
  958 F.3d 409 (6th Cir. 2020) ...............................................................33

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ........................................................................ 8, 34

*Russell v. Lundergan-Grimes,*
  784 F.3d 1037 (6th Cir. 2015) .............................................................15

*Salazar-Gonzalez v. Lynch,*
  798 F.3d 917 (9th Cir. 2015) ...............................................................29

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ...............................................................11

*Speech First, Inc. v. Schlissel,*
  939 F.3d 756 (6th Cir. 2019) ...............................................................11

*Springfield Armory, Inc. v. City of Columbus,*
  29 F.3d 250 (6th Cir. 1994) ............................................................ 29, 30

*State v. Capps,*
  No. 2023-01419, 2024 WL 5135477 (Tenn. Crim. App. Dec. 17, 2024) .............4

*State v. Deberry,*
  651 S.W.3d 918 (Tenn. 2022) ............................................................ 3, 33

*State v. Dorantes,*
  331 S.W.3d 370 (Tenn. 2011) ................................................................9

*State v. Thompson,*
  No. 2011-1277, 2012 WL 3025697 (Tenn. Crim. App. July 25, 2012) ............33

*State v. Young,*
  196 S.W.3d 85 (Tenn. 2006) ................................................................14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023) ...........................................................................14

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .......................................................................... 7, 8

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ......................................................................... 32, 34

*Toll v. Moreno,*
  458 U.S. 1 (1982) ..................................................................................................21

*United States v. Acosta de Evans,*
  531 F.2d 428 (9th Cir. 1976) ...................................................................................5

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) .............................................................................19

*United States v. Blaszak,*
  349 F.3d 881 (6th Cir. 2003) .................................................................................28

*United States v. Franco-Lopez,*
  687 F.3d 1222 (10th Cir. 2012) .............................................................................25

*United States v. Frei,*
  995 F.3d 561 (6th Cir. 2021) ...................................................................................6

*United States v. Garcia,*
  883 F.3d 570 (5th Cir. 2018) ...................................................................................6

*United States v. George,*
  779 F.3d 113 (2d Cir. 2015) ..................................................................................30

*United States v. Kim,*
  435 F.3d 182 (2d Cir. 2006) ..................................................................................10

*United States v. Paulin,*
  329 F. App'x 232 (11th Cir. 2009) ...................................................................... 9, 10

*United States v. Salerno,*
  481 U.S. 739 (1987) ..............................................................................................20

*United States v. Sanchez-Vargas,*
  878 F.2d 1163 (9th Cir. 1989) ...............................................................................19

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ..........................................................18, 19, 23, 28

*United States v. Tipton,*
  518 F.3d 591 (8th Cir. 2008) .................................................................................30

*United States v. Ye,*
  588 F.3d 411 (7th Cir. 2009) ...........................................................................29, 30

*United States v. Zelaya,*
  No. 22-CR-77, 2025 WL 562759 (E.D. La. Feb. 20, 2025)...............................9, 10

*United States v. Zheng,*
  87 F.4th 336 (6th Cir. 2023) ..................................................................................24

*Universal Life Church Monastery Storehouse v. Nabors,*
  35 F.4th 1021 (6th Cir. 2022)...........................................................11, 12, 13, 15

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013)...........................................................1, 19, 25, 28

*Villas at Parkside Partners v. City of Farmers Branch,*
  726 F.3d 524 (5th Cir. 2013) ...........................................................................23, 26

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ..................................................................................11

*Welty v. Dunaway,*
    791 F. Supp. 3d 818 (M.D. Tenn. 2025) ..................................................11

*Wis. Dep't of Indus. v. Gould Inc.,*
    475 U.S. 282 (1986) ..................................................................................25

*Yoder v. Bowen,*
    146 F.4th 516 (6th Cir. 2025)....................................................................12

**Statutes**

8 U.S.C. § 1101 .............................................................................................1

8 U.S.C. § 1158(a) .......................................................................................29

8 U.S.C. § 1182 ...........................................................................................29

8 U.S.C. § 1182(d)(5) ..................................................................................29

8 U.S.C. § 1229(a) .......................................................................................26

8 U.S.C. § 1229(a)(1) ...................................................................................30

8 U.S.C. § 1229b(a) .....................................................................................29

8 U.S.C. § 1324 ..............................................................................................4

8 U.S.C. § 1324(a)(1)(A)(i) .........................................................................19

8 U.S.C. § 1324(a)(1)(A)(ii)–(iii) ...............................................................19

8 U.S.C. § 1324(a)(1)(A)(ii)-(v) ..................................................................18

8 U.S.C. § 1324(a)(1)(A)(iii) .......................................................................24

8 U.S.C. § 1324(a)(1)(B) ..............................................................................27

8 U.S.C. § 1324(b)(3) ............................................................................ 18, 30

8 U.S.C. § 1324(c) .................................................................................. 18, 25

8 U.S.C. § 1328 ............................................................................................19

8 U.S.C. § 1329 .................................................................................... 18, 25

42 U.S.C. § 11343(a) ...................................................................................28

Immigration Reform and Control Act of 1986,
    Pub. L. No. 99-603, § 112, 100 Stat. 3359, 3381-82 (1986) ....................30

Tenn. Code Ann. § 1-3-105(b) ......................................................................3

Tenn. Code Ann. § 39-11-103(d) .................................................................14

Tenn. Code Ann. § 39-11-202(a) .................................................................33

Tenn. Code Ann. § 39-17-118.............................................................1, 2, 4, 5

Tenn. Code Ann. § 39-17-118(c) .................................................................27

Tenn. Code Ann. § 39-17-118(d)..........................................................2, 4, 28

Tenn. Code Ann. § 39-17-118(e) .......................................................2, 4, 32, 33

Tenn. Code Ann. § 40-12-104(a) ....................................................................................12

Tenn. Code Ann. § 40-12-105(a) ....................................................................................12

**Other Authorities**

*H. Floor Debate on H.B. 322*, 2025 Leg., 114th Sess. (Tenn. 2025) ..............................33

*Hearing on S.B. 392 Before the Sen. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025).......................33

*New Proceedings Filed in Immigration Court*, TRAC Immigration (Aug. 2025),
   https://tracreports.org/phptools/immigration/ntanew.........................................31

*Shelter*, Merriam-Webster Dictionary, https://tinyurl.com/crx694vh...............................28

*Tennessee Shelters*, Tenn. Emergency Mgmt. Agency, https://www.tn.gov/tema/tennessee-
   shelters.html ........................................................................................................28

**Regulations**

8 C.F.R. § 214.14(d)(2)-(3) ..........................................................................................29

8 C.F.R. § 239.2(a) .....................................................................................................31

8 C.F.R. § 1003.14(a) .............................................................................................30, 31

## INTRODUCTION

Congress has exercised its exclusive authority to "determine immigration policy" for the "entire Nation," *Arizona v. United States*, 567 U.S. 387, 395 (2012), by enacting a comprehensive framework governing the transport and harboring of noncitizens. *See* 8 U.S.C. § 1101 *et seq*. Federal courts have consistently held that states are barred from regulating in this field. *See, e.g., Ga. Latino All. for Hum. Rts. v. Governor of Georgia* (*GLAHR*), 691 F.3d 1250, 1263-67 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023-26 (9th Cir. 2013). Undeterred, Tennessee enacted a felony ban on transporting or harboring certain noncitizens. *See* Tenn. Code Ann. § 39-17-118 ("Section 5"). Section 5 is field preempted because it intrudes on an area of exclusive federal control and conflict preempted because it impedes federal aims concerning the transport and harboring of noncitizens. It is unconstitutionally vague because it fails to give fair notice of which noncitizens it covers, what a defendant must know about a noncitizen's status, and what counts as harboring. And it unconstitutionally burdens the religious practices and free association of entities that provide shelter without regard to immigration status. Plaintiffs' allegations suffice to survive a motion to dismiss.

## BACKGROUND

On January 22, 2025, Tennessee Governor Bill Lee presented an "agenda on illegal immigration" for a session of the General Assembly. Compl. ¶ 39. "[H]eeding the call" from President Trump for states to "play a major role" in enforcing immigration laws, the governor proposed a "comprehensive framework to strengthen immigration enforcement across Tennessee." *Id.* One component was a bill to "hold[] people accountable for harboring illegal immigrants." *Id.* ¶ 40.

Debates over the bill highlighted its breadth and ambiguity. Lawmakers and opponents raised concerns that it could criminalize nonprofits and faith-based organizations that provide services without regard to immigration status, *see id.* ¶ 48, as well as mixed-immigration-status families. Proponents gave conflicting or nonresponsive answers about whether particular conduct was covered,

but their responses suggested the concerns were valid. *Id.* ¶ 49; *see also id.* ¶ 50 (bill would extend to anyone "harboring, meaning housing, or hiding … individuals that are here illegally" and churches would be protected only so long as they "provid[ed] services ... outside the definitions in this bill").

Section 5 was passed in April 2025 and signed into law May 9, 2025. Section 5 is violated when a person "[i]ntentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection," an individual the person "knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement."[1] Tenn. Code Ann. § 39-17-118. "Harbor" is defined as "to provide shelter to or conceal the whereabouts of an individual whom the person knows has illegally entered or remained in the United States, as determined by" ICE. *Id.* § 118(d). Section 5 exempts lawyers providing "bona fide legal advice" and people providing "healthcare services" at a licensed facility. *Id.* § 118(e).

