# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| SOUTHEASTERN SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:25-cv-00684 |
| v. | ) ) | JUDGE CAMPBELL |
| STEVEN R. FINNEY, et al., | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is brought by Plaintiffs the Southeastern Synod of the Evangelical Lutheran Church in America (the "Synod"), Garrett Causey, and John Doe, against the 32 Tennessee Attorneys General, seeking to preliminarily and permanently enjoin the enforcement of Tenn. Code Ann. § 39-17-118, a Tennessee law criminalizing "human smuggling." (*See* Complaint, Doc. No. 1).

Now before the Court is Plaintiffs' motion for preliminary injunction (Doc. No. 8). For the reasons stated herein, the motion is **DENIED**. Also pending before the Court is Defendants' Motion to Dismiss (Doc. No. 63), which will be resolved separately.

## I. BACKGROUND

### A. The Law

In April 2025, the Tennessee Legislature enacted Senate Bill 392, 2025 Tenn. Pub. Acts, Ch. 424. Governor Bill Lee signed the Bill into law on May 9, 2025. At issue in this lawsuit is Section 5 of the Bill, which is codified as Tennessee Code Annotated § 39-17-118 (hereinafter the "Section 5"). Section 5 provides as follows:

### § 39-17-118. Human smuggling; aggravated human smuggling

(a) A person commits the offense of human smuggling who, for the purpose of commercial advantage or private financial gain:

(1) Knowingly transports an individual with intent to conceal the individual from a law enforcement officer or a federal immigration officer, while knowing the individual has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security; or

(2) Intentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection, an individual that the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security.

(b) Human smuggling is a Class E felony.

(c)(1) A person commits aggravated human smuggling who commits the offense of human smuggling as prohibited by subsection (a), and the victim of the offense was less than thirteen (13) years of age at any time during the person's course of conduct.

(2) Aggravated human smuggling is a Class A felony.

(d) As used in this section, "harbor" means to provide shelter to or conceal the whereabouts of an individual whom the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security.

(e) It is not a violation of subsection (a) for:

(1) An attorney licensed and admitted to the practice of law in this state pursuant to title 23, chapter 1, to provide bona fide legal advice to an individual; or

(2) A person to provide healthcare services or assistance to an individual presenting at a healthcare facility licensed under title 68 or title 33, or the office or other practice site of a healthcare provider licensed, registered, certified, or otherwise permitted to deliver healthcare services under title 63 or title 68, chapter 24.

Tenn. Code Ann. § 39-17-118.

**B.    The Plaintiffs**

1.  <u>The Synod</u>

The Synod is a Christian body composed of 160 congregations across Alabama, Georgia, Mississippi, and 21 of Tennessee's 32 judicial districts. The Synod is part of the Evangelical Lutheran Church in America (ELCA), which has advocated for the rights of immigrants for decades as part of its ministry grounded in the call in Matthew 25:35 to "welcome the stranger." In 2015, the ELCA adopted the AMMPARO Strategy to Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities. As part of the AMMPARO Strategy, the ELCA has committed to "uphold and guarantee basic human rights and safety of migrant children and their families; address the root causes of migration around the world and the treatment of migrants in transit; work toward just and humane policies affecting migrants in and outside the United States; and engage as a church body with all of its companions, affiliates, and partners to respond to the migration situation and its causes and to advocate for migrant children and their families." The ELCA also considers itself a "sanctuary denomination" meaning that "the ELCA has declared that walking alongside immigrants and refugees is a matter of faith."

The Synod states that its churches within Tennessee provide numerous ministries that serve the immigrant community, including undocumented immigrants. The Synod has churches that provide housing within their buildings to asylum seekers, churches that host day shelters that provide food and services to people regardless of immigration status, churches that resettle refugees and asylum seekers, churches that provide English-as-a-second-language classes, churches that run soup kitchens and food pantries, churches that provide rental assistance and help connect immigrants in need to low-cost housing, and churches that host events like weddings and funerals for immigrant communities regardless of immigration status.

