**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SOUTHEASTERN SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, et al.,** | ) | |
| **Plaintiffs,** | ) | **NO. 3:25-cv-00684** |
| **v.** | ) | **JUDGE CAMPBELL** |
| **STEVEN R. FINNEY, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This case is brought by Plaintiffs the Southeastern Synod of the Evangelical Lutheran Church in America (the "Synod"), Garrett Causey, and John Doe, against the 32 Tennessee district attorneys general, seeking to enjoin enforcement of Tenn. Code Ann. § 39-17-118, a Tennessee law criminalizing "human smuggling" that went into effect on July 1, 2025.

Pending before the Court is Defendants' Motion to Dismiss for lack of subject matter jurisdiction (Doc. No. 63). Because Plaintiffs do not have standing to challenge the law, Defendants' motion to dismiss will be **GRANTED**.

## I. BACKGROUND[1]

### A. The Law

At issue in this lawsuit is Section 5 of Senate Bill 392, 2025 Tenn. Pub. Acts, Ch. 424, codified as Tennessee Code Annotated § 39-17-118, (hereinafter the "Anti-Smuggling Act" or "ASA"), which went into effect on July 1, 2025. The ASA states:

[1] The Background is the same as presented in the Court's Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction. (Doc. No. 82). The facts are drawn from the Complaint (Doc. No. 1) and the declarations submitted by Plaintiffs (Strickland Decl., Doc. No. 8-3; Causey Decl., Doc. No. 8-4; Doe Decl., Doc. No. 8-5; Boatner Decl., Doc. No. 8-6; Doe Supp. Decl., Doc. No. 35-1).

**§ 39-17-118. Human smuggling; aggravated human smuggling**

(a) A person commits the offense of human smuggling who, for the purpose of commercial advantage or private financial gain:

(1) Knowingly transports an individual with intent to conceal the individual from a law enforcement officer or a federal immigration officer, while knowing the individual has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security; or

(2) Intentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection, an individual that the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security.

(b) Human smuggling is a Class E felony.

(c)(1) A person commits aggravated human smuggling who commits the offense of human smuggling as prohibited by subsection (a), and the victim of the offense was less than thirteen (13) years of age at any time during the person's course of conduct.

(2) Aggravated human smuggling is a Class A felony.

(d) As used in this section, “harbor” means to provide shelter to or conceal the whereabouts of an individual whom the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security.

(e) It is not a violation of subsection (a) for:

(1) An attorney licensed and admitted to the practice of law in this state pursuant to title 23, chapter 1, to provide bona fide legal advice to an individual; or

(2) A person to provide healthcare services or assistance to an individual presenting at a healthcare facility licensed under title 68 or title 33, or the office or other practice site of a healthcare provider licensed, registered, certified, or otherwise permitted to deliver healthcare services under title 63 or title 68, chapter 24.

Tenn. Code Ann. § 39-17-118.

## B. The Plaintiffs

1. The Synod

The Synod is a Christian body composed of 160 congregations across Alabama, Georgia, Mississippi, and in 21 of Tennessee's 32 judicial districts. (Compl. ¶ 11). The Synod is part of the Evangelical Lutheran Church in America (ELCA), which has advocated for the rights of immigrants for decades as part of its ministry grounded in the call to welcome the stranger in Matthew 25:35. (*Id.*). In 2015, the ELCA adopted the AMMPARO Strategy; AMMPARO stands for Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities. (*Id.* ¶ 12). As part of the AMMPARO Strategy, the ELCA has committed to "uphold and guarantee basic human rights and safety of migrant children and their families; address the root causes of migration around the world and the treatment of migrants in transit; work toward just and humane policies affecting migrants in and outside the United States; and engage as a church body with all of its companions, affiliates, and partners to respond to the migration situation and its causes and to advocate for migrant children and their families." (*Id.*). The ELCA also considers itself a "sanctuary denomination" meaning that "the ELCA has declared that walking alongside immigrants and refugees is a matter of faith." (*Id.* ¶ 13).

The Synod states that its churches within Tennessee provide numerous ministries that serve the immigrant community, including undocumented immigrants. (*Id.* ¶ 15). The Synod has churches that provide housing within their buildings to asylum seekers, churches that host day shelters that provide food and services to people regardless of immigration status, churches that resettle refugees and asylum seekers, churches that provide English-as-a-second-language classes, churches that run soup kitchens and food pantries, churches that provide rental assistance and help

connect immigrants in need to low-cost housing, and churches that host events like weddings and funerals for immigrant communities regardless of immigration status. (*Id.*).