Plaintiffs filed suit to challenge Section 5's constitutionality. Garrett Causey and John Doe sue on behalf of themselves and all others similarly situated. The Southeastern Synod of the Evangelical Lutheran Church in America sues on behalf of its churches, pastors, staff, and congregants.

The Synod comprises 160 congregations across Alabama, Georgia, Mississippi, and Tennessee. Compl. ¶ 11. Its vision is "to equip, empower, and engage God's people to love and serve the world." *Id.* It "lives out these commitments not only in word, but also in deed," *id.* ¶ 15, including by advocating for immigrants' rights and "fair and generous" immigration laws, *id.* ¶ 11. The Synod's Tennessee churches minister to immigrants, including undocumented immigrants. *Id.* ¶ 15. For instance, one church in Middle Tennessee provides sanctuary to immigrants in need, including by housing them, and has received donations to support this ministry. *Id.* ¶ 19. The pastor "would be

---

[1] This likely refers to U.S. Immigration and Customs Enforcement (ICE), which superseded the Bureau of Immigration and Customs Enforcement in 2007. *See* 72 Fed. Reg. 20,131 (Apr. 23, 2007).

2

hard pressed to stop these ministries, even if it meant going to jail." *Id.* ¶ 18. The Synod fears that its members who minister to immigrants could be prosecuted under Section 5.

Garrett Causey is a resident of Murfreesboro, Tennessee, who rents out a house in the Antioch neighborhood of Nashville. *Id.* ¶ 25. His current tenant is a Guatemalan immigrant who Mr. Causey knew did not have legal status when he moved in. *Id.* There are other people who live in the house and contribute to the rent who may not have status. *Id.* ¶ 26. It is important to Mr. Causey to rent to tenants regardless of immigration status. *Id.* ¶ 27. He fears prosecution under Section 5. *Id.*

John Doe is a Tennessee resident and Mexican immigrant who recently became a lawful permanent resident. *Id.* ¶ 28. His daughter and her husband live in Mr. Doe's home and pay rent. *Id.* ¶ 29. Mr. Doe's son-in-law entered the country unlawfully and is seeking asylum, and Mr. Doe knows his son-in-law's immigration status. *Id.* ¶¶ 29-30. Mr. Doe fears prosecution under Section 5. *Id.* ¶ 30.

## LEGAL STANDARD

"To survive a motion to dismiss" under Rule 12(b)(6), "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re McKenzie*, 716 F.3d 404, 412 (6th Cir. 2013) (internal quotation marks omitted). The same standard applies to a Rule 12(b)(1) motion that, like Defendants' here, raises only a "facial attack" on jurisdiction based on "the sufficiency of the pleading." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).

## ARGUMENT

### I.    Tennessee Courts Would Not Adopt Defendants' Interpretation of Section 5.

Because the meaning of Section 5 bears on standing and the merits, Plaintiffs address it first. Under Tennessee law, text "shall be given [its] natural and ordinary meaning, without forced or subtle construction that would limit or extend" it. Tenn. Code Ann. § 1-3-105(b); *see also State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022) (courts "determine what a statute means" based on "how a reasonable reader … would have understood the text" (internal quotation marks omitted)). The plain text

supports Plaintiffs' interpretation.

The "provide shelter" version of the harboring offense does not require intent to conceal. Section 5's actus reus is to "intentionally conceal[], harbor[], or shield[] from detection." Tenn. Code Ann. § 39-17-118(a)(2). "[H]arbor" is defined as "to provide shelter to *or* conceal the whereabouts of an individual." *Id.* § 118(d) (emphasis added). A person can therefore violate Section 5 by intentionally providing shelter to certain noncitizens for financial benefit, without intent to conceal.

The statutory definition of "harbor" does no work on Defendants' reading. "The word 'or' is disjunctive" and so here "indicates an alternative" between providing shelter or concealing the whereabouts. *See State v. Capps*, No. 2023-01419, 2024 WL 5135477, at *6 (Tenn. Crim. App. Dec. 17, 2024); *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018). Given the disjunctive phrasing, one can "harbor" by merely "provid[ing] shelter to … an individual." Defendants do not explain why the General Assembly would have included this definition—which departs from the federal harboring provision, 8 U.S.C. § 1324—if it intended for Section 5 to simply "mirror its federal counterpart." MTD 24. The statutory exemptions for legal advice and healthcare services, Tenn. Code Ann. § 39-17-118(e), buttress this disjunctive reading of the definition, because neither act involves concealment, meaning the exceptions would have been unnecessary if the offense were limited to hiding.

The words "from detection" in the statute's operative phrase do not override the definition. Under the "rule of the last antecedent," the limiting phrase *from detection* modifies "only the noun or phrase that it immediately follows," *shields*, and not *conceals* or *harbors* earlier in the list. *See Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). This "typical[]" approach to statutory interpretation "reflects the basic intuition that when a modifier appears at the end of a list, an ordinary reader would apply that modifier only to the item directly before it." *Allen v. United States*, 83 F.4th 564, 568 (6th Cir. 2023) (internal quotation marks omitted); *see also, e.g.*, *In re Est. of Tanner*, 295 S.W.3d 610, 624 (Tenn. 2009). Though the rule can "be overcome by other indicia of meaning," such as when it would produce "absurd"

results, *id.* at 624-25, there is no reason here "to depart from the 'typical[]' rule," *Allen*, 83 F.4th at 573 (alteration in original).

Defendants' view is irreconcilable with basic principles of grammar. Modifying the entire list with "from detection" produces "the redundant phrase 'conceal from detection'" and "the awkward construction 'harbor from detection.'" *United States v. Acosta de Evans*, 531 F.2d 428, 430 n.3 (9th Cir. 1976). It renders "provide shelter to" superfluous. And if the definition of "harbor" were inserted into the operative clause, in Defendants' view Section 5 would criminalize "concealing from detection," "providing shelter to from detection," "concealing the whereabouts of from detection," and "shielding from detection," an illogical mess. *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) (rejecting the series-modifier canon when it would "take[] more than a little mental energy to process the individual entries in the list"). There is no reason to "stretch the modifier" so far. *Allen*, 83 F.4th at 572 (internal quotation marks omitted).[2]

Section 5 is broader than Defendants recognize in other ways. The requirement that a person "know[]" an individual "has illegally entered or remained in the United States" covers a noncitizen who, at any point, improperly entered the country or was unlawfully present. The present-perfect tense denotes "an act, state, or condition that is *now* completed," or a "change of state that produces a continuing result." *Hewitt v. United States*, 606 U.S. 419, 427-28 (2025) (internal quotation marks omitted). Here, the phrase signifies a historical fact that "continues to be true," *id.* at 429—that a person entered unlawfully—regardless of whether they later obtained status.

Contrary to Defendants' assertions, Section 5 does not require knowledge of a specific ICE "determination." The phrase "as determined by" ICE follows a comma, making it most logically read

---

[2] Defendants support their construction by mischaracterizing Section 5. Their invented title—the "Anti-Smuggling Act"—appears nowhere in the law, and though they insist that the law applies only to "smugglers," Section 5 refers to any "person" who violates it. *See* Tenn. Code Ann. § 39-17-118.

5

as a nonrestrictive modifier that describes how unlawfulness is established rather than part of the scienter requirement. Under that reading, to violate Section 5, a person must know that the individual they are transporting or harboring "has entered or remained" in the United States unlawfully—a fact that is, has been, or will be determined by ICE. Had the legislature intended to require knowledge of an ICE determination, it would have stated directly that Section 5 is violated when a person "who knows that ICE has determined that an individual entered or remained illegally" harbors the individual.

Defendants claim Section 5 protects smuggling victims by catching offenders "'*in the act of smuggling.*'" MTD 2. But under Defendants' view, the law would not "protect victims" if they had never encountered ICE or the smugglers avoided learning about any ICE "determination." Instead, Section 5 would cover only smuggling of noncitizens known to be subject to ICE warrants or Notices to Appear ("NTAs") or on the "Most Wanted" list. *Id.* at 3-4. To justify this improbably narrow scope, Defendants repeatedly conflate the statute's perpetrators and its "victims." The perpetrators under Section 5 are those providing shelter for financial benefit; Section 5 is silent about their immigration status. The noncitizens being sheltered are the statute's "victims," and the ICE determination language refers only to them. Defendants' argument that Section 5 deliberately addresses only the most "high-profile situations and the most culpable offenders," *id.* at 29, confuses those roles: It makes no sense to say Section 5 is "supposed to operate," *id.* at 31, by protecting only the "most culpable" "victims."

Finally, although Section 5 requires acting "for the purpose of commercial advantage or private financial gain," nothing suggests that a person must have profit as their "sole purpose" to come within its scope. *See United States v. Frei*, 995 F.3d 561, 566-67 (6th Cir. 2021). An intent "to profit or otherwise secure some economic benefit" suffices. *United States v. Garcia*, 883 F.3d 570, 574 (5th Cir. 2018).

## II. Defendants' Threshold Arguments Fail.

### A. Plaintiffs Have Standing to Challenge Section 5.

Plaintiffs' complaint plausibly alleges facts sufficient to demonstrate Article III standing, under

6

the familiar test requiring an injury in fact, causation, and redressability. *See Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024).