The Synod provides specific examples of three of its member churches. One church in Middle Tennessee has been engaged in immigrant-focused ministries for more than a decade. The church provides sanctuary to immigrants in need, regardless of their immigration status. For more than a year, two Venezuelan asylum seekers lived in the church building. The church received donations earmarked to support this ministry. The church also owns a small house next door to the church building, and has used this house to provide shelter to refugees. The church also has provided rental assistance and held donation drives to help furnish apartments for immigrants, and also hosts private events such as weddings and birthday parties. Given the demographics of the area, many of the people who use the space are immigrants. They generally provide a donation in exchange for their use of the space. Another Synod member church offers a variety of refugee resettlement services, including holding classes, helping connect immigrants with public services, Bible study, and meals. Another member congregation supports a food pantry next door to the church building that serves the community regardless of immigration status. The church receives donations of both food and money to support this ministry. In addition, the same church serves as a designated safe place for school children in the case of an emergency. Another Synod member church in Middle Tennessee has a Monday open-door policy, which entails welcoming everyone in the community into the church building on Monday mornings and providing them basic services. During this time, the church serves breakfast and coffee and helps connect those who drop in to basic resources, including housing. The church receives donations, including in the form of gift cards, to support this ministry.

The member churches do not check the immigration status of those to whom they provide assistance or allow to use church space. However, the pastor of one church has learned that some of those served do not have legal status.

2. <u>Garrett Causey</u>

Garrett Causey resides in Murfreesboro, Tennessee, and owns a residential rental property in the Antioch neighborhood of Nashville, Tennessee. Mr. Causey states that his current tenant is an immigrant from Guatemala. He believes his tenant currently has "some kind of legal status," though he may have not had legal status when he began leasing the property. The rental application did not ask about immigration status, but the tenant disclosed that he did not have a social security number. Causey states that persons other than the named tenant live in the house and contribute to the rent. Based on the demographics of the neighborhood it is possible that some of them may be undocumented.

3. <u>John Doe</u>[1]

John Doe and his wife own a house in Rutherford County, Tennessee, where they live with their daughter, a United States citizen, and son-in-law, an asylum seeker who entered the country unlawfully. John Doe's daughter and son-in-law pay rent and contribute to the family financially.

**C.      The Lawsuit**

Shortly before Section 5 went into effect on July 1, 2025, Plaintiffs filed this lawsuit challenging the law as unconstitutional. Plaintiffs contend Section 5 is unconstitutional on its face and as applied to them for several reasons. First, Plaintiffs contend Section 5 attempts to regulate matters exclusively reserved for the federal government and conflicts with federal immigration laws, thereby violating the Supremacy Clause, Article VI, Section 2, of the U.S. Constitution.

They also argue the law violates due process because it is unconstitutionally vague in numerous respects. They argue that because "shelter" is undefined, the law could be construed to

---

[1]      The Court granted this plaintiff permission to proceed under a pseudonym. (*See* Order, Doc. No. 45).

criminalize providing overnight accommodations or temporary shelter during inclement weather, educational programming that lasts a few hours and is held indoors, landlords renting to immigrants who entered or remained in the United States unlawfully according to ICE, parents providing housing to an undocumented child who helps pay the bills, charities providing shelter to undocumented immigrants if the charity receives donations or grants to support their work, and churches hosting immigrants within its building for worship, meals, or classes if the church receives donations to support that work.

Plaintiffs also assert is it unclear how to determine who is a person who "illegally entered or remained in the United States," as determined by ICE. Not only does this language appear to encompass persons who now have lawful status but at some point were determined to have "illegally entered or remained in the United States," it is unclear from the text of the statute what it means for ICE to "determine" that a person has unlawfully entered or remained in the country.

Finally, the Synod, whose churches, pastors, staff, and congregations provide ministries, including shelter, to people regardless of their immigration status as an expression of their faith, argues Section 5 violates its members' First Amendment rights of free exercise of religion and freedom of association.

The individual Plaintiffs bring their claims on behalf of themselves and all other persons similarly situated. In the Complaint they define the class as "all persons in Tennessee who (1) provide shelter to immigrants who entered or remained in the United States unlawfully 'as determined by' ICE and (2) receive some form of financial benefit in connection with providing that shelter."[2] (Compl., Doc. No. 1, ¶ 53).