The Synod provides specific examples of three of its member churches. (*Id.* ¶¶ 18-24). One church in Middle Tennessee has been engaged in immigrant-focused ministries for more than a decade. (*Id.* ¶ 18). The church provides sanctuary to immigrants in need, regardless of their immigration status. (*Id.*). For more than a year, two Venezuelan asylum seekers lived in the church building. (*Id.* ¶ 19). The church received donations earmarked to support this ministry. (*Id.*). The church also owns a small house next door to the church building and has used this house to provide shelter to refugees. (*Id.*). This church also has provided rental assistance and held donation drives to help furnish apartments for immigrants. (*Id.*). The church also hosts private events such as weddings and birthday parties. (*Id.* ¶ 20). Given the demographics of the area, many of the people who use the space are immigrants. (*Id.*). They generally provide a donation in exchange for use of the space. (*Id.*). The church does not check the immigration status of those to whom it provides assistance or allows to use its space. (*Id.* ¶ 19)

Another organization offers a variety of refugee resettlement services, including classes, assistance connecting immigrants with public services, Bible study, and meals. (*Id.* ¶ 21). The pastor who runs the organization has learned that some of those served do not have legal status. (*Id.*).

Another congregation supports a food pantry next door to the church building that serves the community regardless of immigration status. (*Id.* ¶ 23). The church receives donations of both food and money to support this ministry. (*Id.*). In addition, the same church serves as a designated safe place for school children in the case of an emergency. (*Id.*). In a tornado or other natural

disaster, the church would provide shelter to those school children regardless of their immigration status—even if the pastor knew that a child was undocumented. (*Id.*).

Another church in Middle Tennessee has a Monday open-door policy, which entails welcoming everyone in the community into the church building on Monday mornings and providing them with basic services. (*Id.* ¶ 24). During this time, the church serves breakfast and coffee and helps connect those who drop in to basic resources, including housing. (*Id.*). The church receives donations, including in the form of gift cards, to support this ministry. (*Id.*).

2. Garrett Causey

Garrett Causey resides in Murfreesboro, Tennessee, and owns a residential rental property in the Antioch neighborhood of Nashville, Tennessee. (*Id.* ¶ 25). Mr. Causey states that his current tenant is an immigrant from Guatemala. (*Id.*). He believes his tenant currently has "some kind of legal status," though he may not have had legal status when he began leasing the property. (*Id.*). The rental application did not ask about immigration status, but the tenant disclosed that he did not have a social security number. (*Id.*). Causey states that people other than the named tenant live in the house and contribute to the rent. (*Id.* ¶26). Based on the demographics of the neighborhood it is possible that some of them may be undocumented. (*Id.*).

3. John Doe[2]

John Doe and his wife own a house in Rutherford County, Tennessee, where they live with their daughter, a United States citizen, and son-in-law, an asylum seeker who entered the country unlawfully. (*Id.* ¶¶ 28-29; Doe Decl., Doc. No. 8-5; Doe Supp. Decl., Doc. No. 35-1). John Doe's daughter and son-in-law pay rent and contribute to the family financially. (Compl. ¶ 29).

[2] The Court granted John Doe permission to proceed under a pseudonym. (*See* Order, Doc. No. 45).

### C. The Lawsuit

Shortly before the ASA went into effect on July 1, 2025, Plaintiffs filed this lawsuit challenging the law as unconstitutional. Plaintiffs contend the ASA is unconstitutional on its face and as applied to them for several reasons. First, Plaintiffs contend the ASA attempts to regulate matters exclusively reserved for the federal government and conflicts with federal laws, thereby violating the Supremacy Clause, Article VI, Section 2, of the U.S. Constitution. They also assert that the law violates due process because it is unconstitutionally vague. And the Synod argues the ASA violates the First Amendment rights of free exercise of religion and freedom of association of the Synod and its member congregations.

Defendants move to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. (Doc. No. 63). Because the Court concludes that it does not have subject matter jurisdiction due to Plaintiffs' lack of standing, the analysis begins and ends there.