### 1. Plaintiffs Have Alleged an Injury in Fact.

An injury in fact must be "actual or imminent and concrete and particularized." *Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022). In "a pre-enforcement challenge" like this one, courts apply a "specialized framework … to determine whether an enforcement action is sufficiently imminent to support Article III jurisdiction." *Id.* Under that framework, a plaintiff has standing to maintain a pre-enforcement challenge if she "alleges (1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)); *see also, e.g.*, *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, --- F.4th ---, No. 23-3630, 2025 WL 3102072, at *4 (6th Cir. Nov. 6, 2025) (en banc); *Kareem*, 95 F.4th at 1022.[3]

**Plaintiffs' conduct implicates constitutional interests.** As Defendants do not contest, Plaintiffs' "conduct is arguably affected with a constitutional interest" because Section 5 "is arguably preempted by federal law." *Iowa Migrant Movement for Just. v. Bird* (*IMMJ*), --- F.4th ----, No. 24-2263, 2025 WL 2984379, at *2 (8th Cir. Oct. 23, 2025) (internal quotation marks omitted). Plaintiffs' vagueness claim arguably implicates their constitutional interest in "fair notice of the conduct [Section

---

[3] Defendants contend Plaintiffs must establish what the statute "proscribes," rather than what is arguably proscribed, and that prosecution must be "certainly impending," not just credible. MTD 6 (quoting *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024)). That is not the law. In *Susan B. Anthony List*, the Supreme Court explained that a "future injury" can confer Article III standing if the injury is "'certainly impending,' or there is a 'substantial risk' that the harm will occur,'" and that in a pre-enforcement challenge this standard is met if the threat of prosecution is "credible." 573 U.S. at 158-59 (internal quotation marks omitted); *see also Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 545 (6th Cir. 2021). The recent *Defending Education* decision reaffirmed that only an arguable interpretation and a credible threat of enforcement are needed. 2025 WL 3102072, at *4.

5] punishes." *Johnson v. United States*, 576 U.S. 591, 595 (2015). And the ministries the Synod provides to immigrants implicate its First Amendment rights to exercise its religion and associate for religious purposes. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

**Section 5 arguably proscribes Plaintiffs' conduct.** On its face, Section 5 covers Plaintiffs' conduct, and Defendants' contrary argument rests on their atextual, illogical interpretation. *See supra*, at 4-6. In contending that their strained reading is the only arguable one for standing purposes, Defendants invoke the canon of constitutional avoidance. MTD 7. But that canon does not apply to standing analysis. "For standing purposes," this Court must "accept as valid the merits of [Plaintiffs'] legal claims" by assuming Section 5 is unconstitutional, *FEC v. Cruz*, 596 U.S. 289, 298 (2022), rather than adopting a reading that avoids constitutional problems. Moreover, the logic of avoidance applies only to the merits. The canon "is a tool for choosing between competing plausible interpretations of a statutory text" on the merits, presuming that the legislature "did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Adopting an interpretation of a statute to defeat standing would not resolve constitutional doubts on the merits. It would merely prevent a plaintiff from challenging an unconstitutional statute in the first place.

Under Plaintiffs' arguably correct interpretation, Section 5 arguably proscribes their conduct. That is especially true because a plaintiff challenging a law's constitutionality need not "confess that he will in fact violate that law," *Driehaus*, 573 U.S. at 163, by admitting every element of a crime.

Starting with Plaintiff Garrett Causey, it is uncontested that he rents out a home for purposes of private financial gain. *See* Compl. ¶¶ 25-27. And he intentionally provides shelter to (i.e., "harbors") one immigrant who did not have legal status when he moved in and other immigrants who Mr. Causey suspects may have entered unlawfully or currently lack status. That is sufficient knowledge to at least arguably fall within the statute. In Tennessee, mens rea "may be established exclusively by

circumstantial evidence," *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011), and the circumstances Mr. Causey alleges could give rise to an inference of knowledge.

Plaintiff John Doe provides shelter to his son-in-law, who he "knows … unlawfully entered the United States," Compl. ¶¶ 29-30, and "has an ongoing immigration case that requires him to check in with ICE," Suppl. Doe Decl. ¶ 3.[4] That shows knowledge that Mr. Doe's son-in-law entered or remained in the United States unlawfully. Even if Section 5 requires knowledge of an ICE determination, Mr. Doe likely satisfies that element. As for private financial gain, Mr. Doe's daughter and son-in-law pay rent. Compl. ¶ 29. Receiving rent is not the primary reason Mr. Doe provides shelter to his relatives, but he does not refuse the rent checks, and a prosecutor could conclude he acts for financial gain. In interpreting the financial-gain sentencing enhancement in the federal harboring statute, courts have held that "the absence of a motive for charity or affection is not an element." *United States v. Paulin*, 329 F. App'x 232, 235 (11th Cir. 2009); *see also United States v. Zelaya*, No. 22-CR-77, 2025 WL 562759, at *4 (E.D. La. Feb. 20, 2025) ("[P]hilanthropic motivations" do not "override any intent … to profit from" "bringing [immigrants] to the United States" "because the two motives are not mutually exclusive."). Arguably, a state court would adopt the same reading.

Several Synod members engage in conduct arguably proscribed by Section 5. Compl. ¶¶ 17-24. One pastor and their congregation "provide[] sanctuary to immigrants in need, regardless of their immigration status." *Id.* ¶ 19. "For more than a year, two Venezuelan asylum seekers lived in the church building," and the church received donations toward that ministry. *Id.* The same church owns a house it has used "to provide shelter to refugees, mostly recently to an Afghan family." *Id.* It also

---

[4] Defendants fault Plaintiffs for relying on Mr. Doe's supplemental declaration without amending the complaint. MTD 14-15 (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014). But Mr. Doe's declaration is in the record, unlike the evidence in *Omnicare*. If the Court concludes that the facts in the supplemental declaration must be alleged in the complaint, Plaintiffs seek leave to amend.

"hosts private events for members of the community," including many immigrants, in exchange for donations. *Id.* ¶ 20. Another Synod entity provides shelter to African immigrants, including those the pastor knows lack status, hosting them "for Bible studies, meals, and other community events" and "connecting immigrants with healthcare and other public benefits." *Id.* ¶ 21. The pastors and congregants who participate in these ministries are arguably covered by Section 5 because they provide shelter to immigrants who they have reason to believe entered or remained in the country unlawfully and receive a financial benefit in return. As with Mr. Doe, the fact that Synod members act for religious and charitable reasons does not preclude a financial purpose. *See Paulin*, 329 F. App'x at 235; *Zelaya*, 2025 WL 562759, at *4; *cf. United States v. Kim*, 435 F.3d 182, 185-86 (2d Cir. 2006) (per curiam).

**Plaintiffs face a credible threat of prosecution.** "[A] variety of facts can demonstrate a credible threat of enforcement." *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). Courts in this circuit sometimes look to "four commonly recurring factors" that indicate probable enforcement, *id.*, drawn from *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016). Those factors are (1) "a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," (3) "an attribute of the challenged statute that makes enforcement easier or more likely," and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* at 869. The *McKay* factors "are not exhaustive, nor must each be established." *Kareem*, 95 F.4th at 1023. The "inquiry distills to whether surrounding factual circumstances plausibly suggest a credible fear of enforcement." *Christian Healthcare Ctrs.*, 117 F.4th at 848 (internal quotation marks omitted).

Several facts support Plaintiffs' fear of enforcement. Section 5 is a new law that Governor Lee portrayed as a top legislative priority, Compl. ¶ 39, indicating that it is likely to be enforced. Plaintiffs challenged Section 5 before it went into effect. *See* MTD 4. Standing must be judged at the time a lawsuit is filed. *Id.* at 12; *see also Christian Healthcare Ctrs.*, 117 F.4th at 849. At that point, Tennessee

"ha[d] not suggested that the newly enacted law w[ould] not be enforced," and there was "no reason to assume otherwise." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). For new laws, "statutory language" can "evince[] a credible threat of prosecution." *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987); *see also, e.g.*, *Bryant v. Woodall*, 1 F.4th 280, 286-87 (4th Cir. 2021); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020). Because Plaintiffs are engaged in conduct that is "subject to the regulations, proscriptions, or compulsions" of Section 5, they suffer a "direct injur[y]" supporting pre-enforcement standing. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764-65 (6th Cir. 2019) (internal quotation marks omitted); *Free Speech Coal., Inc. v. Skrmetti*, 761 F. Supp. 3d 1132, 1146 (W.D. Tenn. 2024).

Because Plaintiffs challenged Section 5 before it went into effect, the first two *McKay* factors, concerning warning letters and past enforcement, carry little weight. *See Welty v. Dunaway*, 791 F. Supp. 3d 818, 834-35 (M.D. Tenn. 2025). Indeed, the Sixth Circuit has found pre-enforcement standing even when a challenged policy was on the books for years without being enforced against the plaintiffs or others engaged in similar conduct. *See. e.g.*, *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035-36 (6th Cir. 2022). For instance, in *Defending Education*, the en banc Sixth Circuit found pre-enforcement standing even though the challenged policy had been in place for a decade without being enforced against the conduct at issue. 2025 WL 3102072, at *5 ("[P]laintiffs need not always show that the defendant has enforced the policies in the feared way." (internal quotation marks omitted)). When a law has been dormant for years, additional indicia of likely enforcement may be needed. But this challenge to a new law is a much easier case.