---

[2] Plaintiffs' proposed class definition is not now before the Court. However, the Court notes that it is somewhat ironic that the proposed class definition incorporates specific language from the statute that Plaintiffs contend is impermissibly vague.

6

The Court held a hearing on Plaintiffs' Motion for Preliminary Injunction on September 10, 2025. In the briefing and during the hearing, Defendants took the position that Plaintiffs' conduct, as described in the Complaint and declarations (Doc. Nos. 1, 8-3. 8-4, 8-5), does not violate Section 5 and that Plaintiffs will not be subject to prosecution based on the conduct described. Following the hearing, the Court ordered Defendants to "promptly notify the Court of any investigation or prosecution of the named Plaintiffs" under the challenged statute. (Doc. No. 52). On October 20, 2025, the parties filed a Joint Motion for Clarification seeking clarification that the required notice to the Court of investigations or prosecutions of Plaintiffs was only with regard to the challenged statutory provisions. (Doc. No. 67). The parties agreed that "requiring notice of investigation or prosecutions only under Section 5 would be sufficient for the purposes of this litigation and therefore jointly request[ed] that the Court clarify that its order extends only to such investigations and prosecutions." (*Id*.). The Court granted the motion for clarification affirming the parties' mutual understanding. (Doc. No. 76). To date, the Court has not received notice of investigation or prosecution of Plaintiffs under Section 5.

## II. ANALYSIS

### A. Preliminary Injunction Standard

"To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Id*. at 883. (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024)). The relief is *preliminary* – "it

does not conclusively resolve anything – that's what final judgment is for." *Id*. "The preliminary injunction simply puts the case in a holding pattern and 'balance[s] the equities as the litigation moves forward.'" *Id*. (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

"Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a 'clear showing' that these factors favor him." *Id*. (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024)). The movant "faces a burden of proof 'more stringent than the proof required to survive a summary judgment motion.'" *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). Regarding the evidentiary burden, "Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Doe #11 v. Lee*, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022) (citing *Libertarian Party of Ohio v. Husten*, 751 F.3d 403, 417 (6th Cir. 2014) and collecting cases).

A failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's quest for a preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). But even if the plaintiff shows a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "The plaintiff must also show that some irreparable harm will take place without the court's immediate intervention." *Id*. ("While the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) *(citing Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). A "hypothetical threat of prosecution" is not an

"immediate," "irreparable" injury that warrants the "extraordinary remedy" of a preliminary injunction. *Id*.

**B.      Irreparable Harm**

Defendants argue Plaintiffs have not shown a likelihood of irreparable harm because there is no evidence that any Tennessee official agrees with Plaintiffs' interpretation of the law and plans to use it against them. Defendants contend that Plaintiffs' fear that they might be prosecuted under the law is insufficient to show an immediate threat of irreparable harm that warrants a preliminary injunction.

The first step in determining whether Plaintiffs face an imminent threat of prosecution is to examine the statute to figure out what it proscribes. *Id*. at 435 (citing *Susan B. Anthony List*, 573 U.S. 149, 159 (2014)). With regard to this particular statute, and perhaps unsurprising given Plaintiffs' vagueness challenge, the task of determining what the statute proscribes is less straightforward than Defendants suggest.

Under Tennessee law, statutory text "shall be given [its] natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning." Tenn. Code Ann. § 1-3-105(b); *see also, State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022) (courts "determine what a statute means" based on "how a reasonable reader … would have understood the text").  Here, the text is plagued by undefined terms, quixotic comma splices, and potential redundancies that render the precise scope of prohibited conduct less than clear. Nevertheless, Defendants contend Section 5 requires: (1) for-profit purpose; (2) intent to conceal; and (3) knowledge of an ICE determination that the person has "illegally entered or remained in the United States." They assert that Plaintiffs do not express an intent to engage in conduct that meets each of these elements, therefore there is no risk of prosecution under the statute.

The Court has serious misgivings that Defendants' interpretation of the statute is not supported by the statutory language itself. For example, the statute does not clearly require the second element listed by Defendants – "intentionally sheltering someone for the purpose of avoiding detection." (*See* Doc. No. 33 at 20).