## II. STANDARD OF REVIEW

Motions to dismiss for lack of subject matter jurisdiction are governed by Federal Rule of Civil Procedure 12(b)(1). Whether a court has subject-matter jurisdiction is a "threshold determination" in any action. *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). This reflects the fundamental principle that "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)); *see also*, *Wayside Church v. Van Buren Cty*., 847 F.3d 812, 816 (6th Cir. 2017) (explaining that courts "are 'bound to consider [a] 12(b)(1) motion first, since [a] Rule 12(b)(6) challenge becomes moot if th[e] court lacks subject matter

jurisdiction" (quoting *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990))). Among the limits of a court's Article III jurisdiction are the standing, ripeness, and sovereign immunity doctrines. *Food & Drug Admin. v. All. for Hippocratic Med.* ("Alliance"), 602 U.S. 367, 379 (2024); *Carman v. Yellen*, 112 F.4th 386, 401 (6th Cir. 2024); *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507-09 (6th Cir. 2008).

The party asserting subject-matter jurisdiction bears the burden of establishing that it exists. *Ammons v. Ally Fin., Inc.*, 305 F. Supp. 3d 818, 820 (M.D. Tenn. 2018). A motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack challenges the sufficiency of the pleading and, like a motion under Rule 12(b)(6), requires the Court to take all factual allegations in the pleading as true. *Wayside Church*, 847 F.3d at 816–17 (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). A factual attack challenges the allegations supporting jurisdiction, raising "a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Id.* at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330). District courts reviewing factual attacks have "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Plaintiffs rely upon affidavits submitted in support of the motion for preliminary injunction. Accordingly, the pending motion is treated as a factual challenge.

## III. ANALYSIS

Standing requires a plaintiff to show "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm. v. Cruz*, 596 U.S. 289, 296 (2022). Defendants contend that Plaintiffs cannot demonstrate pre-enforcement injury; that the Synod lacks associational standing; that Plaintiffs lack causation; and that Plaintiffs lack standing to challenge the transport part of the law that they do not allege an intent to violate. (Doc. No. 64 at 10-11 (citing *Davis v. Colerain Twp*., Ohio, 51 F.4th 164, 171 (6th Cir. 2022)).

"Typically, 'an injury' … requires that the government enforce the allegedly unconstitutional law against the challenging party before it has standing to sue." *Friends of George's Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 1178 (2025). However, when the threatened injury is "real, immediate, and direct," standing can derive from an "imminent, rather than an actual, injury." *Id*. (quoting *Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017)). Pre-enforcement review is permitted when a plaintiff has demonstrated "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Welty v. Dunaway*, No. 25-5738, 2026 WL 2874671, at *5 (6th Cir. Sept. 24, 2026) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

The Court previously addressed the likelihood of prosecution in the context of the motion for preliminary injunction. (*See* Memorandum and Order, Doc. No. 82). The Court then held that Plaintiffs did not show an immediate non-speculative, non-theoretical threat of prosecution, largely because of Defendants' insistence that Plaintiffs' conduct is not unlawful and does not subject them to a threat of prosecution. (*Id*. at 12). That determination, however, applied only to the

showing of irreparable harm for purposes of the preliminary injunction. Accordingly, the Court now considers whether Plaintiffs have shown an injury in fact for purposes of the standing inquiry.

To satisfy the first prong of the injury analysis, Plaintiffs must intend to engage in "a course of conduct arguably affected with a constitutional interest." *Welty* 2026 WL 2874671, at *5. "Conduct is arguably affected with a constitutional interest, for purposes of standing, when the Constitution arguably invalidates a statute that proscribes that conduct." *Ream v. United States Dep't of the Treasury*, 174 F.4th 480, 485 (6th Cir. 2026). Here, Plaintiffs' constitutional interest is in engaging in conduct proscribed by the statute that they contend is preempted by federal law and unconstitutionally vague. Therefore, this requirement for standing is met.

The next step is to determine whether Plaintiffs intend to engage in a course of conduct that is "arguably … proscribed by [the] statute." *Welty*, 2026 WL 2874671, at *6 (citing *Susan B. Anthony List*, 573 U.S. 149, 159 (2014)). The Sixth Circuit has instructed that "courts should not wade too far, or too precisely, into the merits of what a statute means when evaluating standing in pre-enforcement suits: 'at the pre-enforcement stage, [the plaintiff] need not prove conclusively that its intended course of conduct violates the [statute] but only that it is *arguably* proscribed by the statute." *Id*. (citing *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024)). Accordingly, the Court must examine the statute to figure out what it proscribes, which requires some preliminary construction of the challenged statute. *Id.*

Under Tennessee law, statutory text "shall be given [its] natural and ordinary meaning, without forced or subtle construction that would limit or extend the meaning." Tenn. Code Ann. § 1-3-105(b); *see also*, *State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022) (courts "determine what a statute means" based on "how a reasonable reader … would have understood the text").