Under the third *McKay* factor, several attributes of Section 5 add credibility to Plaintiffs' fear of enforcement. *McKay*, 823 F.3d at 869. The law's breadth, covering merely "provid[ing] shelter to" someone who has entered or remained in the country unlawfully, "gives prosecutors significant discretion" over enforcement. *Welty*, 791 F. Supp. 3d at 835. Criminal enforcement may also be

instigated by the public under Tennessee's unique grand jury system, which requires grand jury meetings to be publicly announced and invites "[a]ny person having knowledge or proof that an offense has been committed" to testify. Tenn. Code Ann. § 40-12-105(a); *see also id.* § 40-12-104(a). A district attorney general who learns about an offense from such testimony "has both a 'constitutional and statutory obligation to prosecute.'" *Nabors*, 35 F.4th at 1035 (quoting *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 208 (Tenn. 1999)). And unlike the challenged policy in *McKay*, which allowed for case-by-case exemptions, 823 F.3d at 869-70, Section 5 has no "exemptions that make the threat of enforcement remote." *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025). To the contrary, Section 5's exceptions for medical and legal services underscore that Plaintiffs' conduct is arguably covered.

Fear of prosecution may deter individuals from providing shelter to noncitizens. Landlords may conclude that evicting a tenant is "a modest price to pay to avoid" punishment. *Kareem*, 95 F.4th at 1026. After the law was passed, eviction defense lawyers "received multiple emergency calls from Nashville residents who had been abruptly kicked out by their landlords because of the bill," Boatner Decl. ¶ 10, suggesting Plaintiffs are not alone in interpreting the law to criminalize providing shelter. A "pre-enforcement challenge is particularly appropriate" here. *Kareem*, 95 F.4th at 1026.

Finally, Defendants have not disavowed prosecution. *McKay*, 823 F.3d at 869. To be sure, Defendants' counsel argues that Section 5 does not apply to Plaintiffs. But Defendants themselves "ha[ve] not represented that [they] disavow[] enforcement in a non-litigation context, and 'the government's disavowal must be more than a mere litigation position.'" *Yoder*, 146 F.4th at 525 (quoting *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010)); *see also Cruz*, 596 U.S. at 299-301 (finding pre-enforcement standing despite "the Government arguing" plaintiffs' intended conduct "would *not* violate the statute"). When given an opportunity to be bound by their counsel's interpretation at oral argument, Defendants declined, Ex. 64-1 at 11-13, casting doubt on their commitment to that interpretation, *see Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th

Cir. 2014); *Defending Educ.*, 2025 WL 3102072, at *4.

## 2. Plaintiffs Adequately Alleged Causation and Redressability.

Because Plaintiffs have demonstrated a credible threat of prosecution, causation and redressability are easily met. As the Sixth Circuit has explained regarding a "potential" prosecution, a Tennessee district attorney general "would cause that injury by filing the charges, and the district court could redress it by enjoining [him] from doing so." *Nabors*, 35 F.4th at 1034.

Defendants contend Plaintiffs lack standing to obtain relief against a subset of the district attorneys general because Plaintiffs' injuries cannot be traced to them. MTD 14-15. Plaintiffs agree that they have standing to sue only those district attorneys general who might prosecute them for violating Section 5, *see Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023), but for purposes of the motion to dismiss, at least one Plaintiff has plausibly alleged standing as to each Defendant. Mr. Causey has standing to sue two Defendants, Jennings Jones (the prosecutor where Mr. Causey lives) and Glenn Funk (the prosecutor where Mr. Causey rents out a home). *See* Dkt. 33 at 12. Mr. Doe also has standing to sue Jennings Jones because Mr. Doe both lives and provides shelter in his district. Suppl. Doe Decl. ¶ 1. And the Synod has standing to sue all 32 Defendants.

At the preliminary-injunction stage, Plaintiffs agreed that the Synod had established standing against the 21 Defendants whose districts include the Synod's churches but not the 11 Defendants whose districts do not contain Synod churches, in light of the more stringent evidentiary standards applicable to preliminary-injunction motions, *see Doe #11 v. Lee*, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022). Plaintiffs do not make that same concession, however, with respect to the motion to dismiss.

At the pleading stage, a plaintiff need only "assert a plausible claim" for standing. *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (requisite showing for standing varies at "successive stages of the litigation"). The Court must "construe the complaint in the light most favorable to" Plaintiffs, "accept all well-

13

pleaded factual allegations" as true, and "draw all reasonable inferences in favor of" Plaintiffs. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019). Plaintiffs allege that the Synod has congregations "across" Tennessee and that "[i]ts churches within Tennessee provide numerous ministries that serve the immigrant community, including undocumented immigrants." Compl. ¶¶ 11, 15. The complaint provides specific examples of those ministries. *Id.* ¶¶ 15-24. It is reasonable to infer that many church members cross district lines to worship and participate in ministries serving immigrants. Because Tennessee law permits a crime to be prosecuted in any district where one element occurs, *see* Tenn. Code Ann. § 39-11-103(d); *see also State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006), a church member could be prosecuted where they formed the intent to shelter, even if the sheltering occurred in a different district where the Synod has a church. The Synod has thus plausibly alleged facts sufficient to support standing against all 32 district attorneys general (and at a minimum against the 21 district attorneys general as to whom Defendants agree there is causation and redressability).

### 3. The Synod Has Associational and Organizational Standing.

To demonstrate associational standing, an organization must show that (1) one of its members would have standing to sue, (2) the litigation is germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual member participation. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). The Synod meets that test. Its pastors who shelter undocumented immigrants and receive donations for that work are arguably covered by the statute. This litigation is germane to the Synod's purpose of ministering to immigrants. And this purely legal challenge to Section 5 does not require individual member participation.

Defendants contend that the Synod has failed to identify a member who has suffered or is about to suffer the requisite injury. MTD 13. But the complaint identifies several Synod pastors who credibly fear prosecution under Section 5. Compl. ¶¶ 17-24. The requirement that the Synod identify a member with standing does not necessitate identification *by name. Do No Harm v. Lee*, No. 3:23-CV-

01175, 2024 WL 3730623, at *3 (M.D. Tenn. Aug. 8, 2024); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (collecting cases).

The Synod also has organizational standing because Section 5 will "perceptibly impair[]" its ministries providing shelter to noncitizens and directly "interfere[] with" its "core … activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). The Synod's immigrant-serving ministries are frustrated by fear that members could be prosecuted for participating in them. Compl. ¶¶ 16-17. That is an injury in fact caused by Defendants' enforcement of Section 5.

## B. Defendants Are Not Entitled to Sovereign Immunity.

The *Ex parte Young* exception to state sovereign immunity permits suits against officers with "some connection with the enforcement of" a law. 209 U.S. 123, 157 (1908). Defendants are district attorneys general with "the requisite enforcement connection" to Section 5. *Nabors*, 35 F.4th at 1040. *Ex parte Young* requires no "adverse action" beyond a "realistic possibility" of enforcement. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047-48 (6th Cir. 2015). Because Plaintiffs showed a credible threat of enforcement sufficient for standing, they necessarily satisfy *Ex parte Young*. *Id.*

## C. Plaintiffs' Vagueness Claim Is Ripe.

Ripeness concerns "whether a plaintiff is threatened with imminent injury in fact." *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (internal quotation marks omitted). It "coincide[s]" with standing in pre-enforcement challenges and thus poses no separate obstacle to Plaintiffs' vagueness claim. *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 418 (6th Cir. 2025). Plaintiffs' claim is ripe because they have shown the requisite "credible threat of enforcement" for standing. *Id.*; *see also Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 530 (6th Cir. 1998).

Defendants rely on inapposite cases that involved hypothetical future conduct. MTD 16. In *Carman*, the Sixth Circuit rejected as unripe cryptocurrency traders' facial vagueness challenge to a transaction reporting law because the traders did not engage in the specified transactions and so could

15

not seek to "evaluate the facial constitutionality" of the law based on "transactions that may never occur." 112 F.4th at 391, 397, 401-02. The vagueness claim was also unripe because pending rulemaking might "limit [the law]'s reach" or "redress … plaintiffs' concerns," *id.* at 403, a possibility not present here. And in *Kanuszewski v. Michigan Department of Health & Human Services*, the plaintiffs' "claim concerning defendants' use" of "blood spots for victim identification" was unripe because "[d]efendants never used, or even attempted to use, plaintiff-children's blood spots." 141 F.4th 796, 809 (6th Cir. 2025). By contrast, Plaintiffs already engage in the conduct implicated by Section 5's vagueness issues: sheltering noncitizens who have entered or remained in the United States unlawfully. *See supra*, at 10-13 (detailing Plaintiffs' credible threat of prosecution).

### D. Plaintiffs Have a Cause of Action.

Federal courts have "long recognized" an equitable cause of action for preemption challenges. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). A private plaintiff may generally seek "an equitable anti-suit injunction" "as a *shield* against the enforcement of … preempted[] state laws." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). In *Armstrong*, the Supreme Court reaffirmed "the significant role that courts play in assuring the supremacy of federal law" by enjoining "preempted" state laws and explained that "[t]he ability to sue" in such instances "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." 575 U.S. at 326-27. This confirms the availability of an equitable cause of action here.

To be sure, equitable suits "to enjoin unlawful executive action" are subject to "statutory limitations." *Id.* at 327. But Defendants point to no language in the INA or any other law suggesting Congress displaced the equitable cause of action for a preemption challenge in the immigration context. In *Armstrong*, the Supreme Court found that Congress had statutorily foreclosed an equitable cause of action only because the statute "express[ly] provi[ded] … one method of enforcing a substantive rule" as the "sole remedy," and the federal regime was "judicially unadministrable." *Id.* at

16

328-29 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Neither factor is present here.