The statute provides that the offense of human smuggling requires that a person "intentionally conceals, harbors, *or* shields [an individual] from detection"; and defines "harbor" as "to provide shelter to or conceal the whereabouts of an individual." Tenn. Code Ann. § 39-17-118(a)(2) and (e) (emphasis added). Defendants' assertion that the statute only criminalizes "intentionally sheltering someone for the purpose of avoiding detection" is based on a strained reading of the text in which "from detection" modifies not only "shield" (the noun it immediately follows) but also "harbor" and "conceal." (*See* Doc. No. 33 at 23). Defendants proposed use of the series-qualifier canon results in the awkward and redundant construction "conceal from detection" and "harbor from detection." *See United States v. Acosta de Evans*, 531 F.2d 428, 430 n.3 (9th Cir. 1976) (explaining that "[i]f 'conceal,' 'harbor,' and 'shield' are all modified by 'from detection,' we end up with the redundant phrase 'conceal from detection' as well as 'the awkward construction 'harbor from detection'").

The Court agrees with Plaintiffs that application of the last antecedent canon, which is the ordinary rule, produces the most natural reading of the statute. Under the last-antecedent canon, when a modifier appears at the end of a list, it applies only to the item directly before it. *Allen v. United States*, 83 F.4th 564, 568, 572 (6th Cir. 2023). Application of that rule here means that

"from detection" modifies "shield" – *i.e.*, "shield from detection." Given the use of the conjunction "or," this leaves harbor and conceal as alternative means of satisfying the required conduct.[3]

Using the last antecedent canon, the statute arguably proscribes three categories of conduct: (1) concealing; (2) providing shelter or concealing; and (3) shielding from detection. Notwithstanding the disjunctive wording of the statute specifically defining harboring as "to provide shelter to *or* conceal the whereabouts of an individual," Defendants maintain that the statute only proscribes concealment. To be sure, the statute emphasizes concealment – it's effectively listed three times. But that emphasis does not eliminate the potential for the statute to be read to encompass "providing shelter." *See Falls v. Goins*, 673 S.W.3d 173, 180 (Tenn. 2023) (courts make every effort not to interpret a provision to render other provisions superfluous).

As another example, the offense requires that a person knows the person being concealed, harbored, or shielded from detection "has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security." Tenn. Code Ann. § 39-17-118(a)(2). Defendants argue Tennessee courts would interpret the law as requiring actual knowledge of a current ICE determination and that examples of an ICE determination (not specified in the statute) include a current ICE arrest warrant, NOA, wanted list, or immigration detainer. (Doc. No. 33 at 29). Plaintiffs argue that it is "far from clear" that Section 5 requires knowledge of an ICE determination and that if the Legislature intended that requirement, it should have provided that Section 5 applies to a person "who knows that ICE has determined than an individual has entered or remained illegally in the United States." Plaintiffs argue that because "as determined by [ICE]"

---

[3]    Plaintiffs also argue that the exemption for attorneys providing legal advice and providers delivering healthcare would not be necessary if harboring requires an intent to conceal.

11

follows a comma, a more logical reading is that it is a nonrestrictive modifier describing how unlawfulness is proven, not part of the scienter requirement. (Doc. No. 35 at 3). In other words, to violate the AHA, a person must know only that the individual they are harboring "has entered or remained unlawfully"; such unlawful entry or presence will be established by ICE.

Notwithstanding the challenges in discerning the specific conduct proscribed by the statute, given Defendants' insistence that Plaintiffs' conduct is not unlawful and does not subject them to risk of prosecution, Plaintiffs have not shown an immediate non-speculative, non-theoretical threat of prosecution. *See D.T.*, 942 F.3d at 327.

The Court notes that threat of prosecution is also relevant to Defendants' motion to dismiss based on Plaintiffs' alleged lack of standing. (*See* Doc. No. 63). The determination here applies only to the showing of irreparable harm with regard to the motion for preliminary injunction and does not forecast any determination regarding Plaintiffs' standing. Defendants' motion to dismiss will be addressed separately.

### III.    CONCLUSION

Because Plaintiffs have not shown a likelihood of irreparable harm, the motion for preliminary injunction (Doc. No. 8) is **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

12