As stated above, the ASA imposes criminal consequences on one who:

> [F]or the purpose of commercial advantage or private financial gain:
>
> [] Intentionally conceals, harbors, or shields from detection, or intentionally encourages or induces another to conceal, harbor, or shield from detection, an individual that the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security.

Tenn. Code Ann. § 39-17-118. And the ASA defines "harbor" as "to provide shelter to or conceal the whereabouts of an individual whom the person knows has illegally entered or remained in the United States, as determined by the bureau of immigration and customs enforcement of the United States department of homeland security." *Id.*

Plaintiffs argue that the ASA arguably proscribes knowingly providing shelter to an individual that the person knows has illegally entered or illegally remained in the United States when they receive financial remuneration either as rent or donations in exchange for or in support of providing shelter to such persons. The Synod's members provide food, services, and shelter to undocumented persons and accept payment or donations for those services. Mr. Causey leases property to persons who may be undocumented. Mr. Doe's son-in-law, who entered the country illegally and is seeking asylum, lives with him and contributes to rent and family expenses. Plaintiffs contend that this conduct is arguably proscribed by the ASA.

Defendants disagree. They insist that the ASA requires a narrower construction and that, applying that narrow reading, none of the conduct Plaintiffs describe violates the ASA. Defendants assert the ASA requires: (1) not just financial remuneration, but a *for-profit purpose*; (2) not just shelter, but *intent to conceal*; and (3) not just knowledge of undocumented status, but *knowledge of an ICE determination* that the person has illegally entered or remained in the United States. Defendants argue Plaintiffs each lack at least one of these elements and cannot show that they intend to engage in conduct that the challenged statute proscribes.

As stated in the Memorandum and Order denying Plaintiffs' motion for preliminary injunction, the Court has serious misgivings that the Defendants' interpretation is not supported by the statutory language, particularly with regard to the purported "intent to conceal" requirement and whether the statute requires knowledge of illegal status or knowledge of an ICE determination of illegal status. (*See* Doc. No. 82 at 10-12). But this is not a case where the conduct at issue is "clearly prohibited." *See Kareem v. Cuyahoga Cty. Bd. of Elections*, 95 F.4th 1019, 1024 (6th Cir. 2024). Without delving too far into what the statute means, Plaintiffs' proposed construction is at least arguable. The Court will therefore assume, for purposes of this inquiry, that Plaintiffs intend to engage in conduct that is arguably proscribed by the statute.

Plaintiffs next must show that there is a credible threat that the statute will be enforced against them. *Welty*, 2026 WL 2874671, at *7 (citing *Susan B. Anthony List*, 573 U.S. at 159). The Sixth Circuit has held that plaintiffs may show a credible threat of prosecution where they allege a "subjective chill" and "some combination" of: (1) "a history of past enforcement"; (2) "enforcement warning letters sent to the plaintiffs"; (3) "an attribute of the challenged statute makes enforcement easier or more likely"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id*. (citing *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016)). These factors are not exhaustive, and a plaintiff need not satisfy all the *McKay* factors to establish a credible threat of prosecution. *Id*.; *see also*, *Kareem v. Cuyahoga Cty. Bd. of Elections*, 95 F.4th 1019 (6th Cir. 2024). "*McKay* is a broad, totality-of-the-circumstances inquiry that, '[a]t bottom, … distills to whether surrounding factual circumstances plausibly suggest a credible fear of enforcement.'" *Id*. at *8 (quoting *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 828, 848 (6th Cir. 2024)).

The first two factors – history of enforcement and warning letters sent to plaintiffs – are absent. Of course, this is unsurprising because Plaintiffs filed this lawsuit before the statute went into effect. *See Welty*, 2026 WL 2874671, at *8 (stating that "the absence of past prosecution is 'far from dispositive' on the issue of credible threat of enforcement 'where…the statute had only been in effect for a short while prior to the district court's preliminary-injunction decision and had only ever existed under the shadow of pre-enforcement litigation.'") (citing *NetChoice, LLC v. Skrmetti*, No. 25-5660, 2026 WL 2546423, at *9 (6th Cir. Aug. 28, 2026). Accordingly, these factors are afforded minimal weight.