Defendants distort *Armstrong*'s inquiry by asserting that even absent an exclusive-remedy provision, the United States is the only party that may "raise preemption" in a pre-enforcement challenge. MTD 18. In essence, Defendants contend that because the federal government has expansive authority over immigration enforcement, private parties may not challenge state laws as preempted by the federal immigration regime. But Defendants focus on the wrong kind of "enforcement." Plaintiffs "do not seek to enforce immigration laws" against Defendants; "instead, they argue that, by way of the Supremacy Clause and the Immigration and Nationality Act, [Section 5] is unconstitutional." *Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385, at *3 (11th Cir. June 6, 2025) (emphasis omitted). "Congress has not established any 'one' method for enforcing federal preemption occasioned by the [INA]." *Id.*; *see also IMMJ*, 2025 WL 2984379, at *6. Defendants' approach would overturn decades of precedent and undermine field preemption claims by private plaintiffs, which are premised on federal dominance in a field. *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941). Plaintiffs are unaware of any court that has blessed this reading of *Armstrong*. Rather, courts have continued adjudicating private plaintiffs' claims that the INA preempts state immigration laws. *See, e.g.*, *Fla. Immigrant Coal.*, 2025 WL 1625385, at *3; *IMMJ*, 2025 WL 2984379, at *6; *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993, 1000-03 (W.D. Okla. 2025).

## III. Plaintiffs Have Stated a Claim that Section 5 Is Preempted by Federal Law.

Section 5 is field and conflict preempted. To argue otherwise, Defendants rely on an incoherent interpretation of Section 5; misstate the law governing preemption; mischaracterize Plaintiffs' arguments; all but ignore *Arizona*, the most significant precedent; overstate the implications of *Kansas v. Garcia*, 589 U.S. 191 (2020); and wave away the fact that every court of appeals to consider a materially similar statute has found it preempted.

### A. Plaintiffs Have Stated a Claim that Section 5 Is Field Preempted.

17

Section 5 is an impermissible attempt to supplement federal law governing the transport and harboring of noncitizens. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona*, 567 U.S. at 399 (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Such intent can be determined from the text, "structure and purpose of the statute as a whole," and "surrounding regulatory regime." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal quotation marks omitted).

Congress "has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens." *United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013). The INA makes it a federal crime for any person to knowingly transport an unlawfully present noncitizen in the United States in furtherance of a violation of federal immigration laws; to conceal, harbor, or shield from detection such a noncitizen; to encourage or induce a noncitizen to illegally "come to, enter, or reside in the United States"; or to conspire to commit or to aid or abet the commission of any of those acts. 8 U.S.C. § 1324(a)(1)(A)(ii)-(v). There are detailed evidentiary rules for proving transport and harboring crimes. *See id.* § 1324(b)(3). State and local law enforcement officers may arrest individuals for violations of these laws, but only federal prosecutors may prosecute alleged violations, and such prosecutions must be brought in federal court. *Id.* §§ 1324(c), 1329. This is part of the "larger context of federal statutes criminalizing acts undertaken by aliens and those who assist them in coming to, or remaining within, the United States." *GLAHR*, 691 F.3d at 1264. For instance, 8 U.S.C. § 1325 penalizes noncitizens who enter the United States unlawfully, and § 1326 criminalizes noncitizens unlawfully reentering the country. Meanwhile, § 1323 makes it unlawful to bring into the country a noncitizen without documentation; § 1327 criminalizes knowingly aiding or assisting a noncitizen in unlawfully entering the country; and § 1328 prohibits importing noncitizens

for an "immoral purpose." This federal scheme has evolved over 100 years, with Congress "steadily broaden[ing] the scope" of "proscribed conduct" to "address[] … apparent gap[s] in federal immigration law." *United States v. Sanchez-Vargas*, 878 F.2d 1163, 1168 (9th Cir. 1989).

Section 1324 and its neighboring provisions are a comprehensive, unified federal system, creating a web of federal offenses addressing the various ways noncitizens might be brought into, transported within, and harbored in the United States. "Smuggling" a noncitizen into and within the country could implicate a range of related offenses under Title 8—bringing a noncitizen into the country outside a designated port of entry (§ 1324(a)(1)(A)(i)); transporting and harboring inside the country (§ 1324(a)(1)(A)(ii)–(iii)); and importing for an "immoral purpose" (§ 1328) if the aim is exploitation. "[T]he breadth of these laws illustrates an overwhelmingly dominant federal interest in the field." *GLAHR*, 691 F.3d at 1264; *see also South Carolina*, 720 F.3d at 531 (state anti-harboring scheme "field preempted because the vast array of federal laws and regulations" is so pervasive that "'Congress left no room for the States to supplement it'" (quoting *Arizona*, 567 U.S. at 399)).

Section 5 impermissibly intrudes into a field over which Congress has "exclusive governance," *Arizona*, 567 U.S. at 399, as multiple circuits have held, *see GLAHR*, 691 F.3d at 1264; *South Carolina*, 720 F.3d at 531; *United States v. Alabama*, 691 F.3d 1269, 1285-86 (11th Cir. 2012); *Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3d Cir. 2013); *Valle del Sol*, 732 F.3d at 1024-26. Section 5 parallels and expands upon § 1324, criminalizing the transport and harboring of noncitizens. Tennessee may not "enact[] concurrent state legislation in this field of federal concern." *Alabama*, 691 F.3d at 1287.

To the extent Section 5 tracks § 1324, that does not save it. "Where Congress occupies an entire field," "even complementary state regulation is impermissible," because "[f]ield preemption reflects a congressional decision to foreclose" state law. *Arizona*, 567 U.S. at 401. In *Arizona*, the state "add[ed] a state-law penalty for conduct proscribed by federal law"—the failure to complete and carry registration documents. *Id.* at 400. The Court rejected Arizona's argument that its law had "the same

19

aim as federal law and adopt[ed] its substantive standards," emphasizing that "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Id.* at 402. Here, Congress has established a "full set of standards" to govern the transport and harboring of noncitizens. *Id.* at 401. In light of this "complete scheme of [federal] regulation," Tennessee may not "conflict or interfere with, curtail or complement, the federal law" in any way "or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66-67; *see also, e.g.*, *Pennsylvania v. Nelson*, 350 U.S. 497, 504 (1956).

Defendants' arguments to the contrary are unavailing. As an initial matter, Defendants misstate the legal framework. *See* MTD 19-20. It is doubtful that the standard from *United States v. Salerno*, 481 U.S. 739 (1987)—whether "no set of circumstances exists under which [a law] would be valid," *id.* at 745—applies to preemption challenges. *See, e.g.*, *Lozano*, 724 F.3d at 313 n.22; *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). In *Arizona*, the Supreme Court did not apply *Salerno* or require any heightened showing for a facial challenge. *See Arizona*, 567 U.S. at 401-10; *see also, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999). Even if *Salerno* applied, Plaintiffs would prevail because a law that is preempted is necessarily preempted in all its applications. *See, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 589 (1987). In other words, because federal law comprehensively regulates the transport and harboring of noncitizens, there is no set of circumstances under which a state could validly regulate in the field. *See Arizona*, 567 U.S. at 401.

On the merits, Defendants contend Plaintiffs have failed to "point to something in the 'text or structure'" of the federal regime establishing that Congress "'left no room for supplementary state legislation.'" MTD 20 (quoting *Garcia*, 589 U.S. at 208). But Defendants do not grapple with the relevant federal framework: the regulation of the transport and harboring of noncitizens, a core component of the federal government's ability to set the conditions under which noncitizens can enter and remain in the United States. *See, e.g.*, Compl. ¶¶ 5, 35-36. This framework includes § 1324 as well as its neighboring offenses, which address a range of interrelated, often overlapping conduct. *See supra*,

at 18-19. Defendants' exclusive focus on § 1324 ignores the broader "statutory framework" and "surrounding regulatory regime." *See Medtronic*, 518 U.S. at 486 (internal quotation marks omitted).

Defendants also misrepresent Section 5. While the presumption against preemption applies with "special force" in areas traditionally regulated by the states, MTD 19-20, Section 5 does not fit that bill. Though Section 5 is a criminal law, it exclusively covers harboring noncitizens, making it inextricably bound up in federal immigration enforcement, unlike the general criminal law the Supreme Court upheld in *Garcia*. Section 5 is "not a generally applicable law" but rather "applies only to aliens." *IMMJ*, 2025 WL 2984379, at \*9. "For these reasons, the greatest presumption against preemption likely should not apply." *Id.* at \*7; *see also, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) ("no presumption against pre-emption" in areas "inherently federal in character"). The transport and harboring of noncitizens are central to "the regulation of aliens within our borders," over which the federal government has a "preeminent role." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). The immigration-specific nature of Section 5 is analogous to *Arizona*, where the Supreme Court did not suggest the challenged criminal laws fell within the state's traditional police power. Section 5 can be violated only with respect to immigrants; the state has no special interest in this field.

Defendants are also wrong to insist that federal law "invites State participation in this area." MTD 20. Congress has carefully limited states to arresting individuals for violations of the *federal* transport and harboring laws, suggesting that this is the full extent of state participation Congress deemed appropriate. *Cf. Arizona*, 567 U.S. at 408 (finding conflict where "[f]ederal law specifie[d] limited circumstances in which state officers may perform the functions of an immigration officer"). Defendants cite unrelated provisions of federal immigration law. But it is unclear why state officials' ability to enter "immigration stations" to enforce state laws bears on whether states can create their own laws parallel to § 1324, or how provisions that merely define who qualifies for certain federal immigration relief by assisting in investigating crimes are relevant.

Defendants' contention that this case has no foreign policy implications is likewise incorrect. As discussed above, § 1324 and its surrounding provisions set forth Congress's definitive regulatory treatment of noncitizens entering and within the United States. Those provisions have just as much "to do with the protection of the just rights of a country's own nationals when those nationals are in another country," MTD 22 (quoting *Hines*, 312 U.S. at 64), as the registration provisions in *Arizona*. Moreover, Section 5 directly affects the ability of certain noncitizens to find housing by criminalizing those who would provide them shelter for financial benefit. It therefore could just as easily result in "[p]erceived mistreatment of aliens in the United States" and raise concerns about noncitizens' "status, safety, and security" as the provisions challenged in *Arizona*, 567 U.S. at 395.

Finally, Defendants mistakenly suggest that *Garcia* sub silentio abrogated *Arizona* and its progeny. MTD 23-23. But *Garcia*—like the circuit decisions Plaintiffs cite—applied *Arizona*. It simply found its standards were not met. In *Garcia*, three noncitizens were prosecuted under a state identity-theft law for using another person's Social Security number on tax-withholding forms. 589 U.S. at 195. The Supreme Court rejected an argument that the statute was preempted because the information supplied on the tax forms was used on federal employment verification forms as well. *Id.* at 208. It concluded that federal law did not establish a comprehensive, unified system regarding "information that a State may require employees to provide" simply by creating a mechanism for verifying authorization to work in the United States. *Id.* at 210. That is, the Court concluded there was no comprehensive federal regime at all and, in any event, the two laws were "*fundamentally unrelated.*" *Id.* at 208. This case is unlike *Garcia* because it involves a state law covering immigrants that largely tracks its federal analogue, trenching on an area where there *is* a comprehensive federal system. Nothing in *Garcia* casts doubt on the validity of *Arizona*. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts should not conclude the Supreme Court's "more recent cases have, by implication, overruled an earlier precedent" but should "follow the case which directly controls" (internal quotation marks

omitted)). Under *Arizona* and its progeny, Section 5 is field preempted.

**B. Plaintiffs Have Stated a Claim that Section 5 Is Conflict Preempted.**

Section 5 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal quotation marks omitted); *see, e.g.*, *GLAHR*, 691 F.3d at 1265-67; *South Carolina*, 720 F.3d at 531-32; *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528-36 (5th Cir. 2013). The conflict-preemption analysis is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Defendants misstate the standard by arguing that Plaintiffs' conflict-preemption challenge is "doom[ed]" because Plaintiffs acknowledge that Section 5 "in certain respects mirrors its federal counterpart." MTD 24. Courts frequently find that state laws that partly parallel a federal analogue are conflict preempted. *See, e.g.*, *Arizona*, 567 U.S. at 400-03; *Crosby*, 530 U.S. at 373-74. Indeed, one of the laws struck down in *Arizona* "[i]n effect … add[ed] a state-law penalty for conduct proscribed by federal law." 567 U.S. at 400. The Court concluded that "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Id.* at 402. Far from requiring that it not be "possible to interpret [the challenged law] in even one way that d[id] not conflict with federal law," MTD 23, the Supreme Court in *Arizona* identified only "isolated conflicts with federal law," *see id.* at 24, and nonetheless found those conflicts sufficient.

So too here: While the state law in many respects tracks § 1324, it also conflicts in meaningful ways with its federal counterpart. *California v. Zook*, 336 U.S. 725 (1949), on which Defendants rely, is therefore inapposite. In that case, the Supreme Court rejected an argument that a state law that was "substantially the same" as its federal analogue was conflict preempted, holding that the "fact of identity does not mean the automatic invalidity of State measures." *Id.* at 727, 729-31. But Plaintiffs do not contend that Section 5 conflicts with § 1324 because the two are too closely aligned. Rather, it

is the ways Section 5 differs from its federal analogue that present obstacles to federal aims.

It is also unnecessary to obtain "a definitive interpretation from" state courts. MTD 23 (quoting *Arizona*, 567 U.S. at 415). All three laws successfully challenged in *Arizona* were newly enacted, and the Court did not suggest that the lack of a definitive state court interpretation rendered them ineligible for conflict preemption. *Arizona*, 567 U.S. at 392, 400-410. It held only that where a law "could be read to avoid" preemption concerns and "it would be inappropriate to assume [the law] w[ould] be interpreted in a way that creates a conflict with federal law," a pre-enforcement challenge failed. *Id.* at 413-15. But it did not suggest that courts could reach for any possible construction of the challenged law, however strained or far-fetched, to avoid a conflict.

Section 5 is conflict preempted because it is broader than § 1324, undermining the congressional choice not to criminalize certain acts. In § 1324, Congress "struck a careful balance." *Id.* at 400. It extended its criminal prohibition only to a person who, while "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection" that individual. 8 U.S.C. § 1324(a)(1)(A)(iii). Under the federal scheme, harboring entails "conduct that tends to substantially facilitate noncitizens remaining in the country illegally and prevent authorities from detecting the noncitizens' presence," but not merely providing shelter to noncitizens without lawful status. *United States v. Zheng*, 87 F.4th 336, 343 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2604 (2024). Section 5 by contrast does not require intent to conceal, and Defendants' argument to the contrary rests entirely on their atextual and incoherent interpretation. *See supra*, at 4-5. Properly construed, Section 5 criminalizes a broader range of conduct than § 1324, undermining Congress's purpose in enacting the latter.

Section 5 is also broader than § 1324 because it criminalizes transporting or harboring noncitizens not covered by the federal analogue. To establish a violation of § 1324, a prosecutor must prove that the noncitizen being transported or harbored "was present in the United States in violation

of law." *United States v. Franco-Lopez*, 687 F.3d 1222, 1228 (10th Cir. 2012). But Section 5 applies to transporting or harboring people who unlawfully entered the United States, even if they subsequently obtained legal status. In the INA, Congress provided a host of ways for noncitizens who entered the United States without authorization to obtain status. Section 5 could criminalize providing shelter to these same people, disrupting the federal regime enabling them to remain lawfully in the country.

Again, Defendants' only counterargument is to fight the plain text. *See* MTD 26. They rewrite Section 5 to criminalize transporting or harboring an individual who unlawfully entered or remained in the United States "and *continues* to be here illegally," MTD 26, language notably absent from the law. While Defendants are correct that Section 5 "says nothing at all about a change in legal status," *id.*, this cuts against them: It "continues to be true," *Hewitt*, 606 U.S. at 429, that a noncitizen "has illegally entered" the country even after that person obtains legal status. *See supra*, at 5.

Section 5 also conflicts with Congress's careful calibration of transport and harboring crimes by impermissibly expanding state officials' role. Congress permitted state and local law enforcement officers to make arrests for violations of § 1324 but vested prosecutorial power exclusively in federal authorities. *See* 8 U.S.C. §§ 1324(c), 1329. Congress "specifically considered the appropriate level of involvement for the states," *Valle del Sol*, 732 F.3d at 1025, and the "inference from these enactments is that the role of the states is limited to arrest for violations of federal law," *GLAHR*, 691 F.3d at 1264. By assuming prosecutorial power over transport and harboring crimes, Tennessee impedes federal "control over enforcement" and thus disrupts the system Congress created, *Arizona*, 567 U.S. at 401-02 (quoting *Wis. Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)). In arguing otherwise, Defendants again misread *Garcia*, which did not suggest that a state could override congressional limitations on state participation in immigration enforcement without creating a conflict. Rather, it concluded that the relevant federal law did *not* foreclose state enforcement for the same conduct, and "[t]he mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal

criminal provisions" was not an obstacle to federal objectives. *Garcia*, 589 U.S. at 211-12.

Section 5 further conflicts with the federal system by creating a new immigration classification Congress never contemplated. Section 5 applies to noncitizens who "illegally entered or remained in the United States, as determined by" ICE. As discussed *infra*, at 29-31, this is not a federal immigration status. Federal immigration status is determined by federal law, not by ICE alone, and involves numerous factors, including when and where a person entered (monitored by U.S. Customs and Border Protection); whether they had a visa (issued by the U.S. Department of State) or other entry document; eligibility for immigration benefits and humanitarian protection (adjudicated by U.S. Citizenship and Immigration Services); and the decisions of immigration judges (employed by the U.S. Department of Justice) and courts. If Section 5 were enforced, state actors and juries would have to figure out what it means to have "illegally entered or remained in the United States, as determined by" ICE, without reference to governing law or input from relevant agencies on the person's status. But "[t]he federal government alone … has the power to classify non-citizens," *Farmers Branch*, 726 F.3d at 536, because immigration classifications are bound up in foreign relations and border control, over which the federal government has sole authority, *see Plyler v. Doe*, 457 U.S. 209, 219 n.19 (1982).

Relying on ICE "determinations" also captures lawfully present noncitizens. ICE routinely issues warrants and NTAs for people it considers removable despite having lawful status, *see, e.g.*, *Castillo v. Bondi*, 140 F.4th 777, 778-79, 784 (6th Cir. 2025), or who later obtain status in removal proceedings, *see, e.g.*, *Marouf v. Lynch*, 811 F.3d 174, 177, 189-90 (6th Cir. 2016). And all noncitizens in removal proceedings are permitted to remain in the country until a final adjudication of status, *see* 8 U.S.C. § 1229(a); *Farmers Branch,* 726 F.3d at 530, which Section 5 jeopardizes by making it more difficult for certain noncitizens to obtain housing.

Section 5 also conflicts with federal law because it imposes penalties not authorized by federal law. The § 1324 offenses carry a five-year statutory maximum sentence, increased to 10 years if the

offense was done for commercial advantage or private financial gain; there is no mandatory minimum. 8 U.S.C. § 1324(a)(1)(B). But the aggravated version of Tennessee's offense, which applies when the noncitizen being transported or harbored was less than 13 years old, is a Class A felony that carries a mandatory minimum sentence of 15 years' imprisonment and a statutory maximum sentence of 60 years' imprisonment. *See* Tenn. Code Ann. § 39-17-118(c). Even the non-aggravated versions of the Section 5 offenses, which are Class E felonies, carry a one-year mandatory minimum sentence. This "further intrusion upon the federal scheme" via an "inconsistency … with respect to penalties" creates an additional "conflict with the plan Congress put in place." *Arizona*, 567 U.S. at 402-03.

Defendants concede that Section 5 imposes different, harsher penalties than § 1324 but say this is "irrelevant" because federal and state criminal laws frequently impose different punishments and criminal laws "usually lack[] the foreign-policy concerns that might require" uniformity. MTD 27. That might be true generally, but not here, where the transport and harboring of noncitizens are essential to regulation of the movement of noncitizens into and throughout the United States. *See supra*, at 18-19, 21. But even if Defendants are correct that inconsistent penalties go to field preemption, *see* MTD 27, that would simply be further reason Section 5 is field preempted.

At base, Section 5 "diminish[es]" federal "control over enforcement and detract[s] from the integrated scheme of regulation" Congress created. *Arizona*, 567 U.S. at 402 (internal quotation marks and alterations omitted); *see also GLAHR*, 691 F.3d at 1266 ("federal government loses control over enforcement" when "a state enacts its own parallel to the INA" (internal quotation marks omitted)). Section 5 would let Tennessee prosecute people for transporting and harboring noncitizens even where "federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. Section 5 impedes "the smooth functioning of federal immigration law, improperly place[s] in the hands of state officials the nation's immigration policy, and strip[s] federal officials of the authority and discretion necessary in managing foreign

affairs." *South Carolina*, 720 F.3d at 531-32.

## IV. Plaintiffs Have Stated a Claim that Section 5 Is Unconstitutionally Vague.

Section 5 is facially void for vagueness. A statute must "give ordinary people fair notice of the conduct it punishes." *Johnson*, 576 U.S. at 596. Criminal statutes like Section 5 are subject to a "relatively strict" test, *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999), and "can withstand constitutional scrutiny only" with "a high level of definiteness," *United States v. Blaszak*, 349 F.3d 881, 887 (6th Cir. 2003). Section 5 fails this test because neither "harbor" nor "has illegally entered or remained in the United States as determined by [ICE]" has a "discernible meaning," *Valle del Sol*, 732 F.3d at 1020; *see also Belle Maer*, 170 F.3d at 558-59. This indeterminacy precludes Plaintiffs and other Tennesseans from conforming their conduct to the law.

**Section 5's definition of "harbor" is vague.** Section 5 defines "harbor" as "to provide shelter," Tenn. Code Ann. § 39-17-118(d), but does not define "shelter." Shelter usually means "an establishment providing food, protection, and temporary housing for people who need assistance," *Shelter*, Merriam-Webster Dictionary, https://tinyurl.com/crx694vh, and, in the law, typically signifies providing housing to those unable to obtain it, *see, e.g.*, 42 U.S.C. § 11343(a) (grants may "provide shelter … for homeless individuals"); *Andret v. Garland*, No. 23-3426, 2024 WL 167115, at *6 (6th Cir. Jan. 16, 2024) ("government provides shelter[]" to "survivors of gender-based violence"). But it is unclear whether Section 5 uses "shelter" in the usual charitable sense because it requires a financial benefit. The term is vague "when juxtaposed" with the rest of the law, *see Cameron v. Johnson*, 390 U.S. 611, 616 (1968), and an ordinary Tennessean is left guessing what conduct is covered. "[P]rovide shelter" is also temporally ambiguous. *See, e.g.*, *Tennessee Shelters*, Tenn. Emergency Mgmt. Agency, https://www.tn.gov/tema/tennessee-shelters.html (including "overnight shelter," "storm shelter," "warming center," and "cooling center"). "Shelter" covers everything from permanent and temporary housing to daytime storm shelters to indoor educational programs and soup kitchens.

28

Defendants insist that a specific "intent to conceal" clarifies "shelter." MTD 29-30. But as explained, *see supra*, at 4-5, no intent to conceal applies to the "providing shelter" version of the harboring offense. Section 5's reference to providing "shelter" is unconstitutionally vague.

**The phrase "has illegally entered or remained in the United States" is vague.** Neither Section 5 nor common parlance provide Tennesseans with fair notice of the meaning of "has illegally entered or remained in the United States." Instead, deciphering it requires expertise in immigration law, a "complex … legal specialty." *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010); *see also Salazar-Gonzalez v. Lynch*, 798 F.3d 917, 922 n.4 (9th Cir. 2015) ("[T]he immigration laws have been termed second only to the Internal Revenue Code in complexity." (internal quotation marks omitted)).

Immigration laws and executive policies interact to make entry and lawful presence complex and fluid. A noncitizen may enter unlawfully but immediately receive parole, *see* 8 U.S.C. § 1182(d)(5), or later obtain status, *see, e.g.*, *id.* § 1158(a) (allowing asylum for noncitizen who entered unlawfully); *id.* §§ 1182, 1229b(a) (allowing cancellation of removal and permanent residence). Another may enter unlawfully and obtain DACA or another form of deferred action that prevents deportation but does not confer lawful residence. *See, e.g.*, 8 C.F.R. § 214.14(d)(2)-(3) (granting U-visa applicants deferred action or parole and tolling unlawful presence). The list goes on. "[O]rdinary" people "cannot be expected to know" the intricacies of immigration law. *Cf. Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 253 (6th Cir. 1994). Section 5 requires Tennesseans to master specialized legal concepts and so is "invalid on its face." *See id.* at 254.

Defendants contend that Section 5 is not vague because courts have ruled that 8 U.S.C. § 1324 is not. *See* MTD at 30-31 (citing *Bland v. United States*, 299 F.2d 105 (5th Cir. 1962), *Martinez-Quiroz v. United States*, 210 F.2d 763 (9th Cir. 1954), and *United States v. Ye*, 588 F.3d 411 (7th Cir. 2009)). But precedent about § 1324 is inapposite. Cases decided before 1986 are immaterial because § 1324 did not have present-perfect language analogous to "has illegally entered or remained" until then. *See*

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 112, 100 Stat. 3359, 3381-82 (1986). As for *Ye* and other post-1986 decisions, those cases do not comment on any of the relevant language parallel to Section 5. *See, e.g.*, *Ye*, 588 F.3d at 415 (addressing vagueness of "shield from detection"). Notably, these cases also read the federal statute to require an element that the "provide shelter" version of the Section 5 offense lacks—intent to substantially facilitate a noncitizen remaining in the United States unlawfully, *see, e.g.*, *United States v. George*, 779 F.3d 113, 118 (2d Cir. 2015); *DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 246 (3d Cir. 2012); *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008), or prevent authorities from detecting that noncitizen, *see, e.g.*, *Ye*, 588 F.3d at 415-16.

**The phrase "as determined by" ICE is meaningless.** The ICE determination language compounds Section 5's vagueness. It assigns ICE a role it does not play in federal law without defining an ICE "determination." *Cf. Belle Maer*, 170 F.3d at 558 (voiding ordinance for not defining term lacking "common meaning"). Courts, not ICE, determine who "has illegally entered or remained in the United States." ICE conclusions are "prima facie evidence" in some federal cases, 8 U.S.C. § 1324(b)(3), or allegations of removability in immigration court, *id.* § 1229(a)(1); 8 C.F.R. § 1003.14(a).[5] But courts often reject them. *See, e.g.*, *Castillo*, 140 F.4th at 778-79, 784; *Marouf*, 811 F.3d at 177, 189-90. Section 5 is "fundamentally irrational," *Springfield Armory*, 29 F.3d at 252, because it assumes a nonexistent role for ICE. Moreover, the phrase "as determined by" ICE requires members of the public to ascertain what versions of entry and presence ICE would deem unlawful. Would ICE consider a DACA recipient unlawfully present? An asylum seeker or green card holder in removal proceedings? Section 5 does not "provide[] sufficient information to enable a person of average intelligence to determine" how ICE would approach such scenarios, instead requiring immigration law expertise to try to parse it. *Id.* at 253; *see also Peoples Rts. Org.*, 152 F.3d at 535-38.

---

[5] ICE makes final determinations only in expedited removals. 8 U.S.C. § 1225(b)(2); 8 C.F.R. § 235.15.

Defendants' attempts to define "as determined by" ICE sow more confusion. *See* MTD 3-4 (listing arrest warrant, immigration detainer, NTA, reinstatement of prior removal order, and inclusion on ICE Most Wanted list as "determinations"). Reliance on these records—none of which consider subsequent events and most of which are not final determinations about lawful entry or residence— creates more ambiguity than it resolves, sweeping tens of thousands of lawfully present noncitizens into Section 5's ambit. An NTA, for example, is "ICE's determination that probable cause exist[s] to believe [a noncitizen is] subject to removal." *Abriq v. Metro. Gov't of Nashville*, 333 F. Supp. 3d 783, 785 (M.D. Tenn. 2018); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 164 (2021) (NTA is "case-initiating pleading[]" analogous to "indictment" or "civil complaint"). Treating this pleading as a "determination" makes Section 5 applicable to three-and-a-half million noncitizens in removal proceedings—65,000 of whom live in Tennessee, *see New Proceedings Filed in Immigration Court*, TRAC Immigration (Aug. 2025), https://tracreports.org/phptools/immigration/ntanew (sorting by "Case Type: Removal," "Outcome: Pending," and "Immigrant State: Tennessee")—as well as anyone who has ever been in these proceedings, including those who received lawful status from them.

Scienter does not remedy the confusion. *See* MTD 29. Even if Section 5 requires knowledge of ICE's "determination," *but see supra*, at 5-6, Tennesseans would need to know the import of an NTA or other ICE "determination." Defendants insist that Tennesseans will know an ICE issuance is "current" from its date. MTD 31. But such documents do not expire, and a later grant of status does not "void" an earlier ICE allegation of unlawful presence or entry. *See, e.g.*, 8 C.F.R. §§ 239.2(a), 1003.14(a) (barring ICE from cancelling an NTA once filed in immigration court). Ordinary Tennesseans lack this expertise.

## V. The Synod Has Stated First Amendment Claims.

### A. Section 5 Unlawfully Burdens the Synod's Free Exercise Rights.

Section 5 unlawfully burdens the Synod's free exercise of religion by criminalizing its sincere

religious practices while exempting comparable secular activities. Defendants' main counterargument—that Section 5 is generally applicable—fails because the law exempts Tennessee attorneys and healthcare providers who otherwise might violate it.

The State cannot burden a sincere religious practice through a law that is not neutral or generally applicable unless it satisfies strict scrutiny. *Bremerton*, 597 U.S. at 525. Defendants concede that the Synod exercises sincerely held religious beliefs. MTD 31-32. And they do not contest that Section 5, if applicable to the Synod's provision of shelter to people regardless of immigration status, would burden its sincere religious practice. *Id. See, e.g., Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 877-78 (1990) (criminalization of sincere religious practice burdens free exercise). Defendants insist that Section 5 does not apply to the Synod's conduct, but this is incorrect. *See supra*, at 8-10.

Defendants further argue that Section 5 is neutral. But a law is not generally applicable or neutral when it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *see also Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 303 (6th Cir. 2023) (Murphy, J., concurring) (strict scrutiny triggered if "a regulation that burdens religiously motivated conduct … contains just *one* comparable secular exception"). Section 5 is not neutral because it criminalizes the Synod's sincere religious practice of providing shelter to people regardless of immigration status while allowing comparable secular activities: legal representation and healthcare services. A hospital that admits a patient known to be undocumented to provide healthcare services and a lawyer who advises noncitizens and assists them in obtaining housing, for payment, are exempted while the Synod's analogous religiously motivated conduct is not. *See* Tenn. Code Ann. § 39-17-118(e). Section 5 "fail[s] the general applicability requirement." *Bremerton*, 597 U.S. at 526.

Defendants erroneously contend that Section 5 "*does not* except legal representation and healthcare services." MTD 32. Defendants misstate the legal standard, claiming an exception "occurs only when the law allows certain people to engage in the same conduct that would be unlawful for

others, not when it clarifies that certain activities fall outside of the prohibited conduct." *Id.* But whether conduct is "comparable" "does not depend on whether the religious and secular conduct involve similar forms of activity." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020). The correct test is whether the prohibited religious and exempted secular activities are comparable when measured against the state's interest in restricting those activities. *See id.* (comparing religious schools to gyms, tanning salons, office buildings, and casinos for state's interest in combatting COVID-19); *Roberts v. Neace*, 958 F.3d 409, 414-16 (6th Cir. 2020) (per curiam).

Defendants argue Section 5's exemptions are "clarifications" of its scope, not exceptions. MTD 32-33. This "word play," *Roberts*, 958 F.3d at 414, is an end-run around *Smith*, recharacterizing exemptions as clarifications to justify carving out secular actors at the expense of religious ones. It also fails under Section 5's plain text. Section 5 operates like the other statutes Defendants agree create exceptions: It sets out a broad prohibition on "harboring" and then carves out certain activities that would otherwise be barred. Indeed, that is how Section 5's sponsors understood what they were doing. *See H. Floor Debate on H.B. 322*, 2025 Leg., 114th Sess. (Tenn. 2025)*, at 31:08-32:09 (statement of Rep. Chris Todd) ("two exceptions" for legal and healthcare services); *Hearing on S.B. 392 Before the Sen. Judiciary Comm.*, 2025 Leg., 114th Sess. (Tenn. 2025), at 3:49:58-3:50:06 (statement of Sen. Brent Taylor) (those "assisting illegal aliens with legal … and healthcare services" are "exempted"). If Section 5(a) did not on its face encompass legal and healthcare services, Section 5(e) would be "inoperative, superfluous, void or insignificant." *See Deberry*, 651 S.W. 3d at 925.

Tennessee's definition of an "exception" to a crime confirms this understanding: An exception is "labeled by the phrase: '[i]t is an exception'" or "words of similar import." Tenn. Code Ann. § 39-11-202(a). Section 5 opens its exemption for lawyers and healthcare providers with the phrase "[i]t is not a violation," Tenn. Code Ann. § 39-17-118(e), which are "words of similar import," *cf., e.g.*, *State v. Thompson*, No. 2011-1277, 2012 WL 3025697, at *7 (Tenn. Crim. App. July 25, 2012) ("unless" is a

"word[] of similar import"). Because Section 5 treats the Synod's religious conduct less favorably than comparable secular conduct, it triggers strict scrutiny. *See Tandon,* 593 U.S. at 62. And Defendants make no attempt to show that Section 5 withstands strict scrutiny, MTD 31-33, nor could they.

## B. Section 5 Impedes the Synod's Freedom to Associate for Religious Purposes.

Section 5 burdens the Synod's association for religious purposes and fails heightened scrutiny. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta* (*APF*), 594 U.S. 595, 606 (2021) (quoting *Roberts*, 468 U.S. at 622). Religious exercise "could not be vigorously protected from" state interference without a "correlative freedom to engage in group effort" toward that end. *Roberts*, 468 U.S. at 622. A plaintiff's freedom to associate is impermissibly burdened if (1) it engages in First Amendment-protected activity; (2) a law significantly burdens the plaintiff's ability to associate to pursue the activity; and (3) the law fails heightened scrutiny. *Lichtenstein v. Hargett*, 83 F.4th 575, 602 (6th Cir. 2023). Though freedom to associate is often connected to expression, it applies with equal force to religious association. *See NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958).

The Synod's religious exercise is covered by the First Amendment, as Defendants do not dispute. *See* MTD 34. The First Amendment protects providing material aid to others in furtherance of religious faith. *See, e.g., Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 249 (2025). For the Synod, serving its community without discrimination, including by sheltering noncitizens, is an important aspect of its faith. *E.g.*, Compl. ¶¶ 13-24. And Defendants make no attempt to argue that Section 5 satisfies heightened scrutiny.

Defendants argue Section 5 does not sufficiently burden the Synod's "ability to associate." MTD 34. But heightened scrutiny is not limited to "laws that impose severe burdens" on association, *APF*, 594 U.S. at 611, and associational freedom can be "stifled by more subtle governmental interference," *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960). Section 5 directly restricts the Synod's

ability to associate for religious purposes by making it a crime to provide shelter to members of its community—a form of association its faith compels—and requiring it to discriminate based on immigration status contrary to its religious precepts. Forcing an entity to exclude some people from its scope is the quintessential intrusion on associational rights. *See, e.g.*, *Lichtenstein*, 83 F.4th at 603 ("threaten[ing] legal punishment or practical harm" would substantially burden association).

It is irrelevant that the Synod may associate with immigrants in other ways. The First Amendment protects association in one's chosen manner through a range of informal relationships, *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 566 (1995) (marching in parade); *APF*, 594 U.S. at 606 (making donations), and the government cannot limit certain forms of association even if others remain available, *see NAACP v. Button*, 371 U.S. 415, 431 (1963). Section 5 criminalizes associating with individuals the Synod seeks to serve through the provision of shelter. Defendants' arguments improperly invite the Court to second-guess the Synod's understanding of its interests and the harm Section 5 poses to its community. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 751 n.10 (2020).

Even if there were ambiguity as to whether Section 5 applies to the Synod, that ambiguity itself harms the Synod's associational rights. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("ambiguities concerning the scope" of a law "render[ed] it problematic for purposes of the First Amendment"). When First Amendment interests are threatened by an "ambiguous" law, courts "will not presume that the statute curtails constitutionally protected activity as little as possible." *Button*, 371 U.S. at 432. Rather, for "constitutionally protected activity," "precision of regulation is demanded." *NAACP v. Claiborne Hardware*, 458 U.S. 886, 916 (1982) (internal quotation marks omitted).

## CONCLUSION

The Court should deny the motion to dismiss.

Respectfully submitted this 24th of November, 2025.

Michelle Lapointe*
Suchita Mathur*
Chris Opila*
AMERICAN IMMIGRATION COUNCIL
PMB2026
2001 L Street NW, Suite 500
Washington, DC 20036
Phone: (202) 507-7523
Fax: (202) 742-5619
mlapointe@immcouncil.org
smathur@immcouncil.org
copila@immcouncil.org

/s/ Michael C. Holley
Michael C. Holley
Spring Miller
TENNESSEE IMMIGRANT & REFUGEE RIGHTS
COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
spring@tnimmigrant.org

Rupa Bhattacharyya*
Elizabeth Cruikshank*
Alexandra Lichtenstein*
William Powell*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6629
Fax: (202) 661-6730
rb1796@georgetown.edu
erc56@georgetown.edu
alex.lichtenstein@georgetown.edu
whp25@georgetown.edu

*Attorneys for Plaintiffs*

*Admitted pro hac vice.*

36