The third factor is whether "an attribute of the challenged statute … makes enforcement easier or more likely." *Welty*, 2026 WL 2874671, at *8. The Sixth Circuit has stated that one relevant consideration is whether the statute contains a citizen enforcement provision. *Id.* (law allowed a speaker to be held liable for the "wrongful death of an unborn child who was aborted").

Defendants argue that the ASA is a standard criminal law with no attributes making enforcement easier or more likely. Unlike the statute at issue in *Welty*, the ASA does not have a civil enforcement mechanism. Plaintiffs argue enforcement is more likely because the statute is a new law that Governor Lee portrayed as a top legislative priority and there is no reason to assume it will not be enforced. Plaintiffs also argue that the law's breadth – which they contend covers providing shelter to someone who has entered or remained in the country unlawfully – provides significant discretion to prosecutors over enforcement and thereby makes enforcement more likely. Lastly, Plaintiffs argue that Tennessee's unique grand jury system, which allows any person with proof of an offense to testify, makes enforcement more likely because a district attorney general then has a constitutional and statutory duty to prosecute the offense. (Doc. No. 79 at 12) (citing Tenn. Code Ann. §§ 40-12-104, 40-12-105)).

Of course, Plaintiffs' last argument applies to *every* criminal statute and is not a basis for concluding that this offense is more likely to be prosecuted. The Court does not discern anything about the law itself that makes enforcement easier or more likely.

The final factor is "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* at *7. Defendants argue that they were not afforded the opportunity to disavow prosecution before the case was filed, but that throughout this litigation they have maintained that the ASA does not apply to Plaintiffs' conduct and will not be enforced against them. They further argue that their refusal to enter into an agreed preliminary injunction is not relevant to this inquiry because standing is determined when the lawsuit is filed. Defendants do not claim that they have disavowed prosecution outside the context of litigation. *See id.* at *9 (stating that the government's disavowal of enforcement must be more than a "mere litigation position") (citing *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025). The disavowal factor weighs in favor of Plaintiffs.

The Court also considers that other "surrounding factual circumstances [may] show that a fear of prosecution is plausible." *Welty*, 2026 2874671, at *9 (citing *Universal Life Church Monastery Storehouse (ULCM) v. Nabors*, 35 F.4th 1021, 1034-35 (6th Cir. 2022)). The Sixth Circuit has discussed some of these circumstances in recent cases. For example, in *ULCM*, enforcement against the ULCM plaintiffs was more likely because the challenged statute was enacted by the legislature specifically "to target plaintiffs." *ULCM*, 35 F.4th at 1035. In *Welty*, enforcement against the plaintiff was more likely because, although the State took the position in litigation that the plaintiff's conduct did not violate the statute, the sponsor of the bill had stated during legislative debate that the plaintiff's conduct was exactly the sort of conduct prohibited by the bill. *Welty*, 2026 WL 2874671, at *9. In *NetChoice*, the Attorney General affirmatively took

the position that the plaintiff's members were not in compliance with the law and refused to stay enforcement of the law pending the court's preliminary injunction decision. 2026 WL 2546423, at *9. In *Ream v. United States Department of the Treasury*, the court found enforcement sufficiently likely based on a "triple threat of felony punishment": the statute's express prohibition on producing distilled spirits at home, the government's "conspicuous" refusal to disavow enforcement even in the context of the litigation, and a statement on the Department of Treasury's Alcohol and Tobacco Tax and Trade Bureau website warning of the penalties for violating the statute (5 years in prison, and up to a $10,000 fine). 174 F.4th 480, 485-86 (6th Cir. 2026).

Only one of the factors named in *McKay* is present here, and Plaintiffs do not identify any circumstances similar to those in the foregoing cases – or otherwise – that suggest that they are likely to be prosecuted under the ASA for the conduct they have described. Standing alone, this single *McKay* factor is insufficient to demonstrate a credible threat of enforcement. Thus, on this record, the Court concludes that Plaintiffs have not established standing to challenge the ASA.

## IV. CONCLUSION

For the reasons stated herein, the Court concludes that it does not have subject matter jurisdiction. Accordingly, Defendants' Motion to Dismiss (Doc. No. 63) will be **GRANTED** and this case **DISMISSED WITHOUT PREJUDICE**.

An appropriate Order will enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE